# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| GEORGE A. BROOKS, et al.. | ) | Case No. 8:06-cv-01024-AW |
| | ) | |
| Plaintiffs, | ) | **REPLY MEMORANDUM IN SUPPORT OF** |
| vs. | ) | **DEFENDANTS' MOTION TO DISMISS** |
| | ) | **FOR LACK OF PERSONAL** |
| MOTSENBOCKER ADVANCED | ) | **JURISDICTION, OR IN THE** |
| DEVELOPMENTS, INC., et al., | ) | **ALTERNATIVE, TO TRANSFER THE** |
| | ) | **CASE AND STAY DISCOVERY** |
| Defendants. | ) | |
| | ) | Judge Alexander Williams |
| | ) | Greenbelt Division |

Defendants Motsenbocker Advanced Developments, Inc., Gregg A. Motsenbocker, and Skip A.

Motsenbocker (collectively "Defendants") hereby submit this reply to the Plaintiff's opposition to the

Defendants' motion for an order dismissing the action for lack of both personal and subject matter

jurisdiction, pursuant to Fed. R. Civ. P. 12(b)(2) and 12(b)(1); or, alternatively, for an order transferring

this case to the Southern District of California, pursuant to 28 U.S.C. 1404, and staying discovery.

## I.     INTRODUCTION

Plaintiffs are sadly misinformed concerning the amount of sales of the two products they identify

as the subject of their suit, "Brass Wash" and "Finish Coat," which cannot qualify for the $75,000

amount in controversy requirement for diversity jurisdiction over this dispute.  In fact, Defendants'

entire nationwide sales of the subject products are only $36,000, since the inception of the products,

Supp. Motsenbocker Decl. ¶ 5, of which Plaintiffs erroneously seek to wrest a $3600 commission. More

importantly, Plaintiffs have failed to meet their burden to prove by a preponderance of admissible

evidence (based upon personal knowledge and not sheer speculation) that any of these sales were in Maryland.

Moreover, Plaintiffs repeatedly misrepresent that they "developed" what they define as the subject of their suit, even though they admit in their complaint that "the Product sold as a stripper," Comp. ¶ 15, and "marketed" as "Brass Wash," Comp. ¶ 16, was patented by the inventor, Gregg Motsenbocker, Comp. ¶ 9, nearly five years before he met Mr. Brooks, and was then licensed to Motsenbocker Advanced Developments, Inc. Supp. Motsenbocker Decl. ¶ 1; Ex. A (Patent Numbers 5,415,800 and 5,484,487). Moreover, Plaintiffs admit that the Defendants returned to the original patented formula, Comp. ¶ 17, under Patent Numbers 5,415,800 and 5,484,487, without any modifications supplied by Plaintiffs.

Furthermore, Plaintiffs provide no admissible evidence of any foundational facts for the court to believe that an individual self-described painter and warehouseman could ever have been promised a commission on sales of the identified products when the multi-billion dollar, multi-national Ecolab was required to pay $250,000, up-front, for an exclusive license to distribute the Defendants' patented products as a wholesaler, which license was terminated after Ecolab's breach of the contract in 1999. Supp. Motsenbocker Decl. ¶ 2; Ex. B (Ecolab Distributorship/License Agreement) ¶ 4.1.

## II.    PLAINTIFFS STILL CANNOT MEET THEIR BURDEN TO ESTABLISH THE COURT'S JURISDICTION BY A PREPONDERANCE OF ADMISSIBLE EVIDENCE

Plaintiffs still cannot meet their burden to prove by a preponderance of admissible evidence that the court has jurisdiction over the claims raised in their complaint. Mylan Labs., Inc. v. Akzo, N.V., 2

F.3d 56, 59-60 (4th Cir. 1993).  The Plaintiffs continue to fail to "present *plausible* evidence tending to show that the court has jurisdiction." Chalwest, Ltd. v. Ellis, 924 F.2d 1011, 1014 (11th Cir. 1991).

Contrary to Plaintiffs' allegations, once they have submitted evidence by way of declaration, as they have here, disputing Defendants' declaration that they have no sales representative agreement with the Plaintiffs, Plaintiffs are no longer entitled to an assumption of their credibility, or to a presumption that the allegations of their pleadings are true. They must then meet their burden "of alleging and proving the existence of a factual basis for the exercise of in personam jurisdiction, once it has been placed in controversy," as Plaintiffs concede in their citation of United Merchants and Manuf. Inc. v. David & Dash, Inc., 439 F. Supp. 1078, 1081 (D. Md. 1977), citing McNutt v. General Motors Accpetance Corp., 298 U.S. 178, 189 (1936).

When the Plaintiffs' proffered evidence concerning jurisdiction is "conflicting and the record is rife with contradictions," as here, Boit v. Gar-Tec Products, Inc., 967 F.2d 671, 676 (1st Cir. 1992); *see* General Contracting & Trading Co. v. Interpole, Inc., 899 F.2d 109, 115 (1st Cir. 1990), "or when a plaintiff's affidavits are 'patently incredible,'" Landmark Bank v. Machera, 736 F.Supp. 375, 380 n. 7 (D. Mass. 1990), the court will determine the Defendants' motion to dismiss as an evidentiary hearing. Marshall Exports Inc. v. Phillips, 507 F.2d 47, 49 (4th Cir. 1974). The court will then "consider[] all relevant evidence proffered by the parties and mak[e] all factual findings essential to disposition of the motion. When a court 'hear[s] and determine[s]' a motion to dismiss in this way, the 'hearing' is, at least implicitly, if not explicitly, 'evidentiary' in nature." Boit, 967 F.2d at 676. As stated in Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 203 (1st Cir. 1994), "the court need not credit conclusory allegations."

Not all "evidentiary hearings," however, involve evidence "taken orally in open court" as that phrase is used in Fed. R. Civ. P. 43(a).  Under its own explicit terms, Rule 43(a) applies "[i]n all trials," but not in pretrial proceedings. Boit, 967 F.2d at 676.  "After the parties have proffered their evidence, the court may weigh evidence and make findings about whether plaintiff has made a showing as to each jurisdictional fact," Id., and when doing so the court will apply the preponderance of the evidence standard. Boit, 676-77; Dakota Industries, Inc. v. Dakota Sportswear, Inc., 946 F.2d 1384, 1389 (8th Cir. 1991); Data Disc, Inc. v. Systems Tech. Assoc., Inc., 557 F.2d 1280, 1285 (9th Cir. 1997).

For example, where the jurisdictional question was decided upon briefs supported by affidavits and certain other discovery materials, as here, such questions are determined in the same manner as summary judgment issues. Weller v. Cromwell Oil Co., 504 F.2d 927, 929-30 (6th Cir. 1974). The court was required to review the record for facts supporting the initial showing of jurisdiction in order to satisfy itself that the evidence in the record raises no genuine issue as to the existence of jurisdiction. See Smith v. Hudson 600 F.2d 60, 63-65 (6th Cir.), cert. dismissed, 444 U.S. 986 (1979).

Even if the Plaintiff had not submitted conflicting and contradictory evidence concerning jurisdiction, thereby requiring the court to determine whether the Plaintiffs have met their burden to demonstrate personal jurisdiction by a preponderance of the evidence, their pleadings do not meet the prima facie standard for deciding a motion to dismiss.  Such a prima facie showing of personal jurisdiction must still be based on evidence of each specific jurisdictional fact set forth in the record. Kowalski v. Doherty, Wallace, Pillsbury & Murphy, 787 F.2d 7, 9 (1st Cir. 1986). The "plaintiff must go beyond the pleadings and make affirmative proof." Chlebda v. H.E. Fortna & Bro. Inc., 609 F.2d 1022, 1024 (1st Cir. 1979).  It "is an elementary mistake" to take the allegations in the complaint "as proven for

-4-

purposes of resolving the issue of personal jurisdiction" *Id.*; *see also* <u>Serras v. First Tennessee Bank Nat'l Ass'n</u>, 875 F.2d 1212, 1214 (6th Cir. 1989) (noting that plaintiffs may not rest on their pleadings to make the *prima facie* showing). As noted recently in <u>Harlan v. Agenjca Wydawniczo-Reklamowa "Wprost" Sp. Zo.o</u>, No. Civ.A. 705-2605HFF, 2006 WL 360023 (D.S.C. Feb. 15, 2006):

> It is not isolated, random, or fortuitous-or even foreseeable-contact with [the forum state] which is required. Rather, it is the intentional targeting of [the forum state] residents which Plaintiffs must demonstrate. Having failed to do so, Plaintiffs have failed to meet their burden of making a *prima facie* showing that personal jurisdiction is proper.

<u>Id</u>. at *4.

Plaintiffs do not deny that Defendants have no physical presence in Maryland. Defendants have no offices, no telephone listing, and no employees in Maryland. There is no credible, nor admissible, evidence that the Defendants had any agent in Maryland. Agency cannot be proved by the extra-judicial declarations of the agent or sub-agent. <u>Marshall Exports, Inc. v. C.A. Phillips</u>, 385 F.Supp. 1250, 1252 (E.D.N.C.), *aff'd* 507 F.2d 47 (4th Cir. 1974). Moreover, the Plaintiffs admit that the distributorship agreement between the Defendants and Minnesota based Ecolab (and therefore the alleged agency) terminated in 1999, more than six years before they attempted to serve the complaint in this proceeding, and thus cannot serve to establish personal jurisdiction over the Defendants in Maryland. *See* <u>Bosdorf v. The Vessel Miramar</u>, No. CIV. 1:98CV00441, 1999 WL 1939261 (M.D.N.C. Feb. 2, 1999), at *3.

Finally, even if Ecolab, The Home Depot, Ace Hardware, Dutch Guard, or any of the dealers listed on Plaintiffs' Exhibit C were actually Maryland entities (as opposed to individual stores within national chains), and even if they had license agreements to distribute Defendants' products, which Plaintiffs have not established, Plaintiffs have still failed to prove that any of the Maryland stores bought

-5-

any of the Defendants' products. As with most nationwide distribution channels, the Defendants' internet listing of retail and commercial dealers was obtained from the national chain stores, who buy the products from their national headquarters for shipment to their regional centers, none of which are located in Maryland. Supp. Motsenbocker Decl. ¶ 3. There is no admissible evidence before the court that any of the local Maryland stores of these national chains (as opposed to the national or regional offices of these chains) ever bought any of what the Plaintiffs identify as the subject products.

Moreover, even though Plaintiffs claim that they found a few bottles of Defendants' products in Maryland stores of these national chains, Plaintiffs have failed to prove that Defendants had any knowledge of where their products would subsequently be distributed by these non-forum national and regional distributors, and thus, at most, all that Plaintiff has established is that Defendants placed its products in a national stream of commerce, where a *de minimus* amount of those products reached consumers in Maryland. Asahi Metal Indus. Co. v. Sup. Ct., 480 U.S. 102, 112 (1987). A license agreement with an out of state distributor, who may in turn sell the products in question into the forum state, does not rise to the level of minimum contacts, since the supplier does not have knowledge as to where the products would subsequently be sold. See Nutra Manuf. Inc. v. Pharmline, Inc., No. Civ.A. 6:05-431-HFF, 2005 WL 2837519 (D.S.C. Oct.27, 2005), at *2; Harlan, 2006 WL 360023, at *4; Asahi, 480 U.S. at 112 ("[P]lacement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum state."). Here, Plaintiff has failed to prove by a preponderance of admissible evidence that Defendants engaged in any conduct by which they purposefully availed themselves of Maryland's markets.

Defendants adamantly maintain they have never had a sales representative agreement with

Plaintiffs, and have had no agreement with Mr. Brooks, other than for his employment as a

warehouseman for Motsenbocker's in San Diego, California.  Motsenbocker Decl. ¶ 9.  Moreover,

Defendants categorically deny that they have ever met with either Plaintiff in Maryland.  Motsenbocker

Decl. ¶ 8.  Defendants' sole contact with Maryland is a *de minimus* — less than ½ of 1% — portion of

their nationwide product sales, sold through a national stream of commerce distribution network.

Motsenbocker Decl. ¶ 11-12.

At best, Plaintiffs allege that in 1999 Motsenbocker Advanced Developments, Inc. entered into

an uncorroborated[1] oral modification of an allegedly 1998 written sales representative agreement

between Ecolab, Inc. and Plaintiffs, at a Marriott Hotel outside Baltimore, Maryland.  Significantly,

Plaintiffs have failed to produce a copy of the alleged written agreement that was to have been modified,

and therefore have run afoul of the best evidence rule.  See Fed. R. Evid. 1002-4.  When the disputed

transaction is the result of a writing central to the case and dispositive of the only disputed factual issue,

oral testimony *cannot* be substituted for the writing.  Railroad Management Co., L.L.C. v. CFS Louisiana

Midstream Co., 428 F.3d 214, 219 n. 2 (5th Cir. 2005). The proponent of the terms of a written

agreement must produce the alleged writing or explain the inability to do so, neither of which the

---

[1] Defendants object to the consideration of the hearsay declaration of Doug Earnest, since it is an out of court assertion as to purported statements by the parties offered for the truth of the matter asserted, and because it fails to demonstrate any personal knowledge as to whether Gregg Motsenbocker was ever in Maryland, and more specifically fails to provide any admissible evidence that there was any purported sales representative agreement with Mr. Brooks, let alone what the terms might have been.

Plaintiffs have done here. <u>Los Angeles News Service v. CBS Broadcasting, Inc.</u>, 305 F.3d 924, 935-936, (9th Cir. 2002), as amended 313 F.3d 1093; <u>Cartier v. Jackson</u>, 59 F.3d 1046, 1050 (10th Cir. 1995).

By failing to produce the alleged written contract, Plaintiff has also become subject to the 'adverse inference rule,' which applies where a party has failed to produce relevant evidence within his or her control, giving rise to an inference that the evidence was unfavorable. <u>International Union (UAW) v. NLRB</u>, 459 F.2d 1329, 1339 (D.C. Cir. 1972); <u>Interstate Circuit, Inc. v. United States</u>, 306 U.S. 208, 226, 59 S.Ct. 467, 474, (1939) ("The production of weak evidence when strong is available can lead only to the conclusion that the strong would have been adverse.").

Here, it is therefore more likely than not, given the adverse inference rule, that if there is a written agreement between Ecolab and Plaintiff, it did not make Plaintiff "the exclusive North American sales representative of the Product sold as a stripper," Comp. ¶ 15, and was not executed in Maryland, but in Minnesota, where the Plaintiff admits Ecolab is headquartered. Brooks Decl. ¶ 2. Therefore, the preponderance of admissible and credible evidence is that the Defendants did not orally agree to modify the purported, but unproduced, written sales representative agreement between Ecolab and the Plaintiff, and therefore the Plaintiffs have failed to show "specific" jurisdiction over the Defendants.

Moreover, the distributorship/license agreement between Minnesota based Ecolab and California based Motsenbocker Advanced Developments, Inc., was not executed in Maryland, nor governed by Maryland law, Ex. B ¶ 11.2, and required written consent by Motsenbocker Advanced Developments Inc. for any sub-license, Ex. B. ¶¶ 2.3.1, 2.3.3.1, 2.3.4, 4.8, 11.1, 11.11, and 11.13, which was never given for any alleged agreement between Ecolab and Plaintiffs. Supp. Motsenbocker Decl. ¶ 4. In any event, Plaintiffs admit that when the Defendants were served with the complaint in 2006, they no longer

had any agreement with Ecolab, which had been terminated by Motsenbocker's in 1999, Comp. ¶ 21, and thus have failed to establish any personal jurisdiction through a prior, but now terminated, distributorship agreement.

Most importantly, Plaintiffs fail to allege that there were any sales in Maryland of the subject matter of the alleged sales representative agreement, which they define as: "the Product sold as a stripper" Comp. ¶ 15, "marketed" as "Brass Wash," Comp. ¶ 16, and the "Finish Coat," Comp. ¶ 18. In fact, Defendants' entire nationwide sales of the subject of the Plaintiffs' alleged sales representative agreement, "the Product sold as a stripper," "marketed" as "Brass Wash," and "Finish Coat," have only been $36,000 since the inception of the Products, which is reflected in the Exhibit C spreadsheet from the Defendants' accounting software. Supp. Motsenbocker Decl. ¶ 5.

Hence, Plaintiffs have not, and cannot, establish either "specific" or "general" personal jurisdiction over any of the defendants; nor can Plaintiffs establish that this dispute involves more than $75,000, and therefore should be dismissed pursuant to both F.R.C.P. Rule 12(b)(1) and (2).

## III.   PLAINTIFFS HAVE FAILED TO ESTABLISH SPECIFIC JURISDICTION OVER ANY OF THE DEFENDANTS

Plaintiffs allege that their dubious, unproduced sales representative agreement with the Defendants allows the court to exercise "specific" jurisdiction over this alleged single contact with Maryland. Pls.' Mem. pp. 12-13. However, even Plaintiffs' citation of Du-Al Corp. v. Rudolph Beaver, Inc., 540 F.2d 1230, 1232 (4th Cir. 1976), concedes that the defendant had to have "perform[ed] in part in Maryland," beyond mere execution of the contract, for the court to lawfully exercise personal jurisdiction.

Here, on the contrary, Plaintiffs fail to establish by a preponderance of the evidence that any "purposeful acts were performed in Maryland" by the Defendants, beyond the alleged, but dubious, oral modification of the allegedly written, but unproduced, Ecolab agreement. Plaintiff fails to allege, let alone provide any evidence, that any of the Defendants ever made a single sale of what the Plaintiffs define as "the Product sold as a stripper," "marketed" "as Brass Wash," or "Final Coat," in Maryland. Contrary to Plaintiffs' unsupported assertion, the Defendants have never performed any act in Maryland in furtherance of the alleged sales representative agreement with the Plaintiffs. Gregg Motsenbocker's supplemental declaration establishes that only $36,000 of "the Product sold as a stripper," Comp. ¶ 15, "marketed" as "Brass Wash," Comp. ¶ 16, and the "Finish Coat," Comp. ¶ 18,  was actually sold anywhere in the nation, since the inception of the products.

As the United States Supreme Court has made clear, "[t]he unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State." Hanson v. Denckla, 357 U.S. 235, 253-54 (1958). Hence, the Plaintiffs' alleged unilateral activities, most of which were not even in Maryland,[2] are not allowed to confer this court's jurisdiction over the Defendants.  Similarly, as noted in greater detail below, telephone calls and mailed correspondence from the forum state will not confer jurisdiction over the Defendants. See Nicholas v. Buchanan, 806 F.2d 305, 307 (1st Cir. 1986); Scullin Steel Co. v. Nat'l Ry. Utilization Corp., 676 F.2d 309, 314 (8th Cir. 1982); Sher v. Johnson 911 F.2d 1357, 1362 (9th Cir. 1990).

---

[2] Note the Plaintiffs' far ranging attempts to sell "Brass Wash" and "Finish Coat" at trade shows and demonstrations in Des Moines, Iowa, Chicago, Illinois, New York City, Washington, D.C., New Orleans, Louisiana, San Diego and Los Angeles, California, Houston, Texas, and Florida, Comp. ¶¶ 35-47, where he claims to have spent $140,000 promoting the products. Brooks Decl. ¶ 8.

With regard to the individual Defendants, Plaintiffs concede that they have no evidence, let alone a preponderance of evidence, of any minimum contacts between Gregg Motsenbocker or Skip Motsenbocker and Maryland. At best they allege that Gregg Motsenbocker made one trip to Maryland. Even though the preponderance of the evidence weighs heavily in favor of Gregg Motsenbocker's declaration that he never met with Mr. Brooks in Maryland, even the Plaintiffs' disputed evidence of the purported meeting is insufficient to establish minimum contacts or purposeful availment of the privilege of conducting business in Maryland. As noted in Sher, "Johnson [who] represented Sher, a California resident, made phone calls and sent letters to California in the course of the representation and traveled to California on three occasions to service his client...Such contacts alone do not constitute purposeful availment of the privilege of conducting activities in California [the forum state]." 911 F.2d at 1366.

IV.    **PLAINTIFFS HAVE FAILED TO ESTABLISH GENERAL JURISDICTION OVER THE DEFENDANTS**

Plaintiffs have also failed to establish by a preponderance of the evidence that the court has "general" jurisdiction over the Defendants. First, Plaintiffs do not deny that the individual Defendants have no minimum or substantially continuous contacts with, nor any sales in, Maryland. Second, the Plaintiffs allege that Motsenbocker's Advanced Developments, Inc. "conducts a significant amount of business in this district," Comp. ¶ 8, but fail to allege, let alone prove, the amount they claim is significant.

In fact, Motsenbocker's Advanced Developments Inc. has only had sales of $21,192 for all of its products in Maryland during the last full year for which data is available, Supp. Motsenbocker Decl. ¶ 6 & Ex. D (spreadsheet from Defendants' accounting software), which is less than half of one percent of

-11-

its national sales of all of its products. Motsenbocker Decl. ¶ 11. Contrary to Plaintiffs' mis-citation, such *de minimus* purchases are simply not enough to establish general personal jurisdiction. "[M]ere purchases, even if occurring at regular intervals, are not enough to warrant a state's assertion of in personam jurisdiction over a nonresident corporation in a cause of action not related to those purchase transactions." Helicopteros Nacionales de Colmbia, S.A. v. Hall, 466 U.S. 408, 418 (1984). Merely fortuitous contacts do not provide a basis for general personal jurisdiction. See Mitrano v. Hawes, 377 F.3d 402, 407 (4th Cir. 2004), citing ESAB Group, Inc. v. Centricut, Inc., 126 F.3d 617, 625 (4th Cir. 1997) ("[A] defendant's actions must have been 'directed at the forum state in more than a random, fortuitous or attenuated way.'").

Similarly, alleged contacts by mail and telephone into the forum state are insufficient to establish personal jurisdiction. See Nicholas, 806 F.2d at 307; Scullin Steel, 676 F.2d at 314; Sher, 911 F.2d at 1362. As noted in Sher:

> These contacts, by themselves, do not establish purposeful availment; this is not the deliberate creation of a "substantial connection" with [the forum state]. [citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, nor is it promotion of business within [the forum state]. For one thing, the business that the partnership promoted was legal representation in Florida, not [the forum state]. Moreover, the partnership did not solicit [plaintiff] Sher's business in [the forum state]; Sher came to the firm in Florida. There is no "substantial connection" with [the forum state] because neither the partnership nor any of its partners undertook any affirmative action to promote business within [the forum state]...Even the three trips to [the forum state] were discrete events arising out of a case centered entirely in Florida; they appear to have been little more than a convenience to the client, who would otherwise have had to travel to Florida. We find these contacts too attenuated to create a "substantial connection" with [the forum state].

Id.

Plaintiffs' are simply incorrect in suggesting that <u>United Merchants and Manuf. Inc. v. David &</u>

<u>Dash, Inc.</u>, 439 F.Supp. 1078, 1081 (D. Md. 1977), holds that one half of one percent of national sales in

the forum state is a sufficient minimum contact to permit the court to exercise personal jurisdiction over

an out of state corporation.  That is not the holding in <u>United Merchants</u>, which found, on the contrary,

that there is no talismanic formula for personal jurisdiction, holding that "the dollar value of the sales, of

course, is not to be viewed in the abstract: but in the light of all circumstances." <u>Id</u>. at 1084.

In fact, <u>United Merchants</u> merely held that where the defendant regularly solicited business with

Maryland entities, including a merchandising relationship with Maryland's Rian Taggert, and where the

Plaintiff, Savoir Faire, had transacted more substantial business in the past with the defendant —

$30,000 worth of infringing copyrighted drapery, created and manufactured specifically for shipment

into Maryland, with knowledge that they would be used at the Sheraton-Fontainbleau — the defendant

had purposefully availed itself of the forum, allowing the court to establish specific jurisdiction over the

drapery transaction.

The Fourth Circuit, on the other hand, held in <u>Erlanger Mills, Inc. v. Cohoes Fibre Mills, Inc.</u>,

239 F.2d 502 (4th Cir. 1956), cited by the court in <u>United Merchants</u>, that $17,000 in defective synthetic

yarn was insufficient to establish personal jurisdiction over the defendant, where the New York

manufacturer, as with the Defendants here, had no offices, employees or agents in the forum state, made

one sale, and only one trip into the forum state to discuss the plaintiff's complaint.

Finally, Plaintiffs' citation of <u>Choice Hotels Int'l, Inc. v. Madison Three, Inc.</u>, 23 F.Supp.2d 617

(D. Md. 1998), is inapposite, and actually supports transfer of this action to California, if it is not

-13-

dismissed for failure to meet the jurisdictional amount in dispute for diversity cases. There, as in <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462 (1985), the Defendants traveled to the franchisor's forum state to obtain the license/franchise agreements, and since the Defendant had initiated the contacts in the forum states, the courts had no trouble finding personal jurisdiction over the Defendants.

Here, the Plaintiffs initiated contact and sought out the Defendants in California, both admittedly telephoning and traveling to California to discuss using the Defendants' products to strip brass finishes in commercial buildings. Brooks Decl. ¶¶ 2, 3, 7; Motsenbocker Decl. ¶ 7. Plaintiffs have failed to prove that any of the subsequent sales, on which the Plaintiffs claim a commission, and define as "the Product sold as a stripper," "marketed" "as Brass Wash," and "Finish Coat," were made in Maryland. As Plaintiffs concede, "the strongest factor is whether the defendant initiated the business relationship in some way." Pls.' Mem. p. 19, citing <u>Giannaris v. Cheng</u>, 219 F.Supp. 2d 687, 692 (D. Md. 2002).

For these reasons, Plaintiffs continue to fail to establish by a preponderance of the evidence general jurisdiction over any of the Defendants.

## V.    PLAINTIFFS STILL CANNOT MEET THEIR BURDEN OF PROOF TO DEMONSTRATE THAT THE AMOUNT IN CONTROVERSY IS MORE THAN $75,000

Contrary to Plaintiffs' erroneous assertion, they do not claim that they have been damaged in an amount certain, merely pleading instead that they have been "damaged" in "the specific amount to be proved at trial." Comp. ¶¶ 66, 69, 73, 80, 86, 90, 98, 107, and 117. Moreover, though Plaintiffs demand the sum of $1,000,000 in most of their causes of action, they concede that this demand is based upon their claim of a 10% commission, Comp. ¶ 22, on the sales of "the Product sold as a stripper" Comp. ¶ 15, "marketed" as "Brass Wash," Comp. ¶ 16, and the "Finish Coat," Comp. ¶ 18. They further

-14-

contradict their demand, by alleging that the total amount of national sales of the identified products is only $50,000, Comp. ¶¶ 19 and 58, mathematically precluding their ability to prove damages in the amount of their demand, since a 10% commission of $50,000 in national sales is only $5,000.

Mr. Brooks' declaration that he purportedly "know[s] that substantial quantities of the Product are being sold and that my commissions on Home Depot sales alone will amount to easily a million dollars," Brooks Decl. ¶ 10, is without personal knowledge, and therefore inadmissible, Fed. R. Evid. 602, is uncorroborated by any supporting foundational facts, and is no more than sheer wishful, but unsupported, speculation.

Moreover, the preponderance of admissible evidence before the court establishes that the Defendants' total nationwide sales, on which the Plaintiffs claim a commission, and define as "the Product sold as a stripper" Comp. ¶ 15, "marketed" as "Brass Wash," Comp. ¶ 16, and the "Finish Coat," Comp. ¶ 18, have only been $36,000 since the inception of the products.  Supp. Motsenbocker Decl. ¶ 5.

Hence, by Plaintiffs' own admission, Comp.¶¶ 19, 58, the matter in controversy here is only 10% of $50,000, or $5,000, and based upon Defendants' actual sales records is only 10% of $36,000, or $3,600.  Thus, Defendants have more than met their burden to demonstrate that the amount in controversy is far less than $75,000 by "competent proof." Moore's Manual: Federal Practice and Procedure § 5.72 (2005). For this independent reason, Defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) should be granted with prejudice, since the case does not qualify to be transferred.

**VI.   SHOULD THE COURT DETERMINE THAT THE PLAINTIFFS HAVE MET
THEIR JURISDICTIONAL BURDEN OF PROOF, DEFENDANTS REMAIN
ENTITLED TO HAVE THIS CASE TRANSFERRED TO THE U.S. DISTRICT
COURT FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

Plaintiffs do not deny that should they somehow meet their burden of proof to demonstrate that

the matter in controversy exceeds $75,000, the court has ample authority to transfer this case to the U.S.

District Court for the Southern District of California, should the court conclude that the admissible

evidence demonstrates that the predominate facts arise, and the majority of witnesses and documents

concerning the alleged dispute are located, in California, pursuant to either 28 U.S.C. 1404(a) or

1406(a). SongByrd, Inc. v. Estate of Grossman, 206 F.3d 172, 179 & n.9 (2nd Cir. 2000).

Nowhere in Mr. Brooks' declaration does he evidence any acts by the Defendants to perform the

alleged sales representative agreement in Maryland, other than the alleged, but uncorroborated, meeting

with Gregg Motsenbocker. Similarly, though he lists 14 witnesses as having "locations" in Maryland, he

provides no admissible evidence that he has any personal knowledge of their purported testimony or

their addresses.

On the other hand, Defendants have indicated that their contacts with Mr. Brooks were either on

the telephone from California, or in person in California, when he worked for the company as a

warehouseman. As indicated in Motsenbocker's declaration, the company is headquartered in San

Diego, and maintains its books and records in San Diego, California. Decl. ¶¶ 1-4. The only witnesses

and evidence of which the Defendants are aware concerning the purported sales, on which the Plaintiffs

claim a commission, and define as "the Product sold as a stripper" Comp. ¶ 15, "marketed" as "Brass

-16-

Wash," Comp. ¶ 16, and the "Finish Coat," Comp. ¶ 18, are in San Diego, California.  Supp.

Motsenbocker Decl. ¶ 7.

Finally, contrary to the Plaintiffs' misrepresentation as to which party has the more limited

means, the only admissible evidence before the court indicates that the Defendants' gross sales of the

products on which the Plaintiffs claim a commission, and define as "the Product sold as a stripper"

Comp. ¶ 15, "marketed" as "Brass Wash," Comp. ¶ 16, and the "Finish Coat," Comp. ¶ 18, is only

$36,000, and that Mr. Brooks has spent almost four times that amount in selling those products

nationwide. See footnote 2 above.  Hence, the preponderance of the evidence demonstrates that the

Plaintiffs may well have more means than the Defendants, and certainly have equal means as the

Defendants, with which to litigate their claims in California, should the court find that they have

somehow met their burden to establish that their dubiously claimed commissions are in excess of

$75,000.

## VII.    CONCLUSION

For all of the foregoing reasons, Defendants "could not have 'reasonably anticipated being haled

into [a Maryland] court.'"  Young v. New Haven Advocate, 315 F.3d 256, 264 (4th Cir. 2002) (quoting

Calder v. Jones, 465 U.S. 783, 790 (1984)).  In sum, given the de minimus contacts between Defendants

and Maryland, to require them to defend their interests in this court would "offend traditional notions of

fair play and substantial justice." Int'l Shoe Co. v. Washington, 326 U.S. at 316 (1945).  Thus, the

plaintiffs cannot meet their burden of proof to demonstrate by a preponderance of the evidence that this

court has jurisdiction over this dispute.

-17-

Therefore, this court should dismiss this action for lack of both personal and subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(2); or, in the alternative, transfer this case to the Federal District Court for the Southern District of California, pursuant to 28 U.S.C. 1404, and stay discovery and disclosures pursuant to Fed. R. Civ. P. 26 until this motion is finally determined.


Dated: July 20, 2006                    By:    _____/s/_____

                                               Aaron J. Snow, Bar No. 27814
                                               Attorneys for Defendants
                                               Boies, Schiller & Flexner LLP
                                               5301 Wisconsin Ave., N.W., Ste. 800
                                               Washington, D.C. 20015
                                               Tel: 202-237-2727
                                               Fax: 202-237-6131
                                               asnow@bsfllp.com

                                               Patrick D. Webb
                                               Attorneys for Defendants
                                               Webb & Carey
                                               401 B Street, Ste. 306
                                               San Diego, CA 92101
                                               Tel: 619-236-1650
                                               Fax: 619-236-1283
                                               pwebb@webbcarey.com


Exhibits:
A. Patents 5415800 and 5484487
B. Ecolab Distributorship/License Agreement
C. Inventory Sales History Report-Brass Wash and Finish Coat
D. Customer Sales Analysis-All Products-All Maryland Zip Codes

Enclosed:
1. Supplemental Declaration of Gregg Motsenbocker, July 18, 2006


-18-

# EXHIBIT A



| United States Patent | 5,415,800 |
|---|---|
| Motsenbocker | May 16, 1995 |

## Cleanser for releasing adherent deposits from surfaces

### Abstract

A cleanser for releasing adherent deposits from a surface consisting essentially of ethylene glycol n-butyl ether, acetone, dibasic ester, and optionally water in specified proportions. Also disclosed is a method of releasing adherent deposits from a surface by applying the aforementioned composition to the deposits.

Inventors: **Motsenbocker; Gregg** (Lake Arrowhead, CA)
[*] Notice: The portion of the term of this patent subsequent to July 13, 2010 has been disclaimed.
Appl. No.: **074887**
Filed:       **June 9, 1993**

| | |
|---|---|
| **Current U.S. Class:** | 510/201 ; 134/38; 134/40; 510/174; 510/200; 510/202; 510/203; 510/206; 510/407; 510/505 |
| **Field of Search:** | 252/162,170,171,173,174.19,174.21,DIG.8,143 134/38,40 |

### References Cited [Referenced By]

#### U.S. Patent Documents

| | | |
|---|---|---|
| 3607760 | September 1971 | McIntyre |
| 4309300 | January 1982 | Danforth et al. |
| 4465612 | August 1984 | Alten Schopfler |
| 4780235 | October 1988 | Jackson |
| 4792354 | December 1988 | Matsuo et al. |
| 4927556 | May 1990 | Pokorny |
| 4934391 | June 1990 | Futch et al. |
| 5084200 | January 1992 | Dishart et al. |

| 5089164 | February 1992 | Stanley |
| 5124062 | June 1992 | Stevens |
| 5183514 | February 1993 | Marquis et al. |
| 5227085 | July 1993 | Motsenbocker |
| 5250211 | October 1993 | Motsenbocker |

**Foreign Patent Documents**

| 4034765 | May., 1992 | DE |

*Primary Examiner:* Skaling; Linda
*Attorney, Agent or Firm:* Mon; Donald D.

## Claims

I claim:

1. A environmentally safe cleanser for releasing adherent deposits from surfaces, said cleanser consisting essentially of the following components, whose percentages are expressed relative to the total weight of these components without including other materials that might be included in minor amounts which do not interfere with the intended action of the cleanser;

Ethylene Glycol n-Butyl Ether (Glycol EB), between about 5.0% and about 40.0%;

Acetone, between about 5.0% and about 40.0%

Dibasic ester selected from the group consisting of dimethyl adipate, dimethyl glutarate and dimethyl succinate, and mixtures of any two or more of them, between about 5.0% and about 40.0%;

and optionally water to make 100%

2. A cleanser according to claim 1 in which a minor amount of acetic acid, or phosphoric acid, or a thickener, or any two or more of them, is substituted for an equal amount of said composition.

3. A cleanser for releasing adherent deposits from surfaces, said cleanser consisting essentially of the following components, whose percentages are expressed relative to the total weight of these components without including other materials that might be included in minor amounts that do not interfere with the intended action of the cleanser:

Ethylene Glycol n-Butyl Ester (Glycol EB), about 15.0%

Acetone, about 14.0%

Dibasic ester selected from the group consisting of dimethyl adipate, dimethyl glutarate and dimethyl succinate, or a mixture of two or more of them, about 16.0%;

water to make 100% (about 55).

4. A cleanser according to claim 3 in which a minor amount of acetic acid, or phosphoric acid, or a thickener, or any two or more of them, is substituted for an equal amount of said composition.

5. A cleanser for releasing adherent deposits from surfaces, said cleanser consisting essentially of the following components, whose percentages are expressed relative to the total weight of these components without including other materials that might be included in minor amounts which do not interfere with the intended action of the cleanser:

Ethylene Glycol n-Butyl Ether (Glycol EB), about 33.3%;

Acetone - about 31.20%;

Dibasic ester selected from the group consisting of dimethyl adipate, dimethyl glutarate and dimethyl succinate and mixtures of any two or more of them, about 35.5%.

6. A cleanser according to claim 5 in which a minor amount of acetic acid, or phosphoric acid, or a thickener, or any two or more of them, is substituted for an equal amount of said composition.

---

## Description

---

SPECIFICATION

1. Field of the Invention

A biodegradable cleanser which can be extended with water for releasing adherent deposits from porous, non-porous, soft, and delicate surfaces.

2. Background of the Invention

Removal of paints and paint-like deposits is an old and well-developed art. Generally the objective is to soften the deposit, usually by at least partially dissolving it so that it can be scraped away. The intended effect is usually that of dissolving the material so it becomes fluid. The result is generally a softening of the deposit accompanied by some liquids. The difficulty of pursuing this softened material into cracks and structural intersections is well-known. One response to this problem is to dip the object into a tank of stripper and let it dissolve away.

Not only are these techniques very troublesome, but disposition of the stripper and of its contents is becoming more of an environmental problem. Generally, these strippers use strong organic solvents which, in addition to their disposal problems, constitute a potential health hazard to the user, to the environment, and to the substrate structure.

Despite these inherent problems, because they represent the best materials available, these materials are regularly used on durable, non-porous surfaces that can be regarded as "hard". Examples are the stripping of wood, and the cleansing of metal and enamel surfaces, subject to other problems discussed below.

However, they are not suitable for porous materials such as concrete, concrete block, stucco, cinderblock, rocks and stone, bricks and trees. This is because the dissolved and softened material tends to enter the porous surface, from which it can be removed only partially and then only with great difficulty, and usually with damage to the surface. When the material flows into the pores, later attempts to flush it out can be expected to drive at least some of it deeper. Attempts are sometimes made to

overcome this problem by attacking the surface with a strong water jet, often with sandblast grits in it, or by sandblasting. This leaves modified areas which frequently have faint patterns of what was removed.

Soft surfaces, such as vinyls cannot withstand the action of these strippers, or of sandblasts. Neither can many delicate surfaces, for example plexiglass, where the plexiglass will be rendered translucent, rather that transparent.

Further, especially on large exposed areas such as retaining walls and highway signs, if this dissolved material is flushed from the surface, nearby areas will be contaminated by it. As a consequence, organizations such as the California Department of Transportation and many municipal entities simply cover graffiti with a patch of paint, leaving the deposits in place. A trip along many streets and freeways will disclose those patches, whose only merit is that they are less objectionable than what they cover.

Further, even as to enamelled highway signs, where there is no penetration into the sign itself, the action of strippers is slow. While their action could be accelerated by the use of hot water, hot solvents, steam, and sandblasting, highway crews cannot carry along with them such equipment, which often must reach to very inconvenient places. Again, the run-off is itself objectionable, especially after the solvents evaporate.

In an attempt to frustrate graffiti artists, it has become common practice to place a rather expensive layer of plastic material such as 3M 1150 on enamel signs or to impregnate the signs with laminate at the time of manufacture. Unfortunately these respond poorly to solvents applied hot, such as MEK and Kerosene, and even the new citrus-based solvents. Generally these tend to attack the laminations, often delaminating them, resulting in cracking and migration through the plastic to the sign surface. The inherent problem in solvents such as these is that their primary intended effect is to dissolve the adherent material. When quick dissolving of such deposits is intended, it is not surprising that at least some damage will be done to the substrates because of these "hot" solvents.

What is needed, and what this invention provides, is a biodegradable cleanser, which can be extended with water, which works quickly and well at ambient temperatures, which primarily does not dissolve the substances being removed (although in some circumstances some solution may occur), whose effluent is principally a solid that is not itself objectionable, and which can be flushed away with water or wiped up with a cloth, or gathered with a squeegee. For large areas, removal by small volumes of high pressure Jets of water will be preferred. All of these methods leave the surface cleansed of the deposit.

It is another object of this invention to provide a method for removing the subject deposits from surfaces, which method produces an effluent that often is agreeably left where it drains next to the surface which was cleansed. It does not itself become a disposal problem. In fact, often it can be swept up, raked up, or simply covered up with dirt. The composition is biodegradable.

It is still another object of this invention to provide a cleanser and a method in which the principal mechanism for removal of the deposit is interruption of its physical bond with the surface, followed primarily by removal of the material in a solid condition. Often it is particulate, but in other circumstances it may form a soft layer which can be gathered up as stated above.

Yet another object of this invention is to provide a more affordable cleanser, both in its inherent cost and in the elimination of damage to cleansed surfaces. Known stripper type compositions tend to use expensive organic solvents, sometimes for their own action, and sometimes as a carrier for other components. They themselves frequently damage the surface to be cleansed. No other carrier can be less expensive than water, which this cleanser can use. Furthermore this invention enables the use of a group

of components some of which, if used alone, could frustrate the intended action. For reasons which are presently not fully understood, the combination is more benign, resulting in little or no dissolving of the deposits. Used alone, these components vigorously attack and dissolve paints and paint-like deposits. The combination of ingredients provided by this invention attains the intended results with them, but cause no, or at most minimal, damage to the substrate.

The so-called "green"solvents in general do not work as well as the products of this invention, and are considerably more expensive. While using relatively inexpensive components, the formulations of this invention are safe for the user, safe for the environment, safe for the surface, are biodegradable, and when extended by a carrier, can use water and thereby be water-based.

BRIEF DESCRIPTION OF THE INVENTION

A cleanser according to this invention consists essentially of the following components:

Ethylene glycol n-Butyl Ether (Glycol EB)

Acetone

Dibasic ester (dimethyl adipate, dimethyl glutarate, dimethyl succinate, or a mixture of two or more of them)

Water, if desired.

Glacial acetic acid or phosphoric acid may be substituted for a minor amount of the above formulation for reasons to be disclosed. A thickener may be added to enable the cleanser to reside for a longer time on vertical or steep surfaces, such as street signs and walls. None of these additives when used in minor amounts adversely affects or materially changes the cleansing action of the cleanser as specified.

The invention will be fully understood from the following detailed description.

DETAILED DESCRIPTION OF THE INVENTION

A cleanser according to this invention consists essentially of the following components in the ranges defined, the percentages being in weight relative to the weight of the total formulation in all of the examples given herein:

Glycol EB (ethylene glycol n-butyl ether), between about 5.0 % to about 40.0%

Acetone, between about 5.0% to about 40.0%

Dibasic ester (dimethyl adipate, dimethyl glutarate, dimethyl succinate, or a mixture of two or more of them) between about 5.0% to about 40.0%

Water, if used, to make 100%

The preferred formulation for General usage, and the presently preferred embodiment, consists essentially of the following components in the percentages defined:

Glycol EB (ethylene Glycol n-butyl ether), about 15.0%

Acetone, about 14.0%

Dibasic ester (dimethyl adipate, dimethyl glutarate, dimethyl succinate, or a mixture of two or more of them), about 16.0%

Water to make 100% (about 55%)

This is a water-based cleanser with applicability to a wide range of applications.

The presently-preferred concentrated formulation, which can be used without dilution by water, and which can later be diluted with water as desired,, is as follows:

Ethylene glycol n-butyl ether (Glycol EB)--about 33.3%.

Acetone--about 31.1%.

Dibasic ester (as defined above) about 35.5%. The ingredients are all commercially available. Certain of these are further identified as follows:

Glycol EB (ethylene glycol n-butyl ether) Case No. 111-76-2

Acetone--Cas No. 67-64-1

Glacial acetic acid--Cas No. 64-19-17

Dibasic ester--a mixture of dimethyl adipate, dimethyl glutarate, and dimethyl succinate, obtainable from Ashland Chemical Inc., of Columbus, Ohio, under its mark DIBASIC ESTER 1. This is a mixture of 66% dimethyl glutarate, (Cas No. 1119-40-0), 17% dimethyl adipate (Cas No. 627-93-0) and 16% dimethyl succinate (Cas No. 106-65-0). The total diester content of this product is 99%.

The water to be used should be de-ionized water, which minimizes cloudiness which might be caused by minerals in untreated water.

Substitution of some of the formulation by glacial acetic acid or phosphoric acid appears to enhance the breakage of the bond between the deposit and the substrate surface, and to decrease any tendency for the deposit to be dissolved. These are optional substitutions.

A suitable thickener if one is to be used, is obtainable from Degusa, under its trademark Aerosil-200, which when used will be added to the above formulation, generally between about 2% and at most 4% of the total formulation weight. A thickener will be added when the formulation is to be used on a surface which is so steep that a less viscous product would flow off of the substrate too quickly, such as from a wall or a vertical sign. However, as a commercial matter, a thickener will actually be added to all formulations to facilitate its use in all applications.

The percentages for the formulation itself are given without any of the above optional additives. When these or any of them are used, they are substituted for an equal amount of the total formulation as defined, and they have no deleterious effect on the action of the formulation for its cleansing function.

This invention is primarily directed toward the removal of adherent layers of certain kinds of adherent deposits from many kinds of substrate surfaces. Among these are the following:

Street signs and freeway signs, such as reflectively silk screened, high intensity surfaces, and surfaces coated with protective materials, concrete, cinderblock, cement, slumpstone, mountain rocks and split rocks, stucco, formica, glass, iron work, steel, stainless steel, aluminum, and other metals and alloys, brick - glazed and unglazed, vinyl, and trees. Plastic, for example, plexiglass and fiberglass. Wood, especially denser woods, tile glazed and unglazed, linoleum, clothing and fabrics generally, carpets, wallpaper removal and blackboards and dry mark boards.

This list is not intended to be exhaustive, but instead to be illustrative of the wide range of utility of this invention.

The following are some examples of what are hereafter referred to as an "adherent deposits": oil lacquers, water-based lacquers, high-gloss acrylics, acrylic enamels, enamel semi-gloss, flat-based paints, water-based enamels, urethane enamels, permanent markers, super enamels, Speed-E-Namels, primers, varnish, wood stains, high-liter inks, correction fluid, all aerosol paints, and wallpaper adhesives.

This list is not intended to be exhaustive, but instead to be illustrative of the wide range of utility of this invention. Adherent deposits are characterized by their formation of an adherent layer which, when dried, cured or hardened, is attached to the substrate by a physical bond which it is the purpose of this cleanser to eliminate, or at least to reduce it to the extent that the layer can physically be removed. The marker and Hi-Liter inks, while they do not form this type of deposit, still appear to be removed by this composition by some mechanism from non-porous substrates, without smearing. For this reason, they are included in the list.

The action of this cleanser is instructive to observe. It is applied to the deposit. Left for only a short time, usually for less than one minute, the cleanser will have penetrated the deposit. Then a perceptible release of the deposit from its substrate surface begins to be observed. Occasionally, the deposit will loosen in platelets. Left to work for a bit longer, the deposit divides itself into very small fragments. About three minutes is about the preferred residence time on porous surfaces. For non-porous, soft and delicate surfaces, a shorter time is required. Interestingly, there appears to be little or no solution of the deposit. Observation of the liquid cleanser after the action has occurred shows little if any evidence of solution, for example by transfer of colored material into solution. If placed in water, the water will remain essentially uncolored. Significantly, an advantage of this invention is its quick action. A thickener, while it usually will be used, will be needed only when the surfaces are so steep that there would be insufficient residence time before it drained away, and also to confine it to the surface intended to be cleansed. Advantage should be taken of the quick action of this invention, which is one of its most desirable features.

The importance of this action, for example along highways, is that the deposits when washed from the surfaces can drain onto the ground as entrained material in a low volume stream of water. This effluent can be allowed to flow away, or can be washed away, or can be left on the ground where the entrained material can be covered, swept up, or raked up. Often this material is so ineffusive that it can simply be ignored, because it is inconsequential in size and bulk. The total volume is only that of the deposit which was removed, and it has not been extended by solution mechanisms. The substrate surface is left clean. When the deposit was removed, it was not removed in a form that penetrated the surface, such as by a solution or an emulsion, but rather as a suspension to be carried away by a stream of water, or even wiped up.

An action of this kind has not previously been observed or known to exist by the inventor herein. It is obtained by the formulation of this cleanser by means of a mechanism not fully understood by him, and its very nature is a matter of some speculation, but whatever the mechanism is, the result is as described.

It appears to be the result of an interruption of the bond which held the deposit to the surface. Frequently, if the deposit is not removed, and the cleanser is allowed to evaporate, the deposit returns nearly to its previously adherent condition.

The components of this formulation have been used in other cleanser formulations, but in them their intended objectives appear to have been as solvents. For example, dibasic esters are notable for their ability to soften and dissolve substances of interest to this invention, and that is the very problem with their use in the applications intended for this cleanser. A review of their utility as evidenced by prior publications attests to the fact that their effect is to substitute one mess for another. However, their resulting mess is one which cannot entirely be removed from porous surfaces, and also which involves the disposal problems discussed above.

Similarly, Glycol EB and acetone are principally found in formulations where a surface coating is to be dissolved.

It is surprising that a combination of components which individually are classically directed to reducing a deposit to a solution or to a sludge, can be combined to form a composition which enables the adherent deposit to be removed freely from its substrate surface.

As illustrative examples, most or all of the adherent deposits of concern herein are quickly dissolved in a suitable aqueous solution of the dibasic esters. The addition of acetone does not appear to repress this action. An aqueous solution of acetone is an efficient solvent. The addition of dibasic esters results in the solvent action described above. Similar comments apply to the Glycol EB.

The preferred formulation is the most effective one which the inventor has been able to devise. Any composition which departs from the preferred formulation but in which the components are still within the defined ranges, generally displays a lesser efficiency, and in some circumstances a tendency to soften the deposits, but still provides the advantages of this invention to an important extent.

The reasons for the synergy of the components are not understood, but their consequence is an effective and environmentally benign cleanser and environmentally benign effluent after application of the cleanser.

After a brief residence on the deposit, the cleanser and the loosened deposit, can be flushed, wiped, or scraped away. A reasonably strong stream of water is effective for this purpose. However, in many situations water will be in short supply, and also it is advantageous to reduce the total amount of effluent, so as to reduce the area over which it might flow.

A high-pressure water jet stream will be more effective in removing the particulate material from non-painted porous substrates such as concrete, stucco, stone, or brick. Such a stream will usually be needed only for such substrates. Only a surprisingly small volume of water is needed, which can be carried in a pressure tank which may be so small as to be carried by the workman. There is a wide range of devices for this purpose sold on the market. However, for producing a low volume, high pressure jet spray, the inventor herein has found the conventional "airless" paint gun sprayer to be superior. Many examples of this type of sprayer are available on the market. It can discharge water in an even fan spray at a high velocity. One suitable gun delivers a 4 inch wide fan-shaped jet spray of water up to 3,000 psi. This is very effective, and is a high velocity, low volume jet of water. It successfully blows off the deposits, and provides enough water for them to be washed away without requiring excessive water for the purpose. Supplementary washing can be provided, but will rarely be needed.

For reasons not understood by the inventor, some stains, markers, and High-Lighters, varnishes,

lacquers, stains such as wood stains, can also be removed but not from porous substrates. These do not appear to come away as solids, but to a reasonable degree they will be removed from surfaces such as plexiglass and vinyl. Water based adhesives used for hanging wallpaper are also released. The wallpaper's condition is unimportant. The importance is its release.

This product will preferably be sold with water in it as specified above, because this is a stable, clear mixture readily useable without further care. There are, however, applications where water would more advantageously be added later. Adding it to a container of water, or adding water to it at or near the point of use or sale may in some instances be more convenient, and more economical to ship than carrying the entire pre-mixed product to the point of use.

Also, although it ordinarily will not be preferred, the concentrated formulation can be used without dilution. However, the action of the concentrate is not as effective as the formulation with water in it. It appears that some of the components may preferentially evaporate, leaving the others in a concentration which may more vigorously attack the deposit, sometimes dissolving it. Still, it can be used directly and is useful if used with more care than need be given to a water containing cleanser. Generally, at least about 20% by weight of the formulation will be water, in order to provide a product with widespread utility.

This invention is not to be limited by the embodiments described in the description, which are given by way of example and not of limitation, but only in accordance with the scope of the appended claims.

* * * * *





| United States Patent | 5,484,487 |
|---|---|
| Motsenbocker | January 16, 1996 |

## Cleanser for releasing adherent deposits from surfaces

### Abstract

A cleanser for releasing adherent deposits from a surface consisting essentially of ethylene glycol n-butyl ether, acetone, dibasic ester, and optionally water in specified proportions. Also disclosed is a method of releasing adherent deposits from a surface by applying the aforementioned composition to the deposits.

Inventors: **Motsenbocker; Gregg** (Lake Arrowhead, CA)
Appl. No.: **414199**
Filed: **March 31, 1995**

### Related U.S. Patent Documents

| Application Number | Filing Date | Patent Number | Issue Date |
|---|---|---|---|
| 74887 | Jun., 1993 | 5415800 | |

Current U.S. Class: **134/6** ; 134/38; 134/40
Field of Search: 252/162,170,171,173,143,174.19,174.21,DIG.8 134/38,40,6

### References Cited [Referenced By]

#### U.S. Patent Documents

| | | |
|---|---|---|
| 3607760 | September 1971 | McIntyre |
| 4309300 | January 1982 | Danforth et al. |
| 4465612 | August 1984 | Altenschopfler |
| 4780235 | October 1988 | Jackson |
| 4792354 | December 1988 | Matsuo et al. |

| 4927556 | May 1990 | Pokorny |
| 4934391 | June 1990 | Futch et al. |
| 5084200 | January 1992 | Dishart et al. |
| 5089164 | February 1992 | Stanley |
| 5124062 | June 1992 | Stevens |
| 5183514 | February 1993 | Marquis |
| 5227085 | July 1993 | Motsenbocker |
| 5250211 | October 1993 | Motsenbocker |

**Foreign Patent Documents**

| 4034765 | May., 1992 | DE |

*Primary Examiner:* Therkorn; Linda Skaling
*Attorney, Agent or Firm:* Mon; Donald D.

---

### Parent Case Text

CROSS REFERENCE TO OTHER APPLICATION

This is a division of applicant's U.S. patent application Ser. No. 08/074,887, filed Jun. 9, 1993, now U.S. Pat. No. 5,415,800, entitled "Cleanser for Releasing Adherent Deposits from Surfaces".

---

### Claims

---

I claim:

1. A method of releasing adherent deposits from a surface comprising:

a. applying to an adherent deposit on a surface an environmentally safe cleanser consisting essentially of the following components, whose percentages are expressed relative to the total weight of these components without including other materials that might be included in minor amounts which do not interfere with the intended action of the cleanser:

Ethylene glycol n-Butyl Ether (Glycol EB), between about 5.0% and about 40.0%;

Acetone, between about 5.0% and about 40.0%; and

Dibasic ester selected from the group consisting of dimethyl adipate, dimethyl glutarate and dimethyl succinate, and mixtures of any two or more of them, between about 5.0% and about 40.0%; and optionally water to make 100%; and

b. permitting said cleanser to contact said deposit for a time sufficient to release said deposit from said surface; and

c. removing said released deposit from said surface.

2. A method according to claim 1 in which a stream of water directed against said released deposits to remove them.

3. A method according to claim 2 in which said stream of water is produced by an "airless" paint gun.

4. A method according to claim 1 in which the released deposit is physically removed.

5. A method according claim 4 in which the released deposit is removed by wiping.

---

### Description

---

## FIELD OF THE INVENTION

A biodegradable cleanser which can be extended with water for releasing adherent deposits from porous, non-porous, soft, and delicate surfaces.

## BACKGROUND OF THE INVENTION

Removal of paints and paint-like deposits is an old and well-developed art. Generally the objective is to soften the deposit, usually by at least partially dissolving it so that it can be scraped away. The intended effect is usually that of dissolving the material so it becomes fluid. The result is generally a softening of the deposit accompanied by some liquids. The difficulty of pursuing this softened material into cracks and structural intersections is well-known. One response to this problem is to dip the object into a tank of stripper and let it dissolve away.

Not only are these techniques very troublesome, but disposition of the stripper and of its contents is becoming more of an environmental problem. Generally, these strippers use strong organic solvents which, in addition to their disposal problems, constitute a potential health hazard to the user, to the environment, and to the substrate structure.

Despite these inherent problems, because they represent the best materials available, these materials are regularly used on durable, non-porous surfaces that can be regarded as "hard". Examples are the stripping of wood, and the cleansing of metal and enamel surfaces, subject to other problems discussed below.

However, they are not suitable for porous materials such as concrete, concrete block, stucco, cinderblock, rocks and stone, bricks and trees. This is because the dissolved and softened material tends to enter the porous surface, from which it can be removed only partially and then only with great difficulty, and usually with damage to the surface. When the material flows into the pores, later attempts to flush it out can be expected to drive at least some of it deeper. Attempts are sometimes made to overcome this problem by attacking the surface with a strong water jet, often with sandblast grits in it, or by sandblasting. This leaves modified areas which frequently have faint patterns of what was removed.

Soft surfaces, such as vinyls cannot withstand the action of these strippers, or of sandblasts. Neither can many delicate surfaces, for example plexiglass, where the plexiglass will be rendered translucent, rather that transparent.

Further, especially on large exposed areas such as retaining walls and highway signs, if this dissolved material is flushed from the surface, nearby areas will be contaminated by it. As a consequence,

organizations such as the California Department of Transportation and many municipal entities simply cover graffiti with a patch of paint, leaving the deposits in place. A trip along many streets and freeways will disclose those patches, whose only merit is that they are less objectionable than what they cover.

Further, even as to enamelled highway signs, where there is no penetration into the sign itself, the action of strippers is slow. While their action could be accelerated by the use of hot water, hot solvents, steam, and sandblasting, highway crews cannot carry along with them such equipment, which often must reach to very inconvenient places. Again, the run-off is itself objectionable, especially after the solvents evaporate.

In an attempt to frustrate graffiti artists, it has become common practice to place a rather expensive layer of plastic material such as 3M 1150 on enamel signs or to impregnate the signs with laminate at the time of manufacture. Unfortunately these respond poorly to solvents applied hot, such as MEK and Kerosene, and even the new citrus-based solvents. Generally these tend to attack the laminations, often delaminating them, resulting in cracking and migration through the plastic to the sign surface. The inherent problem in solvents such as these is that their primary intended effect is to dissolve the adherent material. When quick dissolving of such deposits is intended, it is not surprising that at least some damage will be done to the substrates because of these "hot" solvents.

What is needed, and what this invention provides, is a biodegradable cleanser, which can be extended with water, which works quickly and well at ambient temperatures, which primarily does not dissolve the substances being removed (although in some circumstances some solution may occur), whose effluent is principally a solid that is not itself objectionable, and which can be flushed away with water or wiped up with a cloth, or gathered with a squeegee. For large areas, removal by small volumes of high pressure jets of water will be preferred. All of these methods leave the surface cleansed of the deposit.

It is another object of this invention to provide a method for removing the subject deposits from surfaces, which method produces an effluent that often is agreeably left where it drains next to the surface which was cleansed. It does not itself become a disposal problem. In fact, often it can be swept up, raked up, or simply covered up with dirt. The composition is biodegradable.

It is still another object of this invention to provide a cleanser and a method in which the principal mechanism for removal of the deposit is interruption of its physical bond with the surface, followed primarily by removal of the material in a solid condition. Often it is particulate, but in other circumstances it may form a soft layer which can be gathered up as stated above.

Yet another object of this invention is to provide a more affordable cleanser, both in its inherent cost and in the elimination of damage to cleansed surfaces. Known stripper type compositions tend to use expensive organic solvents, sometimes for their own action, and sometimes as a carrier for other components. They themselves frequently damage the surface to be cleansed. No other carrier can be less expensive than water, which this cleanser can use. Furthermore this invention enables the use of a group of components some of which, if used alone, could frustrate the intended action. For reasons which are presently not fully understood, the combination is more benign, resulting in little or no dissolving of the deposits. Used alone, these components vigorously attack and dissolve paints and paint-like deposits. The combination of ingredients provided by this invention attains the intended results with them, but cause no, or at most minimal, damage to the substrate.

The so-called "green" solvents in general do not work as well as the products of this invention, and are considerably more expensive. While using relatively inexpensive components, the formulations of this invention are safe for the user, safe for the environment, safe for the surface, are biodegradable, and

when extended by a carrier, can use water and thereby be water-based.

## BRIEF DESCRIPTION OF THE INVENTION

A cleanser according to this invention consists essentially of the following components:

Ethylene glycol n-Butyl Ether (Glycol EB)

Acetone

Dibasic ester (dimethyl adipate, dimethyl glutarate, dimethyl succinate, or a mixture of two or more of them)

Water, if desired.

Glacial acetic acid or phosphoric acid may be substituted for a minor amount of the above formulation for reasons to be disclosed. A thickener may be added to enable the cleanser to reside for a longer time on vertical or steep surfaces, such as street signs and walls. None of these additives when used in minor amounts adversely affects or materially changes the cleansing action of the cleanser as specified.

The invention will be fully understood from the following detailed description.

## DETAILED DESCRIPTION OF THE INVENTION

A cleanser according to this invention consists essentially of the following components in the ranges defined, the percentages being in weight relative to the weight of the total formulation in all of the examples given herein:

Glycol EB (ethylene glycol n-butyl ether), between about 5.0% to about 40.0%

Acetone, between about 5.0% to about 40.0%

Dibasic ester (dimethyl adipate, dimethyl glutarate, dimethyl succinate, or a mixture of two or more of them) between about 5.0% to about 40.0%

Water, if used, to make 100%

The preferred formulation for general usage, and the presently preferred embodiment, consists essentially of the following components in the percentages defined:

Glycol EB (ethylene glycol n-butyl ether), about 15.0%

Acetone, about 14.0%

Dibasic ester (dimethyl adipate, dimethyl glutarate, dimethyl succinate, or a mixture of two or more of them), about 16.0%

Water to make 100% (about 55%)

This is a water-based cleanser with applicability to a wide range of applications.

The presently-preferred concentrated formulation, which can be used without dilution by water, and which can later be diluted with water as desired, is as follows:

Ethylene glycol n-butyl ether (Glycol EB)--about 33.3%

Acetone--about 31.1%.

Dibasic ester (as defined above) about 35.5%.

The ingredients are all commercially available. Certain of these are further identified as follows:

Glycol EB (ethylene glycol n-butyl ether) Cas No. 111-76-2

Acetone--Cas No. 67-64-1

Glacial acetic acid--Cas No. 64-19-17

Dibasic ester--a mixture of dimethyl adipate, dimethyl glutarate, and dimethyl succinate, obtainable from Ashland Chemical Inc., of Columbus, Ohio, under its mark DIBASIC ESTER 1. This is a mixture of 66% dimethyl glutarate, (Cas No. 1119-40-0), 17% dimethyl adipate (Cas No. 627-93-0) and 16% dimethyl succinate (Cas No. 106-65-0). The total diester content of this product is 99%.

The water to be used should be de-ionized water, which minimizes cloudiness which might be caused by minerals in untreated water.

Substitution of some of the formulation by glacial acetic acid or phosphoric acid appears to enhance the breakage of the bond between the deposit and the substrate surface, and to decrease any tendency for the deposit to be dissolved. These are optional substitutions.

A suitable thickener If one is to be used, is obtainable from Degusa, under its trademark Aerosil-200, which when used will be added to the above formulation, generally between about 2% and at most 4% of the total formulation weight. A thickener will be added when the formulation is to be used on a surface which is so steep that a less viscous product would flow off of the substrate too quickly, such as from a wall or a vertical sign. However, as a commercial matter, a thickener will actually be added to all formulations to facilitate its use in all applications.

The percentages for the formulation itself are given without any of the above optional additives. When these or any of them are used, they are substituted for an equal amount of the total formulation as defined, and they have no deleterious effect on the action of the formulation for its cleansing function.

This invention is primarily directed toward the removal of adherent layers of certain kinds of adherent deposits from many kinds of substrate surfaces, Among these are the following:

Street signs and freeway signs, such as reflectively silk screened, high intensity surfaces, and surfaces coated with protective materials, concrete, cinderblock, cement, slumpstone, mountain rocks and split rocks, stucco, formica, glass, iron work, steel, stainless steel, aluminum, and other metals and alloys, brick--glazed and unglazed, vinyl, and trees. Plastic, for example, plexiglass and fiberglass. Wood, especially denser woods, tile glazed and unglazed, linoleum, clothing and fabrics generally, carpets, wallpaper removal and blackboards and dry mark boards.

This list is not intended to be exhaustive, but instead to be illustrative of the wide range of utility of this

invention.

The following are some examples of what are hereafter referred to as an "adherent deposits":

Oil lacquers, water-based lacquers, high-gloss acrylics, acrylic enamels, enamel semi-gloss, flat-based paints, water-based enamels, urethane enamels, permanent markers, super enamels, Speed-E-Namels, primers, varnish, wood stains, high-liter inks, correction fluid, all aerosol paints, and wallpaper adhesives.

This list is not intended to be exhaustive, but instead to be illustrative of the wide range of utility of this invention. Adherent deposits are characterized by their formation of an adherent layer which, when dried, cured or hardened, is attached to the substrate by a physical bond which it is the purpose of this cleanser to eliminate, or at least to reduce it to the extent that the layer can physically be removed. The marker and Hi-Liter inks, while they do not form this type of deposit, still appear to be removed by this composition by some mechanism from non-porous substrates, without smearing. For this reason, they are included in the list.

The action of this cleanser is instructive to observe. It is applied to the deposit. Left for only a short time, usually for less than one minute, the cleanser will have penetrated the deposit. Then a perceptible release of the deposit from its substrate surface begins to be observed. Occasionally, the deposit will loosen in platelets. Left to work for a bit longer, the deposit divides itself into very small fragments. About three minutes is about the preferred residence time on porous surfaces. For non-porous, soft and delicate surfaces, a shorten time is required. Interestingly, there appears to be little or no solution of the deposit. Observation of the liquid cleanser after the action has occurred shows little if any evidence of solution, for example by transfer of colored material into solution. If placed in water, the water will remain essentially uncolored.

Significantly, an advantage of this invention is its quick action. A thickener, while it usually will be used, will be needed only when the surfaces are so steep that there would be insufficient residence time before it drained away, and also to confine it to the surface intended to be cleansed. Advantage should be taken of the quick action of this invention, which is one of its most desirable features.

The importance of this action, for example along highways, is that the deposits when washed from the surfaces can drain onto the ground as entrained material in a low volume stream of water. This effluent can be allowed to flow away, or can be washed away, or can be left on the ground where the entrained material can be covered, swept up, or raked up. Often this material is so ineffusive that it can simply be ignored, because it is inconsequential in size and bulk. The total volume is only that of the deposit which was removed, and it has not been extended by solution mechanisms. The substrate surface is left clean. When the deposit was removed, it was not removed in a form that penetrated the surface, such as by a solution or an emulsion, but rather as a suspension to be carried away by a stream of water, or even wiped up.

An action of this kind has not previously been observed or known to exist by the Inventor herein. It is obtained by the formulation of this cleanser by means of a mechanism not fully understood by him, and its very nature is a matter of some speculation, but whatever the mechanism is, the result is as described. It appears to be the result of an interruption of the bond which held the deposit to the surface. Frequently, if the deposit is not removed, and the cleanser is allowed to evaporate, the deposit returns nearly to its previously adherent condition.

The components of this formulation have been used in other cleanser formulations, but in them their intended objectives appear to have been as solvents. For example, dibasic esters are notable for their

ability to soften and dissolve substances of interest to this invention, and that is the very problem with their use in the applications intended for this cleanser. A review of their utility as evidenced by prior publications attests to the fact that their effect is to substitute one mess for another. However, their resulting mess is one which cannot entirely be removed from porous surfaces, and also which involves the disposal problems discussed above.

Similarly, Glycol EB and acetone are principally found in formulations where a surface coating is to be dissolved.

It is surprising that a combination of components which individually are classically directed to reducing a deposit to a solution or to a sludge, can be combined to form a composition which enables the adherent deposit to be removed freely from its substrate surface.

As illustrative examples, most or all of the adherent deposits of concern herein are quickly dissolved in a suitable aqueous solution of the dibasic esters. The addition of acetone does not appear to repress this action. An aqueous solution of acetone is an efficient solvent. The addition of dibasic esters results in the solvent action described above. Similar comments apply to the Glycol EB.

The preferred formulation is the most effective one which the inventor has been able to devise. Any composition which departs from the preferred formulation but in which the components are still within the defined ranges, generally displays a lesser efficiency, and in some circumstances a tendency to soften the deposits, but still provides the advantages of this invention to an important extent.

The reasons for the synergy of the components are not understood, but their consequence is an effective and environmentally benign cleanser and environmentally benign effluent after application of the cleanser.

After a brief residence on the deposit, the cleanser and the loosened deposit, can be flushed, wiped, or scraped away. A reasonably strong stream of water is effective for this purpose. However, in many situations water will be in short supply, and also it is advantageous to reduce the total amount of effluent, so as to reduce the area over which it might flow.

A high-pressure water jet stream will be more effective in removing the particulate material from non-painted porous substrates such as concrete, stucco, stone, or brick. Such a stream will usually be needed only for such substrates. Only a surprisingly small volume of water is needed, which can be carried in a pressure tank which may be so small as to be carried by the workman. There is a wide range of devices for this purpose sold on the market. However, for producing a low volume, high pressure jet spray, the inventor herein has found the conventional "airless" paint gun sprayer to be superior. Many examples of this type of sprayer are available on the market. It can discharge water in an even fan spray at a high velocity. One suitable gun delivers a 4 inch wide fan-shaped jet spray of water up to 3,000 psi. This is very effective, and is a high velocity, low volume jet of water. It successfully blows off the deposits, and provides enough water for them to be washed away without requiring excessive water for the purpose. Supplementary washing can be provided, but will rarely be needed.

For reasons not understood by the inventor, some stains, markers, and High-Lighters, varnishes, lacquers, stains such as wood stains, can also be removed but not from porous substrates. These do not appear to come away as solids, but to a reasonable degree they will be removed from surfaces such as plexiglass and vinyl. Water based adhesives used for hanging wallpaper are also released. The wallpaper's condition is unimportant. The importance is its release.

This product will preferably be sold with water in it as specified above, because this is a stable, clear

mixture readily useable without further care. There are, however, applications where water would more advantageously be added later. Adding it to a container of water, or adding water to it at or near the point of use or sale may in some instances be more convenient, and more economical to ship than carrying the entire pre-mixed product to the point of use.

Also, although it ordinarily will not be preferred, the concentrated formulation can be used without dilution. However, the action of the concentrate is not as effective as the formulation with water in it. It appears that some of the components may preferentially evaporate, leaving the others in a concentration which may more vigorously attack the deposit, sometimes dissolving it. Still, it can be used directly and is useful if used with more care than need be given to a water containing cleanser. Generally, at least about 20% by weight of the formulation will be water, in order to provide a product with widespread utility.

This invention is not to be limited by the embodiments described in the description, which are given by way of example and not of limitation, but only in accordance with the scope of the appended claims.

* * * * *



# EXHIBIT B

## DISTRIBUTORSHIP/LICENSE AGREEMENT

This agreement ("Agreement") is made and entered into by and between Motsenbocker's Advanced Development, Inc., a California corporation having a mailing address of P.O. Box 90947, San Diego, California, 92169, (hereinafter, "MAD") and Ecolab Inc., a Delaware corporation having a principal place of business at Ecolab Center, 370 N. Wabasha Street, St. Paul, Minnesota 55102 (hereinafter, "ECOLAB"), effective as of September 1, 1996.

WHEREAS, MAD is engaged in the manufacture, distribution and sale of proprietary chemical agents for the removal and/or cleaning of stains, grease, adhesives, ink and paints, collectively identified as "Cleaning Agents", which are identified in Exhibit A hereto;

WHEREAS, MAD is the exclusive licensee of all patents, pending patents, trade secrets, service marks, trademarks, and any other intellectual property covering or related to the "Cleaning Agents", hereinafter, collectively, the "Intellectual Property";

WHEREAS, ECOLAB, including but not limited to its Janisource division, is a supplier of cleaning products for institutional, industrial and janitorial use;

WHEREAS, ECOLAB wishes to obtain, and MAD wishes to grant an exclusive license for marketing and distribution rights in the United States, Canada and Mexico of the Cleaning Agents for institutional, industrial and janitorial use; and

WHEREAS, MAD is willing to grant licenses to use certain of the Intellectual Property in conjunction with ECOLAB's marketing and distribution of the Cleaning Agents and Related Products on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual obligations and benefits set forth herein, the parties agree to the following terms and conditions:

1.    Definitions

    1.1    "Club Stores" shall mean membership clubs, such as, but not limited to Sam's and Price/Costco.

    1.2    "Consumer Retail Sales" shall mean sales of the Cleaning Agents directly to or for distribution for retail sale to end consumers, including, but not limited to, sales to club and discount stores, hardware, paint, sundry, automotive, pet, office supply, stationery, grocery, and drug stores, and consumer catalogs.

    1.3    "Institutional, Industrial and Janitorial Sales" shall mean sales of the Cleaning Agents to commercial service providers, including, but not limited to, governmental agencies, hotels and motels, restaurants, and other hospitality service providers, hospitals, schools, and janitorial services, and to janitorial supply services.

    1.4    "Licensed Patents" shall mean the issued and pending U.S. Patents identified in Exhibit A hereto, as well as any pending applications for U.S. Patent, unless such pending application is abandoned with no intention to revive.

1.5     "Licensed Products" shall mean the Cleaning Agents listed in Exhibit A hereto and any related cleaning agents or products developed by MAD, regardless of whether or not the cleaning agent or product is patented.

1.6     "Licensed Territory" shall mean the United States of America, including its territories and possessions, Mexico and Canada.

1.7     "Licensed Trademarks" shall mean any of the trademarks, registered or not, identified in Exhibit B hereto as well as, to the extent that such are proprietary to MAD, styles, color combinations, trade dress, designs, symbols, logos and slogans used or developed by MAD for the Cleaning Agents.

1.8     "Net Sales" shall mean the total sales income of ECOLAB based on the actual sales price of the Licensed Products less any refunds, discounts or allowances.

1.9     "New Products" shall mean any cleaning agents of the type identified on Exhibit A or Related Products developed by MAD or licensed to MAD subsequent to the effective date and during the term of this Agreement.

1.10    "Related Products" shall mean any composition of matter or product useful for cleaning and/or removal of stains, grease, adhesives, ink, or paint, which may be used in conjunction with any of the Cleaning Agents, and which does not comprise or contain any of the Cleaning Agents or which is not developed by MAD.

1.11    "Unrelated Product" shall mean any product that not a Cleaning Agent, a related cleaning agent, a New Product, or a Related Product, which is developed by Gregg A. Motsenbocker and/or licensed to MAD during the term of this Agreement, but which, nonetheless, is of interest to ECOLAB for marketing and sale as part of a product line which would not generally be sold under the Licensed Trademarks.

2.  <u>License of Rights</u>
    2.1     Distributorship.      MAD hereby grants to ECOLAB the exclusive right to market and distribute Licensed Products in the Licensed Territory for Institutional, Industrial and Janitorial Sales. MAD reserves the right to market and distribute, and to license for marketing and distribution, Licensed Products for Consumer Retail Sales. All Licensed Products shall be marketed and sold under the Licensed Trademarks unless otherwise agreed in writing by the parties. Neither party shall solicit sales or accept orders for Licensed Products for distribution to and/or sale in Club Stores unless otherwise agreed to in a writing signed by both parties, which writing, if any, will become an amendment to this Agreement.

    2.2     Market Channels.     ECOLAB shall buy and sell Licensed Products for its own account and responsibility and shall be permitted to solicit sales from and accept orders for Licensed Products only for Institutional, Industrial and Janitorial Sales unless otherwise agreed in writing.

2.3    Trademark License.

2.3.1  MAD hereby grants to ECOLAB an exclusive license to use the Licensed Trademarks in the Licensed Territory for the marketing and promotion of Licensed Products and Related Products for Institutional, Industrial and Janitorial Sales, provided that any use of the Licensed Trademarks in conjunction with the marketing and promotion of a Related Product shall only be with the prior written consent of MAD and in accordance with the provisions set forth in Subparagraph 2.3.3.1.

2.3.2  MAD covenants not to use, nor to license or allow others to use, the Licensed Trademarks in the Licensed Territory for Institutional, Industrial and Janitorial Sales of any or all of the Cleaning Agents or any Related Products.

2.3.3  ECOLAB shall use and display the Licensed Trademarks properly and shall take no actions jeopardizing the existence or enforceability thereof. This shall include, but is not limited to, providing any trademark notices required or permitted by law.

2.3.3.1  Approval by MAD for ECOLAB to use the Licensed Trademarks on Related Products is conditioned upon the Related Products having a quality consistent with the level of quality employed in the Licensed Products, as determined by an inspection of the Related Products by MAD. MAD shall have the right to periodically inspect such Related Products to determine whether the level of quality is being maintained. If, in the future, in MAD's judgment, the level of quality for Related Products sold under the Licensed Trademarks should fall below the approved standard, MAD shall have the right, upon written notice, to terminate license to use the Licensed Trademarks on such Related Products.

2.3.4  ECOLAB shall not attempt to register, or aid any third party in attempting to register or to use, any marks or names which may be confusingly similar to any Licensed Trademarks, for any products similar to the Licensed Products or related products

2.4    Patent License.    MAD hereby grants to ECOLAB an exclusive license under the Licensed Patents to market the Licensed Products for Institutional, Industrial and Janitorial Sales. No license to manufacture is granted or implied, except as provided in Section 3.

2.5    New Products.    MAD hereby grants to ECOLAB the option to acquire an exclusive license to market and sell New Products developed by MAD during the term of this agreement for Institutional, Industrial and Janitorial Sales, subject to the royalty provisions of Section 4 and confidentiality provisions set forth in Section 9.

3.  Products, Supply and Pricing

3.1  MAD agrees to designate a third party manufacturer with whom ECOLAB will contract directly for its requirements of Licensed Products, and ECOLAB agrees to purchase all of its requirements for Licensed Products from the designated third party manufacturer during the term of this Agreement, except as provided in paragraph 3.1.1.

3.1.1  In the event that ECOLAB identifies an alternate manufacturer which it believes would enhance its ability to perform its obligations under this Agreement, e.g., a manufacturer that is located in close geographical proximity to ECOLAB, or ECOLAB itself, MAD will evaluate the suitability of the alternate manufacturer and, if deemed suitable by MAD, MAD will consent to such alternative manufacturer supplying ECOLAB with the Licensed Products. Such consent shall not be unreasonably withheld or delayed by MAD.

3.1.2  In the event that ECOLAB acquires the right to have Licensed Products manufactured by it or an alternate third party manufacturer, MAD may independently contract with ECOLAB or such alternate third party manufacturer to manufacture Licensed Products for MAD's marketing and sale.

3.1.3  ECOLAB shall provide to MAD copies of each purchase order to and/or invoice from any third party manufacturer, for all Licensed Products manufactured and/or shipped, indicating the quantity and cost of each Licensed Product. For any Licensed Products manufactured by ECOLAB itself, ECOLAB shall provide to MAD copies of all production reports or other similar documents indicating the quantity of each Licensed Product manufactured and shipped by ECOLAB.

4.  Payments and Royalties

4.1  ECOLAB shall pay to MAD a one-time, non-refundable, non-creditable lump sum license fee of two hundred fifty thousand dollars ($250,000), payable in two equal installments of one hundred twenty five thousand dollars ($125,000). The first installment shall be paid on September 1, 1996, or within two (2) weeks of the execution of this Agreement, whichever is later. The second installment shall be paid on March 1, 1997.

4.1.1  MAD will deliver or cause to be delivered to ECOLAB existing marketing materials developed exclusively for the Licensed Products (i.e., the institutional size package) and marketing materials developed exclusively for the Licensed Products which are in production at the time of execution of this Agreement when such materials are completed. An itemization of such marketing materials and the costs incurred by MAD for their preparation as attached hereto as Exhibit C. ECOLAB shall reimburse MAD for the full cost of the marketing materials listed in Exhibit C within thirty (30) days of the date of execution of this Agreement. Itemized statements reflecting future costs incurred by MAD for preparation of marketing materials which have been requested and authorized by ECOLAB will be submitted to ECOLAB upon

completion of the requested marketing materials, and ECOLAB shall reimburse MAD for such costs within thirty (30) days of the receipt of the itemized statement.

4.2    During the term of this Agreement and any extension thereof, ECOLAB shall pay to MAD a royalty in the amount of fifteen percent (15%) of the Net Sales of Licensed Products sold under the Licensed Patents, including any New Product for which an application for U.S. Patent has been filed.

4.2.1    In the event that a final determination is made by the United States Patent Office or a court of competent jurisdiction, from which no appeal can be, or is, taken, that any of the Licensed Patents is deemed invalid or otherwise lost, or said patent is narrowed in scope as a result of re-examination, or said patent is lapsed as a result of non-payment of any maintenance fee, or a pending patent application is abandoned, royalties due for any Licensed Products covered by said patent or pending patent will adjusted according to Paragraph 4.3 below.
Be

4.3    During the term of this Agreement and any extension thereof, ECOLAB shall pay to MAD a royalty in the amount of twelve percent (12%) of the Net Sales of Licensed Products sold which are not covered by one or more of the Licensed Patents.

4.4    During the term of this Agreement and any extension thereof, ECOLAB shall pay to MAD a royalty in the amount of ten percent (10%) of the Net Sales of Related Products sold under any of the Licensed Trademarks.

4.5    Royalty payments shall be made on a monthly basis, commencing October 1, 1996, and shall be payable no later than the sixteenth (16th) day of the month following the month for which royalties are due.

4.6    MAD shall have the right to request an audit of ECOLAB's Net Sales of Licensed Products and Related Products sold under the Licensed Trademarks no more than twice every calendar year at MAD's expense. Such audit will be by an independent third party which is mutually agreeable and has signed an appropriate confidentiality agreement with ECOLAB. ECOLAB shall make prompt payment to MAD to adjust for any underpayments determined by such audit.

4.7    Beginning in September, 1996, ECOLAB shall make minimum annual royalty payments to MAD based upon minimum sales volume, which will be initially established for the first contract year (September 1 - August 31) as the net sales of MAD for the period September 1, 1995 - August 31, 1996 ("Benchmark Year"), increased by fifteen percent (15%). Thereafter, the minimum sales volume shall increase over the previous contract year as follows:

| Year | Increase Over Previous Contract Year |
|------|--------------------------------------|
| 9/97 - 8/98 | 15% |
| 9/98 - 8/99 | 15% |
| 9/99 - 8/00 | 12% |
| 9/00 - 8/01 | 12%. |

MAD represents that it is transferring customers for the Licensed Products in the Licensed Territory having estimated annualized purchases during the Benchmark year of $800,000 ("Transferred Customers").

4.7.1   In the event that the royalty payments in accordance with Paragraphs 4.2 - 4.4 for a given year do not cumulatively equal or exceed the minimum annual royalty for that year, ECOLAB shall include in the December payment a lump sum payment of the difference between the actual royalty payments and the minimum annual royalty for that year.

4.7.2   Within the time period for monthly royalty payments set forth in Paragraph 4.5 above, ECOLAB shall provide to MAD a written summary report setting forth the Net Sales of all Licensed Products and all Related Products sold under the Licensed Trademarks for the previous month and the sales royalty due thereon. The report for December shall include annual summaries of all sales and royalties paid or to be paid for the preceding year, and an accounting of the same with respect to the minimum annual royalty due, if any.

4.7.2.1   Each summary report shall include a separate breakdown of sales for each of the Licensed Products and Related Products, including quantity and dollar amount.

4.8   In the event that MAD develops any New Products during the term of this Agreement, ECOLAB shall have the opportunity to determine whether to adopt such New Product as one of the Licensed Products. In the event that ECOLAB elects to adopt such New Product, royalties shall be determined as agreed between the parties at the time the New Products are added. Identification of and any information pertaining to any such New Product shall be provided in an amendment to Exhibit A hereto.

4.9   In addition to any payments provided for in the preceding paragraphs of this Section 4, ECOLAB agrees to reimburse MAD for all legal fees and costs incurred in the preparation of this Agreement and the accompanying Consulting Agreement, including any modifications, amendments, or other changes made to any draft agreements as a result of negotiations between the parties, which legal fees shall not exceed five thousand dollars ($5,000).

5.   Warranties and Infringement

5.1   Product Warranty.   MAD warrants that its products will be merchantable and free from defects in materials and workmanship under normal use, service and conditions.

5.2   Patent and Trademark Warranties. MAD warrants that it has full right, title and interest in and to the Licensed Patents and Licensed Trademarks, or sufficient rights hereunder to enable it to provide to ECOLAB the licenses and rights granted herein. MAD further warrants that as of the date of its execution of this Agreement it had no knowledge of any patent which would be infringed by the manufacture, use or sale of the Licensed Products, or of any trademark

which would be infringed by the marketing and sale of the Licensed Products and Related Products under the Licensed Trademarks.

5.3    Patent Infringement. In the event that ECOLAB or its customers receive notice, or any suit is brought against ECOLAB or its customers alleging infringement of a U.S. Patent due to the manufacture, use or sale of the Licensed Products, ECOLAB shall give MAD prompt notice thereof. Similarly, MAD shall notify ECOLAB of any notice of infringement received by or suit alleging infringement brought against MAD. The parties shall promptly thereafter decide a course of action to be followed, which decision shall be the subject of written agreement, to either:

    i)  make modifications which avoid infringement without significantly effecting the economics of ECOLAB's operations under this Agreement;
    ii)  accept a license for ECOLAB and its customers; or
    iii)  contest the alleged infringement.

5.3.1    MAD shall pay all costs related to such claim or suit, including the cost of modifications, litigation expenses including reasonable attorneys' fees, court awarded damages, amounts paid in settlement or compromise of the litigation, provided MAD has the opportunity to participate in any settlement or compromise, and past and future royalties paid or payable to the owner of such patent.

5.3.2    If it is decided to contest the alleged infringement, MAD shall have control of any such litigation and shall indemnify, defend and hold ECOLAB harmless.

5.4    Trademark Infringement.    In the event that ECOLAB or its customers receive notice, or any suit is brought against ECOLAB or its customers alleging infringement of a trademark due to the marketing and sale of the Licensed Products or Related Products, ECOLAB shall give MAD prompt notice thereof. Similarly, MAD shall notify ECOLAB of any notice of infringement received by or suit alleging infringement brought against MAD. The parties shall promptly thereafter decide a course of action to be followed, which decision shall be the subject of written agreement, to either:

    i)  make modifications which avoid infringement without significantly effecting the economics of ECOLAB's operations under this Agreement;
    ii)  accept a license for ECOLAB and its customers; or
    iii)  contest the alleged infringement.

5.4.1    MAD shall pay all costs related to such claim or suit, including the cost of modifications, litigation expenses including reasonable attorneys' fees, court awarded damages, amounts paid in settlement or compromise of the litigation, provided MAD has the opportunity to participate in any settlement or compromise, and past and future royalties paid or payable to the owner of such trademark.

5.4.2    If it is decided to contest the alleged infringement, MAD shall have control of any such litigation and shall indemnify, defend and hold ECOLAB harmless.

6. Enforcement of Intellectual Property Rights

6.1 MAD agrees not to enforce any of the Licensed Patents or Licensed Trademarks against ECOLAB or its direct or indirect customers for their use or sale of Licensed Products, and Related Products under the Licensed Trademarks, purchased directly or indirectly from ECOLAB. Rather, the sale of Licensed Products, and Related Products under the Licensed Trademarks, by ECOLAB shall carry with it a fully paid up license to use and sell the same.

6.2 So long as ECOLAB's rights under this Agreement are exclusive, if ECOLAB becomes aware of any infringement of a patent of the Licensed Patents or a trademark of the Licensed Trademark, ECOLAB shall provide MAD with written notice of such infringement with sufficient detail to allow MAD to investigate further. Within three (3) months after such notice, MAD may, at its election, either:

    i) abate such infringement or institute suit against the infringer;
    ii) give ECOLAB the right to abate such infringement or institute suit against the infringer; or
    iii) agree with ECOLAB on an alternate approach.

6.2.1 In the event that MAD elects option i), ECOLAB may participate in any action by engaging counsel of its choice at its own expense, but any damages recovered shall belong exclusively to MAD.

6.2.2 In the event that MAD elects option ii), ECOLAB may take action, at its expense, and retain 100% of any recovery.

6.2.3 In the event that no action is taken against the infringer, the parties will renegotiate the minimum annual royalties in good faith if the infringement adversely effects the economics of ECOLAB's business.

7. Term and Renewal

7.1 This Agreement shall become effective as of September 1, 1996 and shall remain in full force and effect until August 31, 2001 (the "Initial Term"), unless sooner terminated pursuant to Article 8 below.

7.2 Expiration of this Agreement shall not relieve either party of any obligation incurred prior to such termination.

7.3 In the event that MAD elects to sell all or any part of its business relating to the Licensed Products, MAD will grant to ECOLAB the option to acquire such business or part thereof. Such option shall remain open for a period of forty-five (45) days after MAD gives ECOLAB written notice of its intent to sell and the terms on which such sale is to be made. If ECOLAB fails to exercise its option within the allotted period, MAD shall have no further obligations to ECOLAB with regard to the sale of MAD's business and shall be free to sell to a third party, provided that negotiations for a third party sale are commenced within the six (6) months immediately following expiration of the forty-five (45) day period. Otherwise, ECOLAB's option is renewed.

8. <u>Termination</u>

8.1 If ECOLAB defaults in fulfilling one or more of its obligations under this Agreement, MAD may give written notice specifying the default and indicating its intention to terminate this Agreement if the default is not cured within thirty (30) days after receipt of such notice. If the default is not cured within such thirty day period, MAD may terminate this Agreement by written notice to such effect, except that if the default relates to payment of royalties for which there is a dispute requiring that an audit be performed, the cure period shall be thirty (30) days after completion of the audit.

8.1.1 The Parties agree that the remedy at law for breach of this Agreement may be inadequate and that it may be impracticable and extremely difficult to determine the actual damage resulting to MAD's business reputation, goodwill, patents, and/or trademarks should ECOLAB violate or breach the terms of this Agreement. In the event that ECOLAB violates or breaches any term of this Agreement, should MAD so elect, MAD may pursue injunctive relief against ECOLAB. Both parties reserve all rights to pursue their respective remedies in law and equity upon termination of this Agreement.

8.2 Upon termination or expiration of this Agreement, all rights, options and licenses granted hereunder shall immediately terminate, provided, however, that ECOLAB shall be entitled to continue the use of the Licensed Trademarks to sell the Licensed Products and Related Products solely for the purpose of:

i) selling all of ECOLAB's then-existing inventory of Licensed Products and Related Products already marked with the Licensed Trademarks, or allowing MAD to repurchase such inventory from ECOLAB;

ii) fulfilling any contractual obligations to supply Licensed Products and Related Products under the License Trademarks entered into prior to the effective date of termination, providing that such obligations do not continue beyond ninety (90) days after termination; and

iii) selling of any amount of Licensed Products which ECOLAB is obligated to purchase from the manufacturer with whom it has contracted, unless such obligation can be canceled without cost to ECOLAB.

8.3 Termination of this Agreement shall not relieve either party of any obligation which may have accrued up to the time of termination, including any sales made pursuant to Paragraph 8.2. Minimum annual royalties will not be due for the year in which termination becomes effective.

8.4 Unless MAD terminates or fails to renew this Agreement without cause, within fifteen (15) days of the expiration or termination of this Agreement, ECOLAB shall disclose to MAD all customer lists of customers that purchase the Licensed Products and Related Products sold under the Licensed Trademark, with history and terms of prior sales, future customer commitments, and promotional plans which comprise the business conducted by ECOLAB in the sale of the Licensed Products and Related Products sold under the Licensed Trademarks.

8.5    Unless MAD terminates or fails to renew this Agreement without cause, within thirty (30) days of the expiration or termination of this Agreement, ECOLAB shall notify each customer of the Licensed Products and Related Products that its license to distribute and sell the Licensed Products and the Related Products sold under the Licensed Trademarks has terminated and that it will no longer be distributing or selling such products.

8.6    If any proceedings in bankruptcy or in reorganization or for the appointment of a receiver or trustee or any other proceedings under any law for the relief of debtors shall be instituted by or against either party, or if either party shall make an assignment for the benefit of creditors, the other party may at its option terminate this Agreement by written notice.

9.    Proprietary Information
9.1    ECOLAB shall treat any and all proprietary information of MAD furnished hereunder with respect to Licensed Products, New Products, Related Products, or Unrelated Products including, without limitation, the formulations of such products, which is disclosed in writing and marked "Confidential and Proprietary", or is disclosed orally and subsequently identified in writing as confidential or proprietary within thirty (30) days after the oral disclosure, as confidential and shall take reasonable precautions to prevent disclosure, in whole or in part, of such information to any third party. Further, ECOLAB shall not use any of such information for its own benefit or for the benefit of others, except as permitted hereunder. ECOLAB shall be under no obligation, however, with respect to information which:

i)  was known to it at the time of disclosure as evidenced by written documents in its possession;
ii)  is or becomes publicly available without breach of this Agreement by ECOLAB; or
iii)  is disclosed to ECOLAB without restriction on disclosure by a third party who has the lawful right to disclose such information.

9.2    ECOLAB shall use its best efforts to limit disclosure of MAD's proprietary information to its employees on a need-to-know basis and shall bind its employees to the above requirement of confidentiality and limited use, exercising at least the same standard of care that it uses with regard to its own confidential and proprietary information. Any consultants, suppliers or other contractors of ECOLAB who have a need to know such information in order to allow performance under this Agreement shall also be bound by the confidentiality and limited use provision.

9.3    Any legal action taken for violation of this Section 9 may include requests for injunctive relief and damages.

10.    Future Relationship.  The parties agree to negotiate in good faith for a possible extension of the terms of this Agreement on mutually agreeable terms and/or a possible sale of MAD's business to ECOLAB. Such negotiations may take place either during or after the initial term of this Agreement.

11.    Miscellaneous Provisions

11.1    Relationship between the Parties.  Nothing in this Agreement shall be deemed to create a joint venture, agency or partnership relationship between the parties, and neither party shall have authority to act on behalf of, or bind the other party, in any way based upon this Agreement alone.

11.2    Construction.        This Agreement shall be construed in accordance with the laws of the State of California.

11.3    Severability.  If any term, provision, covenant or condition of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions shall remain in full force and effect.  In the event that any one or more provisions is determined to be invalid, void or unenforceable, the parties shall immediately negotiate an appropriate provision in replacement thereof.

11.4    Notices.        All notices required or allowed under this Agreement shall be in writing and shall be hand delivered, sent by Certified, Return Receipt Request mail, or by U.S Postal Service or commercial overnight delivery service, postage/delivery charges prepaid, to the respective parties at the addresses provided below.  Either party shall notify the other party of any change of address within thirty (30) days of the change.

**MAD:**                                        **ECOLAB:**
Gregg Motsenbocker                  Ronald Fraboni
P.O. Box 90947                          Director
San Diego, 92169                       ECOLAB INC.
        or                                      ECOLAB CENTER
Lewis Silverberg                        370 N. Wabasha Street
11975 El Camino Real                 St. Paul, MN  55102
Suite 300
San Diego, CA  92130

                                                with a copy to:
                                                ECOLAB INC.
                                                ECOLAB CENTER
                                                370 N. Wabasha Street
                                                St. Paul, MN  55102
                                                Attn:  General Counsel

11.5    Waiver.        Failure by either party to enforce any provision of this Agreement or waiver by either party to the breach of any provisions herein shall not be deemed a waiver for subsequent breaches of the same or any other provisions herein.

11.6    Disputes.        If, at the time of notification of one party by the other of the existence of a dispute for which action is to be sought, some form of alternative dispute resolution (ADR), including arbitration or mediation, is desired by one party, both parties must agree that the dispute is to be handled by ADR.  If one party objects to the use of ADR, that party cannot be compelled to ADR, and

the dispute must be submitted to the court which has subject matter jurisdiction over the matter.

11.7    Attorneys' Fees.    In the event an action is brought by either party to enforce the terms of this Agreement, including, but not limited to, arbitration, the prevailing party shall be entitled to recover costs and reasonable attorneys' fees. "Prevailing party" shall be defined as the party receiving the greatest recovery on the issues (which includes the successful defense of such an action). Costs shall include fees for mediation or arbitration services, if any.

11.8    Interpretation.    This Agreement was prepared with the input of both parties as a result of arm's length negotiations and shall not be strictly construed in favor of or against either party. Headings and captions in this Agreement are for reference purposes only, and shall have no effect in Interpreting this Agreement.

11.9    Entire Agreement.    This Agreement embodies all of the understandings and agreements between the parties, and wholly and completely supersedes in all respects any understanding or negotiation between the parties.

11.10   Related Agreement. Being executed concurrently herewith is a Consulting Agreement between ECOLAB and Gregg A. Motsenbocker, which Consulting Agreement relates to services provided to ECOLAB for the marketing and promotion of the Licensed Products which are licensed under this Agreement. Certain terms of the Consulting Agreement bear upon the performance of the parties' respective obligations under this Agreement and vice versa. Therefore, the terms of the Consulting Agreement are incorporated herein by reference.

11.11   Modification. This Agreement may be changed or modified only by an Agreement in writing, signed by both parties.

11.12   Incidental Sales.    MAD and ECOLAB acknowledge and agree that the incidental sale of Licensed Products or Related Products under the Licensed Trademarks in violation of Section 2 shall not constitute a breach of this Agreement. The parties agree to take such actions as may be reasonably necessary, and as is allowed by law, to honor the narrow and exclusive grant set forth herein, and to avoid any such incidental sales. In the event such prohibited sales total more than $3,000 of end user sales in any quarter, it shall constitute a material breach and the aggrieved party may terminate this Agreement upon thirty (30) days prior written notice.

11.13 Assignment; Binding Effect.    This Agreement may not be assigned by either party without the prior written consent of the other. This Agreement shall be binding and inure to the benefit of each parties' respective successors in interest or assigns, subject to the consent requirements of this paragraph.

**INTENDING TO BE LEGALLY BOUND**, the parties have entered into this Agreement:

MOTSENBOCKER ADVANCED DEVELOPMENTS, INC.

Dated: _9-1-96_

Gregg A. Motsenbocker
President

ECOLAB INC.

Dated: _4/1/16_

Dean deBuhr
Vice President/General Manager

## EXHIBIT A

| LICENSED PRODUCT | U.S. PATENT NO./SERIAL NO. |
| --- | --- |
| MOTSENBOCKER'S LIFT OFF 1<br>FOOD, BEVERAGE AND PROTEIN<br>STAIN REMOVER | 5,250,211 |
| MOTSENBOCKER'S LIFT OFF 2<br>ADHESIVES, GREASE AND OILY<br>STAINS TAPE REMOVER | 4,306,989 |
| MOTSENBOCKER'S LIFT OFF 3<br>PEN, INK AND MARKER<br>STAIN REMOVER | 5,227,085 |
| MOTSENBOCKER'S LIFT OFF 4<br>SPRAY PAINT GRAFFITI<br>REMOVER | 5,415,800<br>5,484,487 |
| MOTSENBOCKER'S LIFT OFF 5<br>LATEX BASED PAINT<br>REMOVER | 5,227,085 |

*EXHIBIT A*

## *EXHIBIT B*

| LICENSED TRADEMARK | REGISTRATION NO./SERIAL NO. |
|---|---|
| MOTSENBOCKER'S LIFT OFF | 1,497,329 |
| REMOVAL MADE EASY | 74-467,437 |
| MAKING LIFE'S LITTLE PROBLEMS DISAPPEAR | |
| ALL STAINS ARE NOT CREATED EQUAL | |
| NAME THAT STAIN | 1,935,302 |
| KEEP OFF | 75-052,257 |

*EXHIBIT B*

# EXHIBIT C

# MOTSENBOCKER'S LIFT OFF INC.

## INVENTORY SALES HISTORY REPORT

### ITEM SUMMARY SORTED BY ITEM NUMBER
### FROM YEAR 2000 TO 2006

**428-01 MLO BRASS WASH-COATING REMOVER PROD LN: 4281 PROD TYP: FINISHED GOOD U/M: CASE**

| ITEM NUM. | JAN | FEB | MARCH | APRIL | MAY | JUNE | JULY | AUG | SEPT | OCT | NOV | DEC | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **YEAR: 2002** | | | | | | | | | | | | | |
| QTY SOLD: | 25 | 22 | 2 | 3 | 0 | 0 | 9 | 1 | 8 | 1 | 3 | 3 | 77 |
| $ SOLD: | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **YEAR: 2003** | | | | | | | | | | | | | |
| QTY SOLD: | 8 | 1 | 93 | 41 | 32 | 0 | 5 | 1 | 4 | 4 | 2 | 11 | 202 |
| $ SOLD: | 828 | 86 | 8,104 | 3,611 | 2,799 | 0 | 466 | 86 | 380 | 482 | 207 | 1,011 | 18,060 |
| **YEAR: 2004** | | | | | | | | | | | | | |
| QTY SOLD: | 4 | 5 | 4 | 0 | 7 | 1 | 1 | 3 | 1 | 1 | 12 | 3 | 42 |
| $ SOLD: | 380 | 432 | 380 | 0 | 628 | 121 | 86 | 259 | 121 | 86 | 1,044 | 293 | 3,830 |
| **YEAR: 2005** | | | | | | | | | | | | | |
| QTY SOLD: | 0 | 3 | 38 | 3 | 0 | 0 | 0 | 0 | 1 | 0 | 9 | 5 | 59 |
| $ SOLD: | 0 | 259 | 2,765 | 259 | 0 | 0 | 0 | 0 | 86 | 0 | 778 | 432 | 4,579 |
| **YEAR: 2006** | | | | | | | | | | | | | |
| QTY SOLD: | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| $ SOLD: | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **TOTAL FOR ITEM: 428-01 MLO BRASS WASH-COATING REMOVER** | | | | | | | | | | | | | |
| QTY SOLD: | 37 | 31 | 137 | 47 | 39 | 1 | 15 | 5 | 14 | 6 | 26 | 22 | 380 |
| $ SOLD: | 1,208 | 777 | 11,249 | 3,870 | 3,427 | 121 | 552 | 345 | 587 | 568 | 2,029 | 1,736 | 26,469 |
| **REPORT TOTAL:** | | | | | | | | | | | | | |
| QTY SOLD: | 37 | 31 | 137 | 47 | 39 | 1 | 15 | 5 | 14 | 6 | 26 | 22 | 380 |
| $ SOLD: | 1,208 | 777 | 11,249 | 3,870 | 3,427 | 121 | 552 | 345 | 587 | 568 | 2,029 | 1,736 | 26,469 |

# MOTSENBOCKER'S LIFT OFF INC.

## INVENTORY SALES HISTORY REPORT

### ITEM SUMMARY SORTED BY ITEM NUMBER
### FROM YEAR 2000 TO 2006

**ITEM NUM.** 429-01   MLO FINISH COAT   PROD LN: 4291   PROD TYP: FINISHED GOOD   U/M: CASE

| ITEM NUM. | JAN | FEB | MARCH | APRIL | MAY | JUNE | JULY | AUG | SEPT | OCT | NOV | DEC | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **YEAR: 2002** | | | | | | | | | | | | | |
| QTY SOLD: | 8 | 2 | 4 | 2 | 0 | 0 | 2 | 1 | 1 | 2 | 1 | 0 | 23 |
| $ SOLD: | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **YEAR: 2003** | | | | | | | | | | | | | |
| QTY SOLD: | 6 | 2 | 5 | 6 | 3 | 0 | 0 | 0 | 2 | 2 | 2 | 0 | 28 |
| $ SOLD: | 1,326 | 628 | 1,291 | 1,512 | 756 | 0 | 0 | 0 | 535 | 535 | 442 | 0 | 7,025 |
| **YEAR: 2004** | | | | | | | | | | | | | |
| QTY SOLD: | 2 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 2 | 8 |
| $ SOLD: | 535 | 221 | 0 | 0 | 0 | 314 | 314 | 0 | 0 | 0 | 221 | 535 | 2,140 |
| **YEAR: 2005** | | | | | | | | | | | | | |
| QTY SOLD: | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| $ SOLD: | 0 | 0 | 21 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 221 |
| **YEAR: 2006** | | | | | | | | | | | | | |
| QTY SOLD: | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| $ SOLD: | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **TOTAL FOR ITEM: 429-01  MLO FINISH COAT** | | | | | | | | | | | | | |
| QTY SOLD: | 16 | 5 | 10 | 8 | 3 | 1 | 3 | 1 | 3 | 4 | 4 | 2 | 60 |
| $ SOLD: | 1,861 | 849 | 1,512 | 1,512 | 756 | 314 | 314 | 0 | 535 | 535 | 663 | 535 | 9,386 |
| **REPORT TOTAL:** | | | | | | | | | | | | | |
| QTY SOLD: | 16 | 5 | 10 | 8 | 3 | 1 | 3 | 1 | 3 | 4 | 4 | 2 | 60 |
| $ SOLD: | 1,861 | 849 | 1,512 | 1,512 | 756 | 314 | 314 | 0 | 535 | 535 | 663 | 535 | 9,386 |

# EXHIBIT D

Y-T-D: CURRENT YEAR SALE
PRIOR: ALL SALES YEAR 200

| ZIP CODE | CUSTOMER NUMBER | NAME | AVG DAYS PAY/OVERDUE | | SALES | FINANCE CHARGES | NO. OF INVOICE | NO. OF FIN CHG |
|---|---|---|---|---|---|---|---|---|
| i01 | 01 - AT | ATLANTIC REFINISHING & REST. | | | | | | |
| | | 022 000 | Y-T-D: | | .00 | .00 | 0 | 0 |
| | | | PRIOR: | | .00 | .00 | 0 | 0 |
| '05 | 01 - MASTER | MASTER ADVANTAGE | | | | | | |
| | | 023 023 | Y-T-D: | | .00 | .00 | 0 | 0 |
| | | | PRIOR: | | .00 | .00 | 0 | 0 |
| '35 | 01 - LSR | LSR/ REFINISHING | | | | | | |
| | | 085 055 | Y-T-D: | | .00 | .00 | 0 | 0 |
| | | | PRIOR: | | .00 | .00 | 0 | 0 |
| '74 | 00 - DAYCON | DAYCON PRODUCTS COMPANY | | | | | | |
| | | 040 010 | Y-T-D: | | 10,121.81 | .00 | 7 | 0 |
| | | | PRIOR: | | 20,819.55 | .00 | 12 | 0 |
| i79 | 03 - TW | T W PERRY | | | | | | |
| | | 031 001 | Y-T-D: | | .00 | .00 | 0 | 0 |
| | | | PRIOR: | | 373.20 | .00 | 1 | 0 |
| )10 | 03 - ABER | ABERCROMBIE & CO. SILVER | | | | | | |
| | | 035 035 | Y-T-D: | | .00 | .00 | 0 | 0 |
| | | | PRIOR: | | .00 | .00 | 0 | 0 |
| :24 | 00 - BALT | BALTIMORE JANITORIAL | | | | | | |
| | | 128 098 | Y-T-D: | | .00 | .00 | 0 | 0 |
| | | | PRIOR: | | .00 | .00 | 0 | 0 |
| 30 | 03 - FELMOR | FELMOR CORPORATION | | | | | | |
| | | 048 018 | Y-T-D: | | .00 | .00 | 0 | 0 |
| | | | PRIOR: | | .00 | .00 | 0 | 0 |
| | | REPORT TOTALS - Y-T-D: | | | 10,121.81 | .00 | 7 | 0 |
| | | REPORT TOTALS - PRIOR: | | | 21,192.75 | .00 | 13 | 0 |
| | | NUMBER OF CUSTOMERS: | 8 | | | | | |

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| GEORGE A. BROOKS, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>MOTSENBOCKER ADVANCED<br>DEVELOPMENTS, INC., et al.,<br><br>Defendants.<br>_____ | ) Case No. 8:06-cv-01024-AW<br>)<br>) SUPPLEMENTAL DECLARATION<br>) OF GREGG A. MOTSENBOCKER IN<br>) SUPPORT OF DEFENDANTS'<br>) MOTION TO DISMISS FOR LACK<br>) OF PERSONAL JURISDICTION, OR<br>) IN THE ALTERNATIVE, TO<br>) TRANSFER THE CASE AND STAY<br>) DISCOVERY<br>)<br>) Judge Alexander Williams<br>) Greenbelt Division |

I, Gregg A. Motsenbocker declare:

I am President of Motsenbocker Advanced Developments, Inc., and I have personal knowledge of the facts stated herein and if called as a witness would and could testify truthfully thereto.

1.    Plaintiffs repeatedly misrepresent that they "developed," what they define as the subject of their suit, "the Product sold as a stripper" Comp. ¶ 15, "marketed" as "Brass Wash," Comp. ¶ 16. The design and use of these products are within those I patented, nearly five years before I met Mr. Brooks, then licensed to Motsenbocker Advanced Developments, Inc., under Patent Numbers 5,484,487 and 5,415,800, which are attached hereto as Exhibit A.

2.    I did not, and would not, promise Mr. Brooks, an individual, self-described painter and warehouseman, a commission on sales of the identified products, particularly when the multi-billion dollar, multi-national Ecolab was required to pay $250,000, up-front, for an exclusive license to

distribute the Defendants' patented products as a wholesaler, which distributorship/license agreement is attached hereto as Exhibit B, and was terminated after Ecolab's breach of the contract in 1999.

3.      As with most nationwide distribution channels, the Defendants' internet listing of retail and commercial dealers, Plaintiffs' Ex. C, was obtained from the national chain stores, who buy the Defendants' products from their national headquarters for shipment to their regional centers, none of which are located in Maryland.

4.      The distributorship/license agreement, between Minnesota based Ecolab and California based Motsenbocker Advanced Developments, Inc., was not executed in Maryland, nor governed by Maryland law, Ex. B, ¶ 11.2, and required written consent by Motsenbocker Advanced Developments Inc. for any sub-license, Ex. B. ¶¶ 2.3.1, 2.3.3.1, 2.3.4, 4.8, 11.1, 11.11, and 11.13, which was never given for any alleged agreement between Ecolab and Plaintiffs.

5.      Defendants' entire nationwide sales of the subject of the Plaintiffs' alleged sales representative agreement, "the Product sold as a stripper," "marketed" as "Brass Wash," and "Finish Coat," have only been $36,000, since the inception of the Products, which is reflected in the spreadsheet from the Defendants' accounting software, Exhibit C, attached hereto.

6.      Motsenbocker's Advanced Developments Inc. has sold only $21,192.75 of all of its products in Maryland, during the last full year for which data is available, which is reflected in the spreadsheet from the Defendants' accounting software, Exhibit D, attached hereto.

7.      The only witnesses and evidence of which the Defendants are aware concerning the purported sales, on which the Plaintiffs claim a commission, and define as "the Product sold as a stripper" Comp. ¶ 15, "marketed" as "Brass Wash," Comp. ¶ 16, and the "Finish Coat," Comp. ¶ 18, are in San Diego, California.

I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed on July 18, 2006 at San Diego, California.

Gregg A. Motsenbocker

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| George A. Brooks et al | ) | |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | Civil Action No. 06cv1024 AW |
| | ) | Judge Alexander Williams, Jr. |
| Motsenbocker Advanced Developments, Inc. et al | ) ) | |
| Defendants. | ) ) | |

## Motion for Leave to File Surreply Memorandum

Pursuant to Local Rule 105(2)(a) and Fed. R. Civ. P. 7(b), the plaintiffs request leave to file a surreply memorandum in opposition to defendants' motion to dismiss.

Respectfully submitted,

Dated: 26 July 2006      Signed:     /s/
                                  Michael J. Trevelline, Maryland Fed. Bar No. 14733
                          Address:    1823 Jefferson Place, NW
                                    Washington, DC 20036-2504
                          Telephone:   (202) 737-1139/Fax: (202) 775-1118
                          Email:       mjt@mjtlegal.com

**Attorney for Plaintiffs George Brooks and Brooks Industries, Inc.**

### Certificate of Attempted Consent

I hereby certify that consent for the relief sought in this motion was diligently sought but

__X__ was refused.

_____ Communication with the affected party was attempted but was unsuccessful.

/s/
Michael J. Trevelline

### Certificate of Service

I hereby certify that this motion and supporting memorandum this 26th day of July 2006 was

*Motion for Leave to File Surreply—Page 1*

served by electronic case filing through the Court

/s/ _____<br>
Michael J. Trevelline

## <u>Memorandum of Points and Authorities in Support of Motion</u>

Defendants filed a motion to dismiss for lack of personal jurisdiction supported by a seven-page memorandum. They have now filed a much larger eighteen-page reply memorandum supported by several exhibits including a supplemental factual affidavit. Plaintiffs suggest that, out of fairness, they be allowed to respond to the reply, which presents new legal arguments and new evidence. Some of the reasons supporting this motion include:

1. Plaintiffs have never had the opportunity to respond to the lengthy argument defendants make in their reply, but failed to include in their original memorandum.

2. Defendants in their reply misread the complaint to limit it to seeking recovery of commissions only on "brass wash" and "finish coat" and present detailed statistics showing little or no such sales and showing that such sales ended some time ago. To the contrary, the complaint very clearly seeks recovery of commissions for all sales of Motsenbocker Developments' graffiti remover sold as a coating remover ("the Product"). Plaintiffs need the opportunity to point out to the Court defendants' misreading of the complaint and that the defendants have presented no statistics showing what the sales of the Product at Home Depot and other outlets may be, statistics the Court would need to grant defendants' motion.

3. Plaintiffs have obtained an affidavit of Mr. Walter Noga stating that Mr. Gregg Motsenbocker did travel to Maryland to met

*Motion for Leave to File Surreply—Page 2*

Mr. George Brooks and would like to present it to the Court.  That
Mr. Motsenbocker entered Maryland to negotiate and to enter into an
agreement with Mr. Brooks is significant to the jurisdiction
question.

    4.  Mr. Motsenbocker contradicts his own affidavit in his
reply.  In his original affidavit attached to the motion, Mr.
Motsenbocker denies making Mr. Brooks a sales representative
through Ecolab (Motsenbocker Affidavit ¶ 7) while in his reply he
admits such an arrangement existed (Reply Memorandum p. 5).  For
the sake of fairness, plaintiffs should be allowed to point this
and other defects out and to counter defendants' legal arguments.

    Undersigned counsel will be on vacation from 28 July through 6
August and so requests until 21 August to file a surreply.

    WHEREFORE, since defendants have filed a reply much larger than
their original motion and have therein raised new arguments and
presented new facts, plaintiffs must in all fairness be given leave
to oppose these arguments and evidence.

                              Respectfully submitted,


Dated:  26 July 2006         Signed:        /s/_____
                                            Michael J. Trevelline, Maryland Fed. Bar No. 14733
                             Address:       1823 Jefferson Place, NW
                                            Washington, DC 20036-2504
                             Telephone:     (202) 737-1139/Fax:  (202) 775-1118
                             Email:         mjt@mjtlegal.com

                             **Attorney for Plaintiffs George Brooks and Brooks Industries, Inc.**

1 Exhibit:
A.  Proposed Order


                                                        *Motion for Leave to File Surreply—Page 3*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| **George A. Brooks et al** ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Civil Action No. 06cv1024 AW |
| vs. ) | Judge Alexander Williams, Jr. |
| ) | |
| **Motsenbocker Advanced Developments,** ) | |
| **Inc. et al** ) | |
| Defendants. ) | |
| ) | |

## Order

This matter came before the Court upon plaintiffs' Motion for Leave to File Surreply Memorandum, and it appearing that good cause exists for such motion;

IT IS THEREFORE ORDERED, that the motion be, and it is, hereby GRANTED.

Plaintiffs shall have until 21 August 2006 to file a surreply memorandum.

Dated:_____

_____
The Honorable Alexander Williams, Jr.

Copies to:

Michael J. Trevelline
Attorney-at-Law
1823 Jefferson Place, NW
Washington, DC  20036-2504

Aaron J. Snow
Boies, Schiller & Flexner LLP
5301 Wisconsin Avenue, NW, Suite 800
Washington, DC  20015

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| GEORGE A. BROOKS, et al., | ) | Case No. 8:06-cv-01024-AW |
| | ) | |
| Plaintiffs, | ) | **DEFENDANTS' OPPOSITION TO** |
| vs. | ) | **PLAINTIFFS' MOTION FOR LEAVE** |
| | ) | **TO FILE A SURREPLY TO** |
| MOTSENBOCKER ADVANCED | ) | **DEFENDANTS' MOTION TO** |
| DEVELOPMENTS, INC., et al., | ) | **DISMISS FOR LACK OF PERSONAL** |
| | ) | **JURISDICTION, OR IN THE** |
| Defendants. | ) | **ALTERNATIVE, TO TRANSFER THE** |
| | ) | **CASE AND STAY DISCOVERY** |
| | ) | |
| | ) | Judge Alexander Williams |
| | ) | Greenbelt Division |

Defendants Motsenbocker Advanced Developments, Inc., Gregg A. Motsenbocker, and Skip A.

Motsenbocker (collectively "Defendants") submit this memorandum of points and authorities in

opposition to Plaintiffs' motion for leave to file a surreply.

## I.    SURREPLIES ARE DISFAVORED

Local Rule 105.2(a) provides: "Unless otherwise ordered by the Court, surreply memoranda are

not permitted to be filed." Unless requested by the court, no response to the reply brief is allowed.

Schwarzer, et al., Federal Civil Procedure before Trial 12:110 (Rutter 2006), citing Springs Indus., Inc.

v. Am. Motorists Ins. Co., 137 F.R.D. 238, 240 (N.D. Tex. 1991). Surreplies are not permitted without

leave of court. Taylor v. Sebelius, 350 F. Supp. 888, 900 (D. Kan. 2004), citing Humphries v. Williams

Nat. Gas Co., Case No. 96-4196-SAC, 1998 WL 982903, at *1 (D. Kan. Sept. 23, 1998).

"That Anchor failed to put forth its best case in its opposition is not grounds for permitting a surreply." U.S. v. Baroid Corp., 346 F. Supp. 138, 143 (D.D.C. 2004). A motion to file a surreply will be denied where it does not supply adequate grounds for the filing of such a further response, in that "new matter" was not introduced in the reply as that term is defined in the caselaw. U.S. ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc., 238 F. Supp. 2d 270, 279 (D.D.C. 2002). See also Derringer v. Denko, 126 Fed. Appx. 901, 903 (10th Cir. 2005) (motion for leave to file surreply denied because the reply raised no new legal argument or evidentiary material).

A reply brief on a motion to dismiss for lack of jurisdiction may properly address matters raised in the opposition brief and affidavits, particularly where the plaintiff fleshes out the complaint by introducing facts not pled in the complaint. See, e.g., Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb, Inc., 767 F. Supp. 1220, 1235 (S.D.N.Y. 1991), rev'd on other grounds, 967 F.2d 742 (2nd Cir. 1992). It is within a district court's discretion to consider issues raised in a defendant's reply which are responsive to a plaintiff's opposition to a motion to dismiss. See, e.g., Glenn K. Jackson v. Roe, 273 F.3d 1192, 1201-1202 (9th Cir. 2001).

## II.    DEFENDANTS' REPLY MERELY RESPONDED TO PLAINTIFFS' OPPOSITION AND DID NOT RAISE ANY ISSUES THAT PLAINTIFFS HAD NOT ALREADY RAISED

Plaintiffs' motion for leave to file a surreply fails to advance any new legal arguments or allege any new facts that were not raised either in Defendants' original motion to dismiss or in Plaintiffs' 28-page opposition to Defendants' motion.

Contrary to Plaintiffs' false assertion in their moving papers that Defendants have misread the Complaint, see Mot. ¶ 2, it is Plaintiffs who defined the "products" for which they seek a commission in this dispute as: "the Product sold as a stripper," Compl. ¶ 15, and "marketed" as "Brass Wash," Compl. ¶

16, and "Finish Coat," Compl. ¶ 18, even though Plaintiffs admit that what was sold as "Brass Wash" was patented by the inventor, Gregg Motsenbocker, Compl. ¶ 9, nearly five years before he met Mr. Brooks, and was licensed to Motsenbocker Advanced Developments Inc. Now, in a motion for leave to file a surreply, Plaintiffs seek to improperly amend the Complaint to expand their claim for commissions to all sales of the patented product, now seeking "commissions for all sales of Motsenbocker Developments' graffiti remover sold as a coating remover," without any evidentiary support that Plaintiffs had anything to do with the development of the patented product for which they wishfully seek to obtain commissions.

As noted above, the Plaintiffs' failure to put forth their best case in its opposition is not grounds for permitting a surreply. Baroid, 346 F. Supp. at 143. Hence, the purported Walter Noga affidavit should not be belatedly admitted in violation of the filing deadlines set out in Local Rule 105.

Contrary to Plaintiffs' false assertion, Mr. Motsenbocker did not admit that Mr. Brooks was a sales representative through Ecolab. In fact, at page 4-5 of their reply, Defendants categorically stated: "There is no credible, nor admissible, evidence that the Defendants had any agent in Maryland."

## III.    CONCLUSION

It is quite clear that Plaintiffs' counsel merely wants a third bite at the apple, in hopes that he can state a viable cause of action for personal jurisdiction over the California Defendants that he failed to establish in the Complaint and his original opposition. Defendants have raised no new legal or factual issues in their reply that were not in direct response to the 28-page opposition filed by Plaintiffs. Defendants' reply merely responds to Plaintiffs' opposition, explaining that Plaintiffs' erroneous allegations cannot satisfy their burden of proof as to the court's lack of personal jurisdiction over the

defendants and that the court lacks proper diversity jurisdiction over the defendants, as set out in

Defendants' original motion to dismiss.

For all of these reasons, Plaintiffs' motion for leave to file a surreply should be denied in all

respects.


Dated: August 14, 2006                     By:    /s/_____
                                           Aaron J. Snow
                                           Attorneys for Defendants
                                           Boies, Schiller & Flexner LLP
                                           5301 Wisconsin Ave., N.W., Ste. 800
                                           Washington, D.C. 20015
                                           Tel: 202-237-2727
                                           Fax: 202-237-6131
                                           asnow@bsfllp.com

                                           Patrick D. Webb
                                           Attorneys for Defendants
                                           Webb & Carey
                                           401 B Street, Ste. 306
                                           San Diego, CA  92101
                                           Tel: 619-236-1650
                                           Fax: 619-236-1283
                                           pwebb@webbcarey.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

| | | |
|---|---|---|
| GEORGE A. BROOKS, *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action No. AW-06-1024 |
| MOTSENBOCKER ADVANCED DEVELOPMENTS, INC., *et al.*, | * | |
| Defendants. | * | |

\* \* \* \* \*

## ORDER

Currently pending before the Court is Plaintiffs' Motion for Leave to File a Surreply [17]. The Motion has been fully briefed and is now ripe for resolution. Although Local Rule 105.2 discourages the filing of surreply memoranda and permits their submission only when ordered by the Court, the Court believes that Defendants have presented additional arguments and evidence that warrant the acceptance of a surreply. Therefore, IT IS this 31st day of August, 2006, by the United States District Court for the District of Maryland, hereby **ORDERED**:

1. That Plaintiffs' Motion for Leave to File a Surreply [17], BE, and hereby IS, **GRANTED**;

2. That Plaintiffs have until September 8, 2006 to submit a surreply; AND

2. That the Clerk of the Court transmit a copy of this Order to counsel of record.

　　　　　　　　　　　　　　　　　　　/s/
　　　　　　　　　　　　　　　　　Alexander Williams, Jr.
　　　　　　　　　　　　　　　　　United States District Judge

1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| George A. Brooks et al | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| Motsenbocker Advanced Developments, | ) |
| Inc. et al | ) |
| Defendants. | ) |

Civil Action No. 06cv1024 AW
Judge Alexander Williams, Jr.

**Surreply Memorandum of Points and Authorities**

**in Opposition to**

**Defendants' Motion to Dismiss**

**for Lack of Personal Jurisdiction,**

**or in the Alternative,**

**to Transfer the Case and Stay Discovery**

### I.  Definition of "the Product"

The Complaint seeks commissions on sales of what it defines as "the Product."  Defendants provide no information about "the Product," but rather read the Complaint to limit it to seeking recovery of commissions on "brass wash" and "finish coat" and present detailed statistics showing little or no such sales and showing that such sales ended some time ago.  Based on the small amount of sales of "brass wash" and of "finish coat," defendants argue both that the $75,000 jurisdictional requirement cannot be met and also that no personal jurisdiction can be had in Maryland over Motsenbocker Developments since it has no current and so little sales of these products in Maryland.  Defendants present

*Surreply Memorandum—Page 1*

statistics at Exhibit C of the Reply Memorandum showing that sales of "brass wash-coating remover" ended in 2005 (wholly consistent with Brooks' Complaint and Affidavit). And defendants present Gregg Motsenbocker' citation to these statistics in his Supplemental Declaration at paragraph 5.

A puzzling misreading of the Complaint is the most charitable description that can be given to defendants' reading. For the Complaint in the fact section, in the counts section, and in the WHEREAS section claims a commission of all sales of "the Product" sold as a stripper used in refinishing wood and metal. The Complaint makes it clear that the Product was sold under various names and never purports to provide an authoritative list of all the different names used. For example, Brooks says: "I developed other uses and names for the Product, all done in Maryland;" (Brooks Affidavit ¶ 6) and he says that the Product is labeled as "MÖTSENBÖCKER'S LIFT OFF®" under that name and with various additional titles serving to identify particular uses . . . ." (Complaint ¶ 10.) In fact, the complaint alleges that defendants and plaintiffs started to market "the Product" in 2001 under the labels "coating remover" and "lacquer remover" (Complaint ¶ 31 & 32) so that the lack of current sales under the earlier label "brass wash" is quite understandable. Without conducting discovery, the plaintiffs have no means of knowing what names Motsenbocker Developments is marketing "the Product" under currently.

Therefore, the defendants' presentation of statistics showing sales of "the Product" under the label "brass wash" and refusal to provide statistics showing sales of "the Product" under other

*Surreply Memorandum—Page 2*

labels indicates that defendants do not take their jurisdiction argument seriously.

As explained further below, the plaintiffs have alleged that defendants are selling substantial amounts of "the Product" through Home Depot and other retail outlets.  The defendants have not denied this, nor have they presented statistics on the Home Depot sales.  Through the Complaint and the supporting affidavit of Brooks, the plaintiffs have met their burden of proof on this matter especially since the Court "must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction."  Giannaris v. Cheng, 219 F. Supp. 2d 687, 691 (D. Md. 2002).  In fairness, the defendants' disinclination to provide the relevant statistics should be construed as an admission of the allegations of the Complaint on this jurisdiction question.  Finally, for the court to find that "the Product" is not being sold in large amounts through Home Depot and other outlets would be unfair for the same reason of lack of evidence before it.  Before making such a finding, the Court would have to grant defendants leave to conduct discovery on the jurisdiction question.

Undersigned counsel apologizes for appearing tedious, but will now cite to the relevant portions of the Complaint in order to demonstrate how unfair it would be to limit it to be seen as a claim on "brass wash."  The complaint alleges that "Motsenbocker Developments possesses patents (Patent Numbers 5,484,487 and 5,415,800) on a biodegradable, water-based, nonflammable, liquid

*Surreply Memorandum—Page 3*

cleaner used to remove paint and paint-like coverings and deposits" and defines this cleaner as "the Product." (Complaint ¶ 9.) It then alleges that "Motsenbocker markets and labels the Product as MÖTSENBÖCKER'S LIFT OFF® under that name **and with various additional titles serving to identify particular uses** and with at times a gel additive making it more suitable for particular uses." (Complaint ¶ 10.) (Emphasis added.) The complaint describes how Motsenbocker Developments marketed the Product only as a graffiti remover; Brooks discovered it worked as a remover and stripper of coverings or coatings so that the Product could be used to refinish metal and wood and proposed to develop and market the product in this way. (Complaint ¶¶ 12, 13, 14, 17.)

The complaint goes on to describe an agreement that Motsenbocker Developments and its agent Ecolab entered into with Brooks to develop and to market the Product. Paragraphs 21 through 24 describe a 1999 meeting where "Motsenbocker Developments offered to engage Brooks as the sales representative for the Product" (Complaint ¶ 22) where the parties "were to share revenues from North American sales of the Product and in fact worked very closely together to develop and promote the Product so that the Agreement was a type of partnership agreement, with the purpose of developing the Product into use as a refinishing stripper with various formulations" (Complaint ¶ 24). Brooks developed the product for several years. (Complaint ¶¶ 30, 31, 33.) Finally, the complaint alleges that Motsenbocker Developments negotiated for Home Depot to carry the Product (Complaint ¶ 59), and is now "selling large quantities of the Product throughout North America though Home Depot so that large commissions are due and owing to Brooks or

Brooks Industries" (Complaint ¶ 60), but Motsenbocker Developments refuses to pay Brooks his commission (Complaint ¶ 62).  Since filing the complaint, Brooks has learned that Motsenbocker Developments is also selling the Product through other distributors.  (Brooks Affidavit ¶ 10.)

Thus, the essence of the complaint is that Brooks is suing under a partnership agreement to recover commissions owing.  The Product is described in the complaint in detail especially at paragraph 9.

## II.  Law of Personal Jurisdiction

Plaintiffs wish to briefly point out errors, absences of evidence, and logical fallacies found in the Reply Memorandum of defendants.  Defendants use several pages to cite legal precedent to the effect that the law places little value on conclusory, contradictory, and incredulous allegations (Reply Memorandum 1-5), but nowhere do the defendants actually point to any way in which the twenty-three page complaint and the nine-page Brooks Affidavit (attached to the Opposition Memorandum) could be characterized in these ways.

On pages five to six of their Reply Memorandum, defendants add an odd twist to their slight-of-hand discussion of the Product.  Suddenly they drop the pretense that the Product is limited to some of the marketing labels mentioned in the Complaint and discuss the Product as currently found in Maryland Home Depot stores.  They make the farfetched argument that even if Brooks found the Product in Maryland stores, such does not establish that anyone actually is buying the Product.  If not farfetched, then the argument is legally incorrect since it would consist in arguing that deductive

*Surreply Memorandum—Page 5*

proof alone is allowed in courts of law, inductive reasoning not being permitted.  To the contrary, that the law accepts inductive reasoning, circumstantial evidence, is axiomatic.  <u>See</u>, <u>e.g.</u>, Ruggero J. Aldisert, <u>Logic for Lawyers: A Guide to Clear Legal Thinking</u> 89 et seq. (3rd ed. 1997); 4: 74-6 <u>Modern Federal Jury Instructions—Civil</u>, ¶ 74.02 (Matthew Bender).  Without discovery, Brooks has no way of showing how much of the Product is being purchased in Maryland; however, the plaintiffs have plead on information and belief that large quantities of the Product are being sold in North America including in Maryland and has pointed to circumstantial evidence supporting this.  The defendants have offered no denial.  Again, defendants refusal to provide any statistics on sales of the Product is quite telling—instead of providing the facts they limit their argumentation to farfetched or incorrect propositions.

Defendants do present a Supplemental Declaration of Gregg Motsenbocker, but the affidavit goes out of its way to provide virtually no facts.  For example, paragraph three acknowledges that Motsenbocker Developments is selling the Product through various national distributors, but instead of providing statistics of what sales are being made through these distributors, Gregg Motsenbocker seems to make a legal argument that he does not think the sales should be considered since the distributors are not based in Maryland.  This "factual declaration" provides so few facts, leaves so many questions unanswered, makes so many arguments (implicit and explicit), that it is difficult to see how it could be considered a factual declaration at all.

Defendants fault plaintiffs for not attaching a copy of the

*Surreply Memorandum—Page 6*

written agreement between Brooks and Motsenbocker Developments'
agent Ecolab (Reply Memorandum 7-8), but fails to explain how
before discovery has begun plaintiffs can be expected to produce
all the documents and statistics potentially available. Moreover,
plaintiffs attach to this Memorandum as Exhibit A an affidavit of
Mr. Walter Noga, Ecolab's Maryland representative, stating that
indeed "George Brooks was Ecolab's North American sales
representative for a prototype Motsenbocker Liftoff product used to
clean metal. Brooks had taken a graffiti remover of Motsenbocker
Developments and had proposed to market it as a stripper of
coverings on metal surfaces." Again defendants' tact is quite
telling—they decline to present virtually any evidence on the
jurisdiction question even though an enormous amount of evidence is
in their control, but limit themselves to making arguments based on
the fact that discovery has not yet occurred.

In a similar manner, defendants do provide a copy of an
agreement between Motsenbocker Developments and Ecolab. (Reply
Memorandum Exhibit B.) However, paragraph 2.5 of this agreement
contemplates supplemental agreements being entered into should
Motsenbocker Developments develop additional products. A new
product was developed, the Product, but defendants fail to provide
the supplemental agreement, a supplemental agreement that plaintiff
Brooks knows for a fact was entered into.

Defendants do break with their policy of stonewalling on the
facts and toss to the Court one tantalizing tidbit of a seemingly
relevant fact: Motsenbocker Developments derives less than one-
half of one percent of sales in Maryland (Motsenbocker Affidavit ¶
11) and "has sold $21,192.75 of all of its products in Maryland,

*Surreply Memorandum—Page 7*

during the last full year for which data is available, which is reflected in the spreadsheet from the Defendants' accounting software, Exhibit D, attached hereto" (Motsenbocker Supplemental Declaration ¶ 6).

A review of these assertions of fact reveals them to be incomplete, suspicious and untrustworthy. To begin, Motsenbocker only vaguely alludes to "the last full year for which data is available." Why did not Motsenbocker state the year in his Supplemental Declaration? What exactly is that full year? This Court has no idea, other than the first two digits start with 20. Exhibit D does not provide the answer since the year in the top right corner has been cut off. In addition, the distributors that Brooks asserts is selling large quantities of the Product—Home Depot, Ace Hardware, Dutch Guard—are not listed in the Exhibit D spreadsheet. In other words, the one tidbit of information that defendants do provide turns out to be virtually worthless. The Complaint makes it clear that Brooks believes much of the Product is being sold through Home Depot. Defendants provide no record of Home Depot sales. This leaves only three possible conclusions: (1) the statistics are from a year before Home Depot started distributing in full measure the Product or (2) the statistics do not include Home Depot sales or (3) there are no Home Depot sales of the Product. Defendants have nowhere denied Home Depot sales (for such would be an evident lie) so that only the first two alternatives apply, both alternatives indicating the statistics provided are wholly unhelpful.

In addition, defendants misconstrue the law of in-state sales. Plaintiffs in their Opposition Memorandum point out that under the

*Surreply Memorandum—Page 8*

analysis of section (b)(4) of the Maryland long-arm statute, courts look to several factors in deciding whether personal jurisdiction can be had; one of those factors is the percentage of in-state sales, and one-half of one percent has been found to be a significant percentage. (Opposition Memorandum 15-16.) Defendants never argued that the percentage of sales alone would establish jurisdiction. Interestingly, the new fact that Motsenbocker does now provide--$21,192 in Maryland sales in some unidentified past years exclusive of sales through Home Depot, Ace Hardware, Dutch Guard—supports a finding of personal jurisdiction. In finding personal jurisdiction over a defendant corporation, this Court stated:

> [T]his Court would still find that the proceeds of this transaction were substantial both in terms of gross amount and as a percentage of overall sales. The sale [of a product by plaintiff to defendant] realized more than $30,000, representing nearly ¼ of 1 percent of [defendant's] total 1975 sales. The dollar value of the sales, of course is not to be viewed in the abstract; but, in the light of all circumstances, the Court views it as substantial. Indeed, much smaller sums have been regarded as "substantial." The percentage of gross sales represented by these proceeds, while not dispositive, is a significant factor in this assessment.

United Merchants & Mfrs. Inc. v. David & Dash, Inc., 439 F. Supp. 1078, 1084-85 (1977) (citations omitted). Thus, that Motsenbocker Developments is deriving Maryland revenues greatly in excess of $21,192 when probable Home Depot sales are included is a significant consideration in favor of a finding of personal jurisdiction. Please see plaintiffs' original Opposition Memorandum at pages 13 to 19.

### III.   $75,000 Amount in Controversy Requirement

As discussed in Section I above, plaintiffs are seeking

*Surreply Memorandum—Page 9*

recovery of ten percent commissions on all sales of the Product for
an indefinite period of time.  Plaintiffs allege that the Product
is being sold at stores with an extensive North American presence
to include Home Depot, Ace Hardware, and Dutch Guard (Brooks
Affidavit ¶ 10; Complaint ¶ 60), and plaintiffs ask the Court to
take judicial notice that Home Depot and Ace Hardware have many
retail outlets throughout North America.  Finally, plaintiffs
allege that the Product possesses significant and unique
attributes—water-based, non-toxic, biodegradable—so that sales of
the Product are likely brisk and will continue to be so for years
to come.  (Brooks Affidavit ¶¶ 4, 8; Complaint ¶ 14.)  Under these
circumstances, the value of plaintiffs' claim is greatly in excess
of $75,000 and the defendants have presented no "competent proof"
that it is less than $75,000; indeed, they have declined to present
any evidence at all of sales of the Product through Home Depot and
other outlets.  As pointed out on pages twenty-two and twenty-three
of the Opposition Memorandum, Gregg Motsenbocker in his original
declaration refused to provide the Court with the gross sales
figures of the Product at Home Depot and elsewhere and he continues
his refusal in this supplemental declaration.

### IIII.  Conclusion

WHEREFORE, since "specific jurisdiction" exists over all three
defendants, the motion of defendants must be denied.

Respectfully submitted,

| Dated: 8 September 2006 | Signed: | /s/ |
| | | Michael J. Trevelline, Maryland Fed. Bar No. 14733 |
| | Address: | 1823 Jefferson Place, NW |
| | | Washington, DC 20036-2504 |
| | Telephone: | (202) 737-1139/Fax:  (202) 775-1118 |
| | Email: | mjt@mjtlegal.com |

*Surreply Memorandum—Page 10*

**Attorney for Plaintiffs George Brooks and Brooks Industries, Inc.**

1 Exhibit:
A.  Affidavit of Walter Noga

## Certificate of Service

I hereby certify that the **foregoing this 8 September 2006** was served by electronic case filing through the Court

_/s/_____
Michael J. Trevelline

*Surreply Memorandum—Page 11*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **George A. Brooks et al** ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | Civil Action No. 06cv1024 AW |
| ) | Judge Alexander Williams, Jr. |
| **Motsenbocker Advanced Developments,** ) | |
| **Inc. et al** ) | |
| Defendants. ) | |
| ) | |

## <u>Affidavit of Walter Noga</u>

State of Maryland        )
                         ) ss:
County of Montgomery

  I, Walter Noga, do hereby depose and say:

  1.    I am over the age of 18 and am competent to testify and to make this affidavit from personal knowledge.  I am a Maryland resident.

  2.    I am presently employed in Maryland by Calico Industries. From to 1976 to 2002, I was employed by Ecolab, Inc. as a sales representative/manager for cleaning and maintenance products.  I worked out of Maryland for Ecolab.  Ecolab was a Minnesota based company doing business in Maryland.  In the late 1990s, Ecolab was the North American institutional distributor of Liftoff products manufactured by Motsenbocker Advanced Developments, Inc. of San Diego, California.

  3.    In the late 1990s, George Brooks was Ecolab's North

*Affidavit of Walter Noga—Page 1 of 2*

American sales representative for a prototype Motsenbocker Liftoff product used to clean metal.  Brooks had taken a graffiti remover of Motsenbocker Developments and had proposed to market it as a stripper of coverings on metal surfaces.

4.    I believe sometime in 1999, Gregg Motsenbocker, the president of Motsenbocker Developments, came to Maryland and met George Brooks.  I believe the meeting took place at the Marriott hotel located near BWI airport.  Following the meeting, I believe Gregg Motsenbocker traveled to New York to meet with David Straub of the Metal Maintenance Industrial Association in order to promote this metal cleaning product Brooks was selling. It is possible I traveled with Gregg to this meeting, however, I cannot remember this as fact.

a. I declare under penalty of perjury that the foregoing is true and correct as to the best of my recollection at this time.

Executed on _____7-24-06_____.

Walter Noga

*Affidavit of Walter Noga—Page 2 of 2*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### SOUTHERN DIVISION

CHAMBERS OF
ALEXANDER WILLIAMS, JR.

UNITED STATES DISTRICT JUDGE

6500 CHERRYWOOD LANE
GREENBELT, MARYLAND 20770

301/344-0637
**fax** 301/344-0672

November 28, 2006

MEMO TO COUNSEL RE:
GEORGE A. BROOKS, et al.
v.
MOTSENBOCKER ADVANCED
DEVELOPMENTS
(AW-06-1024)

Dear Counsel:

The Court has set in a hearing on the Motion to Dismiss in the above referenced matter. It will take place on December 5, 2006 at 9:00 a.m. in the United States District Court for the District of Maryland, Southern Division, courtroom, 4A.

Despite the informal nature of this ruling, it shall constitute an Order of Court, and the Clerk is directed to docket it accordingly.

_____/s/_____
Alexander Williams, Jr.
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

GEORGE A. BROOKS, *et al.*,           *

         Plaintiffs,       *

      v.              *     Civil Action No. AW-06-1024

MOTSENBOCKER ADVANCED
DEVELOPMENTS, INC., *et al.*,     *

        Defendants.     *
                  * * * * *

## MEMORANDUM OPINION

This action involves a suit brought by George A. Brooks ("Brooks" or "Plaintiff") and Brooks Industries, Inc. against Motsenbocker Advanced Developments, Inc. ("Motsenbocker"), Gregg Motsenbocker, and Skip Motsenbocker (collectively "Defendants") for breach of contract, misrepresentation, and related claims. Currently pending before the Court is Defendants' Motion to Dismiss for Lack of Jurisdiction, or in the alternative, To Transfer the Case and Stay Discovery (Paper No. 10). On December 5, 2006, the Court heard oral arguments on the motion in open court. The Court has reviewed the entire record, including the Pleadings with respect to the instant motion and the arguments of counsel. For the reasons stated below, the Court will grant Defendants' motion to dismiss.

## FACTUAL & PROCEDURAL BACKGROUND

The following facts are taken in the light most favorable to Plaintiffs. Brooks is a resident of Prince George's County, Maryland and Brooks Industries is a Maryland corporation with its principal place of business in Prince George's County, Maryland. Motsenbocker is a California corporation with its principal place of business in San Diego, California. Individual Defendants

1

Gregg and Skip Motsenbocker are both residents of San Diego, California.

Motsenbocker owns patents (U.S. Patent Nos. 5,484,487 and 5,415,800) on a biodegradable, water-based, nonflammable, liquid cleaner used to remove paint and paint-like coverings and deposits (the "Product"). Motsenbocker markets and labels the Product as MÖTSENBÖCKER'S LIFT OFF® under that name and with various additional titles serving to identify particular uses and with, at times, a gel additive making it more suitable for particular uses. In May 1998, Brooks purchased a bottle of the Product in a Maryland store marketed as a graffiti remover with a disclaimer that it is not to be used on painted wood and metal. As an experiment, Brooks tested the Product as a stripper for removing clear coats from brass, finding that it worked well. Brooks telephoned Motsenbocker and spoke to Gregg Motsenbocker. After receiving assurances from Gregg Motsenbocker that he would not steal Brooks' ideas, Brooks related that following the death of workers stripping brass with flammable strippers, the painting industry was looking for a water-based brass stripper and that the Product seemed to fulfill this need. Brooks proposed marketing it for Motsenbocker.

Motsenbocker agreed and allegedly arranged for Brooks to sign a contract with Ecolab. At that time, Ecolab possessed the exclusive rights to market the Product wholesale under a distributorship/license agreement ("Distributorship Agreement") between Ecolab and Motsenbocker.[1] In or about August 1998, Brooks entered into a written contract with Ecolab making Brooks the exclusive North American sales representative of the Product sold as a stripper

---

[1] The relationship between Motsenbocker and Ecolab began in 1996 and ended in 1999, more than five years before this action commenced.

2

to remove coatings such as paint, lacquers, and varnish.[2]   The terms of the agreement allegedly included that Brooks would be paid exclusively by commission earning 12% of the first million dollars in sales, 10% of the next half million, and 8% thereafter.   As the exclusive sales representative, Brooks was to receive his commission on all North American wholesale sales whether Brooks initiated it or not, and Brooks was to receive such for as long as Ecolab had the right to distribute the Product whether or not sold through any other sales representative.  Ecolab granted Brooks these rights well beyond what a sales representative would normally have in recognition of Brook's contribution to the development of the Product.[3]

Brooks then chose the name "Brass Wash" and marketed it under that name.  In 1999 on behalf of Motsenbocker, Brooks worked with The Sherwin Williams Company at its Cleveland, Ohio and Olive Branch, Mississippi laboratories to develop a water-based clear coat to protect metal and wood and that could also be removed with the Product when it came time to refinish the part or panel without leaving a stain on metal.  At that time, all existing waterbased coats could not be used to cover metal and wood without tarnishing it.  Brooks perfected a covering, Sherwin Williams produced it, and Motsenbocker marketed it under the name "MÖTSENBÖCKER'S LIFT OFF® Finish Coat" ("Finish Coat"), with Brooks entering into an agreement with Motsenbocker making Brooks the North American, exclusive sales representative of Finish Coat earning a commission of

---

[2] Other than Plaintiffs' contention that the contract existed, Plaintiff has produced no evidence of this contract.

[3] In disputing the existence of this contract, Motsenbocker asserts that it would never have "promised a commission on sales of [the Product] when the multi-billion dollar, multi-national Ecolab was required to pay $250,000, up-front, for an exclusive license to distribute [the Product]." *See* Reply Mem. in Support of Def. Mot. at 2.

3

10% on all sales, wholesale or retail.[4]   From in or about 1999 to 2005, Motsenbocker sold

approximately $20,000 worth of Finish Coat, with Brooks earning a commission of approximately

$2,000.

At some point in 1999, Gregg Motsenbocker on behalf of Motsenbocker traveled to

Baltimore, Maryland and met with Brooks.  When meeting with Brooks, Motsenbocker offered to

engage Brooks as the sales representative for the Product and Finish Coat, offering the same terms

as Brooks' alleged contract with Ecolab, except that Brooks' commission would be a flat 10% and

Brooks would earn a commission on retail as well as wholesale sales, and except that Brooks was

free to market the Product under whatever name he and Motsenbocker agreed to and to work with

Motsenbocker to vary the formula if doing so would improve it.[5]   Brooks accepted the offer, thus

entering into an agreement (the "Agreement") with the understanding that Brooks would start

marketing the Product under the Agreement as soon as Ecolab was no longer marketing the Product.

In August 2000, Brooks formed Brooks Industries, Inc., a janitorial service and seller of

cleaning products.  Brooks Industries paid Motsenbocker for the samples Brooks distributed under

the Agreement.  In 2004, when Brooks noticed that Gregg Motsenbocker had appeared to say that

the Product with gel added was actually not covered by the Agreement with Brooks, Brooks asked

---

[4] Although Plaintiffs could not produce a written agreement, at oral argument Plaintiffs
asserted that Brooks was to receive these commissions for the rest of his life (or at least for the
life of the Product).

[5] The parties vigorously dispute this particular fact.  Defendants "categorically deny that
they have ever met with either Plaintiff in Maryland."  *See* Reply Mem. in Support of Def. Mot.
at 7.  This assertion is supported by the affidavit of Gregg Motsenbocker denying ever meeting
with Plaintiffs in Maryland (Paper No. 12).  In response, Plaintiffs submit the affidavits of
Brooks and Douglas Earnest averring that the meeting between Gregg and Brooks did occur in
Maryland.

4

Gregg and Skip Motsenbocker about this. The Motsenbockers replied that Brooks could trust them and assured Brooks that he would receive his commissions and that the Motsenbockers would put something in writing. Under the Agreement, Brooks began marketing the Product and to experiment and further develop it and continued to do so until May 2005 when Motsenbocker breached the Agreement by refusing to acknowledge its existence.

## STANDARD OF REVIEW

The parties dispute what standard of review is applied to a personal jurisdiction challenge. The standard articulated by the Fourth Circuit is as follows:

> When a court's personal jurisdiction is properly challenged by a Rule 12(b)(2) motion, the jurisdictional question thus raised is one for the judge, with the burden on the plaintiff ultimately to prove the existence of a ground for jurisdiction by a preponderance of the evidence. If the existence of jurisdiction turns on disputed factual questions the court may resolve the challenge on the basis of a separate evidentiary hearing, or may defer ruling pending receipt at trial of evidence relevant to the jurisdictional question. But when, as here, the court addresses the question on the basis only of motion papers, supporting legal memoranda and the relevant allegations of a complaint, the burden on the plaintiff is simply to make a *prima facie* showing of a sufficient jurisdictional basis in order to survive the jurisdictional challenge. In considering a challenge on such a record, the court must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction.

*Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989). Plaintiffs contend that the law in this Circuit requires Plaintiff to only make a *prima facie* showing of jurisdiction. However, the Court has directed its consideration of Defendants' motion beyond merely the motion papers, memoranda, and allegations of Plaintiffs' complaint. Instead, the Court has considered the affidavits submitted by both parties, the Distributorship Agreement between Motsenbocker and Ecolab, the relevant patents covering the Product, the inventory and customer sales history of the Product, relevant magazine advertisements, and the list of the Product's retail dealers located in Maryland. The Court has also

5

considered the oral arguments of counsel.[6]  Because its review has gone beyond the papers, the

Court's consideration of the motion is certainly "evidentiary" in nature.  As such, the burden on

Plaintiffs is to prove the existence of jurisdiction by a preponderance of the evidence.  Although the

Court will construe all relevant pleading allegations in the light most favorable to the plaintiff, the

Court will not and is not required to assume the credibility of Plaintiffs allegations.  *See Combs*, 886

F.2d at 676 (requiring the district court to assume credibility when its consideration of the

jurisdictional challenge is confined to the papers, and not additional evidence).  Instead, the Court

will make its determination based on the evidence produced by the parties.

## DISCUSSION

### A.  Subject Matter Jurisdiction

Defendants contest the subject matter jurisdiction of this Court over this diversity action on

the grounds that the amount in controversy is less than the minimum jurisdictional amount required

under 28 U.S.C. § 1332.  In *Shanaghan v. Cahill*, 58 F.3d 106 (4th Cir. 1995), the Fourth Circuit

articulated the standard for determining whether the amount in controversy has been met.

> First, the court should look to the face of the complaint itself to determine whether
> it is a *legal certainty* that plaintiff's claims do not reach the required amount. Unless
> the claim for an amount over the jurisdictional prerequisite is made in bad faith, or
> unless it is plain from the complaint that an amount less than the jurisdictional
> amount is all that is at issue, the district court has jurisdiction over the case. This is
> akin to the "well-pleaded complaint" rule.

*Shanaghan*, 58 F.3d at 112 (emphasis added).  Applying the *Shanaghan* test to the present case, the

Court is unable to conclude that it is a legal certainty that Plaintiffs' claims do not reach the

---

[6] At oral argument, the Court asked Plaintiffs if Plaintiffs had any other evidence, other
than that already before the Court, to establish this Court's personal jurisdiction over
Defendants.  Plaintiffs responded in the negative.

jurisdictional amount.  Plaintiffs' Complaint alleges damages in excess of $2 million.  With no evidence of bad faith before the Court, the Court will assume that Plaintiffs have met the amount in controversy requirement.

**B. Personal Jurisdiction**

A federal district court may only exercise jurisdiction over a non-resident defendant in the manner and extent authorized by state law in the forum state unless a federal statute establishes an alternative basis for exercising personal jurisdiction.  *See* Fed. R. Civ. P. 4(k); *ePlus Tech. v. Aboud*, 313 F.3d 166, 175 (4th Cir. 2002).  Thus, in a diversity case, a federal court only has personal jurisdiction over a party if a state court in the federal court's forum state would have personal jurisdiction.  *Copiers Typewriters Calculators, Inc v. Toshiba*, 576 F. Supp. 312, 318 (D. Md. 1983).  To evaluate whether personal jurisdiction exists in a diversity case, a federal court will engage in a two-part analysis.  First, the court will determine whether the state long-arm statute authorizes the exercise of jurisdiction in the particular circumstances presented.  Second, if the court finds that the long-arm statute permits the court to exercise jurisdiction, the court must then consider whether such an exercise of jurisdiction comports with the due process standards of the Fourteenth Amendment. *Carefirst of Maryland, Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003); *Christian Sci. Bd. of Dir. of the First Church of Christ v. Nolan*, 259 F.3d 209, 215 (4th Cir. 2001); *Ellicott Mach. Corp. v. John Holland Party Ltd.*, 995 F.2d 474, 477 (4th Cir. 1993).

1.  Maryland Law on *In Personam* Jurisdiction

Because Plaintiffs filed this action in federal court in Maryland, this Court must first examine whether it may exercise personal jurisdiction over the Defendant under Maryland law.  Maryland's long-arm statute provides, in pertinent part:

7

> (b) A court may exercise personal jurisdiction over a person, who directly or by an agent:
>
>     (1)    Transacts any business or performs any character of work or service in the State;
>
>     (2)    Contracts to supply goods, food, services, or manufactured products in the State; ...
>
>     (4)    Causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the State ...

Md. Code Ann., Cts. & Jud. Proc. § 6-103(b) (2006). Courts have interpreted Maryland's long-arm statute as coterminous with the limits of the Due Process Clause of the Fourteenth Amendment. *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 710 (4th Cir. 2002). Therefore, "the statutory inquiry necessarily merges with the constitutional inquiry and the two inquiries become one." *Id.*

The exercise of personal jurisdiction over a non-resident defendant comports with the Due Process Clause only where the defendant has certain "minimum contacts" with the forum state "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotations and citations omitted); *Lesnick v. Hollingsworth & Vose Co.*, 35 F.3d 939, 941-42 (4th Cir. 1994). As explained in *ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617 (4th Cir. 1997), the jurisprudence of minimum contacts developed to determine whether a defendant had a surrogate presence in the state. *Id.* at 623. Thus, a court must focus its inquiry on whether "a defendant's contacts with the forum state are so substantial that they amount to a surrogate for presence and . . . render the exercise of sovereignty just, notwithstanding the lack of physical presence in the state." *Id.* Where a defendant

8

purposefully availed himself of the privilege of conducting business in a particular forum, the defendant has sought both the benefits and protections of that state's laws. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985). In such situations, "it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well." *Id.*; *see also Foster v. Arletty 3 Sarl*, 278 F.3d 409, 415 (4th Cir. 2002).

In considering the question of personal jurisdiction, the Supreme Court has drawn a distinction between "specific" and "general" jurisdiction. *See Helicopteros Nacionales de Columbia v. Hall*, 466 U.S. 408, 414 (1984). Specific jurisdiction exists where a suit "arises out of" a defendant's contacts with the forum state. *Id.* General jurisdiction, which permits a court to subject a non-resident defendant to a suit in the forum wholly unrelated to any contact it has with the forum, exists only where a foreign defendant's in-state activities amount to "continuous and systematic" contact with the state. *Id.* at 414-15. The level of contact required for the exercise of general jurisdiction is significantly higher than that required for specific jurisdiction. *ESAB Group, Inc.*, 126 F.3d at 628.

2. General Jurisdiction

Plaintiffs contend that the activities of Ecoloab, as Motsenbocker's agent, including product sales and distribution, negotiation and signing of contract with Brooks, and on-going relations with Brooks are sufficiently "continuous and systematic" to sustain general jurisdiction over Defendants. The only conduct of Motsenbocker independent of Ecolab's activities Plaintiffs assert tending to establish general jurisdiction is "repeating a lie to Brooks by telephone into Maryland over the course of years." Opposition to Mot. at 21. However, these alleged contacts are not the type of systematic conduct needed to confer general jurisdiction over these Defendants. Further, because

9

Plaintiffs have not proven by a preponderance of the evidence that Ecolab is in fact Defendants'

agent for purposes of jurisdiction, the alleged conduct of Ecolab is not sufficient to establish general

jurisdiction over Defendants.

3. Specific Jurisdiction

According to Plaintiffs, the facts most relevant to the establishment of specific jurisdiction

include: the maintaining of a distributor-agent in Maryland, the marketing of the Product through

Ecolab in Maryland, the signing of a written contract in Maryland, having Gregg Motsenbocker

travel to Maryland to orally modify the written contract. Plaintiffs contend these purposeful acts on

the part of Defendants give this Court personal jurisdiction over Defendants under the Maryland

long-arm statute. Plaintiffs principally rely on the Fourth Circuit holding in *Du-Al Corp. v. Rudolph*

*Beaver, Inc.*, 540 F.3d 1230 (4th Cir. 1976).

In Du-Al Corp., a Maryland manufacturer sued an out-of-state distributor for breach of

contract and violations of anti-trust laws where a small amount of the distribution was in Maryland.

In finding jurisdiction under sections (b)(1), (3), and (4) of the Maryland long-arm statute, the

Fourth Circuit noted:

> [I]n at least two respects the contract was to be performed by Beaver in Maryland,
> Beaver did perform in part in Maryland, and its performance is now alleged to be
> defective, incomplete, tortious, or in violation of the antitrust laws. In addition,
> Maryland was the site either of the final execution of the contract, or of steps
> preliminary to its execution. There is thus no doubt that in entering into and
> performing the contract Beaver *purposefully* availed itself of the *privilege of
> conducting activities* within the *forum State, thus invoking* the benefits and
> protections of its laws.

Du-Al Corp., 540 F.2d at 1233 (citation and internal quotes omitted) (emphasis in original). The

court held that "Maryland courts could and would assert jurisdiction over a party to a contract in a

suit for breach of that contract if the party has performed purposeful acts in Maryland in relation to

10

the contract, albeit preliminary or subsequent to its execution." *Id.* at 1232.

Plaintiffs argue that by having Defendants' agent enter into a written contract in Maryland with Brooks, by having its president travel into Maryland and enter into a an oral modification in Maryland, Maryland became the site of negotiating the contract, the site of its final execution, and the site of its modification. Also, Plaintiffs submit that since Motsenbocker admits that it derives less than ½ of 1 percent of its sales in Maryland (Motsenbocker Affidavit ¶ 11), and this Court has found a company deriving ½ of 1 percent of its sales in Maryland to be quite significant and a justification for a finding of personal jurisdiction under section (b)(4) of the long-arm statute, *see United Merchants & Mfrs. Inc. v. David & Dash, Inc.*, 439 F. Supp. 1078, 1084-85 (1977), this Court has specific jurisdiction over Defendants.

However, Plaintiffs have produced nothing to dispute the fact that Motsenbocker has no offices, no telephone listing, and no employees in Maryland. Plaintiffs essentially hang their hats on the activities between Plaintiffs and Ecolab. Plaintiffs admit that Brooks initiated contact with Defendants in California, and even traveled to California to work for Motsenbocker as a painter and warehouseman. Plaintiffs also took several promotional trips in marketing the Product. Compl. ¶¶ 30-49. However, Plaintiff has not convinced the Court that any of these activities were done at the request of Defendants. The United States Supreme Court has explained that "[t]he unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State." *Hanson v. Denckla*, 357 U.S. 235, 253-54 (1958). This Court has stated that "[i]n determining whether prior business negotiations in the forum state give rise to specific jurisdiction, the strongest factor is whether the defendant initiated the business relationship in some way." *Giannaris v. Cheng*, 219 F. Supp. 2d 687, 692 (D. Md. 2002). Here, Plaintiffs

11

cannot rely neither on their unsupported legal conclusion that Ecolab was Motsenbocker's agent nor

their unilateral activities with Defendants to establish personal jurisdiction.

Neither can Plaintiffs rely on a stream of commerce argument. In *Asahi Metal Industry Co.*

*v. Superior Court of California*, 480 U.S. 102 (1987), Justice O'Connor, although not writing for

the majority,  noted that

> [t]he placement of a product into the stream of commerce, without more, is not an act
> of the defendant purposefully directed toward the forum State. Additional conduct of
> the defendant may indicate an intent or purpose to serve the market in the forum State,
> for example, designing the product for the market in the forum State, advertising in
> the forum State, establishing channels for providing regular advice to customers in the
> forum State, or marketing the product through a distributor *who has agreed to serve*
> *as the sales agent* in the forum State. But a defendant's awareness that the stream of
> commerce may or will sweep the product into the forum State does not convert the
> mere act of placing the product into the stream into an act purposefully directed
> toward the forum State.

*Asahi*, 480 U.S. at 112 (O'Connor, J.) (emphasis added).[7]

Here, there is no evidence that Ecolab agreed to serve as a sales agent in Maryland for

Motsenbocker.  Ecolab is a Delaware corporation with its principal place of business in Minnesota.

Further, the Distributorship Agreement between Motsenbocker and Ecolab provided for the

distribution of Motsenbocker's products throughout the U.S., Canada, and Mexico.  There is no

indication that Motsenbocker in any way deliberately targeted consumers in Maryland.  "To permit

a state to assert jurisdiction over any [company] in the country whose product is sold in the state

simply because [the company] must expect that to happen destroys the notion of individual

sovereignties inherent in our system of federalism." *Lesnick v. Hollingsworth & Vose Co.*, 35 F.3d

939, 945 (4th Cir. 1994).

---

[7] The issue of "minimum contacts" in the *Asahi* case produced three opinions, none of
which garnered enough votes to constitute a majority.

With respect to Plaintiffs' section (b)(4) argument, the Court is not persuaded that the amount of revenue Motsenbocker has derived from Maryland is substantial enough to warrant the exercise of personal jurisdiction over Motsenbocker. Although this Court held in *United Merchants*, 439 F. Supp 1078 (D. Md. 1977), that revenue totaling ½ of 1 percent of a company's total sales was sufficient to confer jurisdiction, the facts of that case are distinguishable from those *sub judice*. In that case, the Court held that where the defendant regularly solicited business with Maryland entities, including a merchandising relationship with a Maryland company, and where the plaintiff had transacted more substantial business in the past with the defendant ($30,000 worth of infringing copyrighted drapery, created and manufactured specifically for shipment into Maryland, with knowledge that they would be used in Maryland), the defendant had purposefully availed itself of the forum, allowing the Court to establish specific jurisdiction over the drapery transaction.

The Fourth Circuit, on the other hand, held in *Erlanger Mills, Inc. v. Cohoes Fibre Mills, Inc.*, 239 F.2d 502 (4th Cir. 1956), cited by the court in *United Merchants*, that $17,000 in defective synthetic yarn was insufficient to establish personal jurisdiction over the defendant, where the out-of-state defendant had no offices, employees or agents in the forum state, made one sale, and only one trip into the forum state to discuss the plaintiff's complaint. Like the defendants in *Erlanger*, the Defendants here have no offices, employees, or agents in Maryland. Because Defendants' connection with the forum state is not as substantial as the connection in *United Merchants*, the Court does not believe the percentage of revenue here is substantial enough to make the exercise of personal jurisdiction comport with due process.

With regard to the individual Defendants, Plaintiffs allege that Gregg Motsenbocker made one trip into Maryland. In support of their contention that Gregg did travel to Maryland to meet

13

with Brooks, Plaintiffs submit the affidavits of Brooks, his assistant Douglas Earnest, and a former

employee of Ecolab, Walter Noga.[8]  Because the Court's review of the record in this case is

evidentiary in nature, and not solely on the papers, the Court is not bound to assume the credibility

of the affidavits submitted by Plaintiffs.  *See Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989).

Plaintiffs must establish the existence of jurisdiction by a preponderance of the evidence, and with

such weak evidence of Defendants' purposeful contacts with Maryland, Plaintiffs have failed to

meet their burden.

Even if the Court assumes that Gregg Motsenbocker did travel to Maryland on this one

occasion, the Court does not believe that this single contact is sufficient to satisfy constitutional due

process.  There is not sufficient evidence that a contract was entered into at this meeting.  There is

not sufficient evidence that Gregg Motsenbocker's purpose for coming into Maryland was to do

business with Brooks, a Maryland resident.  There is simply not enough here to indicate that

Defendants purposefully availed themselves of the privileges of conducting business in Maryland.

As the Court in *Erlanger* observed, "[w]e cannot shut our eyes to the disorder and unfairness likely

to follow from sustaining jurisdiction in a case like this.  It might require corporations from coast

to coast having the most indirect, casual and tenuous connection with a State to answer frivolous law

suits in its courts.  To permit this could seriously impair the guarantees which due process seeks to

secure."  *Erlanger Mills, Inc. v. Cohoes Fibre Mills, Inc.*, 239 F.2d 502, 507 (4th Cir. 1956).

---

[8] Neither Mr. Earnest nor Mr. Noga have personal knowledge that Gregg met with
Brooks in Maryland.  Mr. Earnest drove Brooks to the hotel where the alleged meeting occurred,
but did not see or personally observed Gregg as being present.  Aff. of George Brooks.  Mr.
Noga only states that he "believes" the meeting occurred "sometime in 1999," and that "it is
possible [he] traveled with Gregg to this meeting," although he "cannot remember this as fact."
Aff. of Walter Noga.

Because Plaintiffs have failed to meet their burden, this Court cannot exercise personal jurisdiction over these Defendants.

**C. Transfer of Venue**

Defendants have asked, in the alternative, that this Court transfer this action to the United States District Court for the Southern District of California. Because the Court will dismiss this action for lack of personal jurisdiction, the Court need not reach the question of transfer.

## CONCLUSION

For all of the reasons stated above, the Court will GRANT Defendants' Motion to Dismiss for Lack of Jurisdiction (Paper No. 10). An Order consistent with this Opinion will follow.

Date:    <u>December 8, 2006</u>                    <u>          /s/          </u>
                                          Alexander Williams, Jr.
                                          United States District Judge

15

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

GEORGE A. BROOKS, *et al.*,                    *

            Plaintiffs,                    *

        v.                    *          Civil Action No. AW-06-1024

MOTSENBOCKER ADVANCED
DEVELOPMENTS, INC., *et al.*,                    *

           Defendants.                    *
                         * * * * *

## ORDER

For the reasons stated in the accompanying Memorandum Opinion, IT IS this **8th day of December, 2006**, by the United States District Court for the District of Maryland, hereby **ORDERED:**

    1.    That the Motion to Dismiss for Lack of Jurisdiction (Paper No. 10) BE, and the same hereby IS, **GRANTED;**

    2.    That the Clerk of the Court **CLOSE** this Case; AND

    3.    That the Clerk of the Court transmit a copy of this Memorandum Opinion and Order to all counsel of record.

 

                                             /s/
                                    Alexander Williams, Jr.
                                    United States District Court

FILED:  March 7, 2007

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

No. 07-1033
(8:06-cv-01024-AW)

_____

GEORGE A. BROOKS; BROOKS INDUSTRIES, Inc.,

                                        Plaintiffs - Appellants,

          versus

MOTSENBOCKER ADVANCED DEVELOPMENTS, INC.;
GREGG A. MOTSENBOCKER; SKIP A. MOTSENBOCKER,

                                        Defendants - Appellees.

_____

O R D E R

_____

    Appellants have filed a motion to correct the record, with
an attachment consisting of the affidavit of George Brooks.
Appellees have filed a response in opposition to the motion.

    The Court denies the motion without prejudice to the filing
of a motion to supplement the record on appeal in district court
pursuant to Rule 10(e) of the Federal Rules of Appellate
Procedure and Local Rule 10(e).

                    For the Court - By Direction

                    /s/ Patricia S. Connor
                    _____
                              Clerk