1 | Patrick D. Webb, Esq., State Bar No. 82857
**WEBB  CAREY**
2 | 402 West Broadway Ste 680
San Diego, Calif. 92101
3 | (619) 236-1650

4 | Attorneys for Defendants

5

6

7

8 | UNITED STATES DISTRICT COURT

9 | FOR THE SOUTHERN DISTRICT OF CALIFORNIA

10 | GEORGE A. BROOKS, BROOKS INDUSTRIES, INC.          )   Case No. 08cv378 BTM NLS
11 |                                                    )   **DECLARATION OF GREGG A.**
     |                                                  )   **MOTSENBOCKER IN SUPPORT OF**
12 |              Plaintiff,                            )   **DEFENDANTS' MOTION FOR**
     |                                                  )   **SUMMARY JUDGMENT OR IN THE**
13 | v.                                                 )   **ALTERNATIVE SUMMARY**
     |                                                  )   **ADJUDICATION**
14 | MOTSENBOCKER ADVANCED                              )
     | DEVELOPMENTS, INC.; GREGG A.                     )   DATE:        September 26, 2008
15 | MOTSENBOCKER; SKIP A.                              )   TIME:        11:00 A.M.
     | MOTSENBOCKER,                                    )   JUDGE:       Barry Ted Moskowitz
16 |                                                    )
     |                                                  )   **Per Chambers No Oral Argument**
17 |              Defendants.                           )   **Unless Requested by Court**
     |                                                  )

18

19 |        I, Gregg A. Motsenbocker declare:

20 |        I am President of Motsenbocker Advanced Developments, Inc., and I have personal

21 | knowledge of the facts stated herein and if called as a witness would and could testify truthfully

22 | thereto.

23 |        1.      Motsenbocker Advanced Developments, Inc. is a fledgling startup corporation in

24 | San Diego, California.  I am president of the company.  MAD, Inc. has eight employees, and is a

25 | manufacturer of several patented products for removing paint and other adherents from certain

26 | surfaces.

27

28

2.      There is no evidentiary support that Plaintiffs had anything to do with the development, placement or sales of the patented products for which they seek to obtain commissions. All of the these products were invented and developed almost 10 years before Brooks ever contacted any one at MAD, Inc., and they have been patented for almost 14 years. Plaintiffs repeatedly misrepresent in their amended complaint that they "developed," what they define as the subject of their suit, even though they concede in their complaint that "the Product sold as a stripper," Comp. ¶ 15, and "marketed" as "Brass Wash," Comp. ¶ 16, was patented by me, the inventor, Comp. ¶ 9, nearly five years before I met Mr. Brooks. I then licensed the manufacture of the patented products to MAD, Inc., who in turn hires others to contract package the products. See, copies of the patents of the products identified in the Plaintiffs' amended complaint, which are attached as Exhibit A.

3.      I was first contacted by George A. Brooks during a telephone call in 1999. He indicated that he was a painter, and that he had an idea for the use of Motsenbocker's patented formulas for the removal of clear finishes from metal elevator doors, which was not a new idea since it was one of the claims under the patent for the product, as well as described on the product label. I responded to Brooks solely on behalf of MAD, Inc.  Specifically, Mr. Brooks told me he had purchased a bottle of the product then and now marketed as Motsenbocker's Lift Off #4 Graffiti Remover, from a retailer known as Hi Gear, and that our product removed clear finishes from brass. As with many other similar trade contacts, on behalf of MAD Inc., I offered Mr. Brooks free product with which he was permitted to conduct and develop his own business.

4.      None of the defendants have ever entered into the agreement described in plaintiffs' complaint with either plaintiff. Defendants are not aware of any written evidence, including correspondence, emails or faxes describing, mentioning or referring to the alleged agreement described in plaintiffs' complaint with either plaintiff.  MAD Inc. totally, absolutely and conclusively repudiated any claim by the Plaintiffs that any of them had a contract with MAD Inc., and has done so for more than 4 years prior to the original complaint being filed in Maryland on April 24, 2006. On multiple occasions in 2001 and 2003, Mr. Brooks and potential customers of Brooks Industries cleaning and janitorial services, were told that Mr. Brooks is not

1   working on behalf of the Defendants and has no agreement to represent the Defendants.

2       5.      I did not, and would not, promise Mr. Brooks, an individual, self-described

3   painter and warehouseman, a commission on sales of the products identified in the amended

4   complaint, particularly when the multi-billion dollar, multi-national Ecolab was required to pay

5   $250,000 to MAD, Inc., up-front, for an exclusive license to distribute and sell my patented

6   products, for which MAD, Inc. was paid a royalty. The Ecolab distributorship/license agreement

7   is attached hereto as Exhibit B, and was terminated after Ecolab's breach of the contract in 1999.

8   Brooks never paid any of the Defendants a license fee.

9       6.      In October 2004, Mr. Brooks traveled to San Diego and was employed by MAD

10  Inc. as a warehouseman, until May 2005, when Mr. Brooks returned to Maryland.

11      7.      Defendants made no representation to Plaintiffs that they would be paid a

12  commission under any agreement, and Defendants are not aware of any written evidence of any

13  representation by Defendants to Plaintiffs that they would be paid a commission under any

14  agreement.

15      8.      MAD Inc. paid Mr. Brooks salary for being a warehouseman from October 2004

16  through May 2005.  Neither I, nor Skip Motsenbocker paid Mr. Brooks any form of

17  compensation. None of the Plaintiffs were ever paid any commissions by any of the Defendants.

18      9.      I made no representation to Plaintiffs outside the scope of my authority as

19  President to act on behalf of MAD, Inc. All of my contacts with the Plaintiffs were in my

20  capacity as a principal and officer of MAD, Inc.  I made no personal promises or agreements

21  with either of the Plaintiffs, and I received no individual benefit from any of the services alleged

22  to have been performed by Plaintiffs.

23      I declare under the penalty of perjury under the laws of the State of California that the

24  foregoing is true and correct.  Executed on August 4, 2008 at San Diego, California.

25

26                          /s/_____
                            Gregg A. Motsenbocker
27

28

1   working on behalf of the Defendants and has no agreement to represent the Defendants.

2       5.      I did not, and would not, promise Mr. Brooks, an individual, self-described

3   painter and warehouseman, a commission on sales of the products identified in the amended

4   complaint, particularly when the multi-billion dollar, multi-national Ecolab was required to pay

5   $250,000 to MAD, Inc., up-front, for an exclusive license to distribute and sell my patented

6   products, for which MAD, Inc. was paid a royalty. The Ecolab distributorship/license agreement

7   is attached hereto as Exhibit B, and was terminated after Ecolab's breach of the contract in 1999.

8   Brooks never paid any of the Defendants a license fee.

9       6.      In October 2004, Mr. Brooks traveled to San Diego and was employed by MAD

10  Inc. as a warehouseman, until May 2005, when Mr. Brooks returned to Maryland.

11      7.      Defendants made no representation to Plaintiffs that they would be paid a

12  commission under any agreement, and Defendants are not aware of any written evidence of any

13  representation by Defendants to Plaintiffs that they would be paid a commission under any

14  agreement.

15      8.      MAD Inc. paid Mr. Brooks salary for being a warehouseman from October 2004

16  through May 2005.  Neither I, nor Skip Motsenbocker paid Mr. Brooks any form of

17  compensation. None of the Plaintiffs were ever paid any commissions by any of the Defendants.

18      9.      I made no representation to Plaintiffs outside the scope of my authority as

19  President to act on behalf of MAD, Inc. All of my contacts with the Plaintiffs were in my

20  capacity as a principal and officer of MAD, Inc.  I made no personal promises or agreements

21  with either of the Plaintiffs, and I received no individual benefit from any of the services alleged

22  to have been performed by Plaintiffs.

23      I declare under the penalty of perjury under the laws of the State of California that the

24  foregoing is true and correct.  Executed on August 4, 2008 at San Diego, California.

25

26      /s/ _____

        Gregg A. Motsenbocker

27

28

**LIST OF EXHIBITS TO GREGG MOTSENBOCKER'S DECLARATION**

A.      Copies of the patents of the products identified in the Plaintiffs' amended complaint.

B.      The Ecolab distributorship/license agreement

EXHIBIT A



( 1 of 1 )

| **United States Patent** | **5,415,800** |
|---|---|
| **Motsenbocker** | **May 16, 1995** |

Cleanser for releasing adherent deposits from surfaces

### Abstract

A cleanser for releasing adherent deposits from a surface consisting essentially of ethylene glycol n-butyl ether, acetone, dibasic ester, and optionally water in specified proportions. Also disclosed is a method of releasing adherent deposits from a surface by applying the aforementioned composition to the deposits.

Inventors: **Motsenbocker; Gregg** (Lake Arrowhead, CA)
[*] Notice: The portion of the term of this patent subsequent to July 13, 2010 has been disclaimed.
Appl. No.: **074887**
Filed: **June 9, 1993**

| **Current U.S. Class:** | **510/201** ; 134/38; 134/40; 510/174; 510/200; 510/202; 510/203; 510/206; 510/407; 510/505 |
|---|---|
| **Field of Search:** | 252/162,170,171,173,174.19,174.21,DIG.8,143 134/38,40 |

### References Cited [Referenced By]

#### U.S. Patent Documents

| | | |
|---|---|---|
| 3607760 | September 1971 | McIntyre |
| 4309300 | January 1982 | Danforth et al. |
| 4465612 | August 1984 | Alten Schopfler |
| 4780235 | October 1988 | Jackson |
| 4792354 | December 1988 | Matsuo et al. |
| 4927556 | May 1990 | Pokorny |
| 4934391 | June 1990 | Futch et al. |
| 5084200 | January 1992 | Dishart et al. |

| 5089164 | February 1992 | Stanley |
| 5124062 | June 1992 | Stevens |
| 5183514 | February 1993 | Marquis et al. |
| 5227085 | July 1993 | Motsenbocker |
| 5250211 | October 1993 | Motsenbocker |

### Foreign Patent Documents

| 4034765 | May., 1992 | DE |

*Primary Examiner:* Skaling; Linda
*Attorney, Agent or Firm:* Mon; Donald D.

---

## *Claims*

---

I claim:

1. A environmentally safe cleanser for releasing adherent deposits from surfaces, said cleanser consisting essentially of the following components, whose percentages are expressed relative to the total weight of these components without including other materials that might be included in minor amounts which do not interfere with the intended action of the cleanser;

Ethylene Glycol n-Butyl Ether (Glycol EB), between about 5.0% and about 40.0%;

Acetone, between about 5.0% and about 40.0%

Dibasic ester selected from the group consisting of dimethyl adipate, dimethyl glutarate and dimethyl succinate, and mixtures of any two or more of them, between about 5.0% and about 40.0%;

and optionally water to make 100%

2. A cleanser according to claim 1 in which a minor amount of acetic acid, or phosphoric acid, or a thickener, or any two or more of them, is substituted for an equal amount of said composition.

3. A cleanser for releasing adherent deposits from surfaces, said cleanser consisting essentially of the following components, whose percentages are expressed relative to the total weight of these components without including other materials that might be included in minor amounts that do not interfere with the intended action of the cleanser:

Ethylene Glycol n-Butyl Ester (Glycol EB), about 15.0%

Acetone, about 14.0%

Dibasic ester selected from the group consisting of dimethyl adipate, dimethyl glutarate and dimethyl succinate, or a mixture of two or more of them, about 16.0%;

water to make 100% (about 55).

4. A cleanser according to claim 3 in which a minor amount of acetic acid, or phosphoric acid, or a thickener, or any two or more of them, is substituted for an equal amount of said composition.

5. A cleanser for releasing adherent deposits from surfaces, said cleanser consisting essentially of the following components, whose percentages are expressed relative to the total weight of these components without including other materials that might be included in minor amounts which do not interfere with the intended action of the cleanser:

Ethylene Glycol n-Butyl Ether (Glycol EB), about 33.3%;

Acetone - about 31.20%;

Dibasic ester selected from the group consisting of dimethyl adipate, dimethyl glutarate and dimethyl succinate and mixtures of any two or more of them, about 35.5%.

6. A cleanser according to claim 5 in which a minor amount of acetic acid, or phosphoric acid, or a thickener, or any two or more of them, is substituted for an equal amount of said composition.

---

## *Description*

---

## SPECIFICATION

1. Field of the Invention

A biodegradable cleanser which can be extended with water for releasing adherent deposits from porous, non-porous, soft, and delicate surfaces.

2. Background of the Invention

Removal of paints and paint-like deposits is an old and well-developed art. Generally the objective is to soften the deposit, usually by at least partially dissolving it so that it can be scraped away. The intended effect is usually that of dissolving the material so it becomes fluid. The result is generally a softening of the deposit accompanied by some liquids. The difficulty of pursuing this softened material into cracks and structural intersections is well-known. One response to this problem is to dip the object into a tank of stripper and let it dissolve away.

Not only are these techniques very troublesome, but disposition of the stripper and of its contents is becoming more of an environmental problem. Generally, these strippers use strong organic solvents which, in addition to their disposal problems, constitute a potential health hazard to the user, to the environment, and to the substrate structure.

Despite these inherent problems, because they represent the best materials available, these materials are regularly used on durable, non-porous surfaces that can be regarded as "hard". Examples are the stripping of wood, and the cleansing of metal and enamel surfaces, subject to other problems discussed below.

However, they are not suitable for porous materials such as concrete, concrete block, stucco, cinderblock, rocks and stone, bricks and trees. This is because the dissolved and softened material tends to enter the porous surface, from which it can be removed only partially and then only with great difficulty, and usually with damage to the surface. When the material flows into the pores, later attempts to flush it out can be expected to drive at least some of it deeper. Attempts are sometimes made to

overcome this problem by attacking the surface with a strong water jet, often with sandblast grits in it, or by sandblasting. This leaves modified areas which frequently have faint patterns of what was removed.

Soft surfaces, such as vinyls cannot withstand the action of these strippers, or of sandblasts. Neither can many delicate surfaces, for example plexiglass, where the plexiglass will be rendered translucent, rather that transparent.

Further, especially on large exposed areas such as retaining walls and highway signs, if this dissolved material is flushed from the surface, nearby areas will be contaminated by it. As a consequence, organizations such as the California Department of Transportation and many municipal entities simply cover graffiti with a patch of paint, leaving the deposits in place. A trip along many streets and freeways will disclose those patches, whose only merit is that they are less objectionable than what they cover.

Further, even as to enamelled highway signs, where there is no penetration into the sign itself, the action of strippers is slow. While their action could be accelerated by the use of hot water, hot solvents, steam, and sandblasting, highway crews cannot carry along with them such equipment, which often must reach to very inconvenient places. Again, the run-off is itself objectionable, especially after the solvents evaporate.

In an attempt to frustrate graffiti artists, it has become common practice to place a rather expensive layer of plastic material such as 3M 1150 on enamel signs or to impregnate the signs with laminate at the time of manufacture. Unfortunately these respond poorly to solvents applied hot, such as MEK and Kerosene, and even the new citrus-based solvents. Generally these tend to attack the laminations, often delaminating them, resulting in cracking and migration through the plastic to the sign surface. The inherent problem in solvents such as these is that their primary intended effect is to dissolve the adherent material. When quick dissolving of such deposits is intended, it is not surprising that at least some damage will be done to the substrates because of these "hot" solvents.

What is needed, and what this invention provides, is a biodegradable cleanser, which can be extended with water, which works quickly and well at ambient temperatures, which primarily does not dissolve the substances being removed (although in some circumstances some solution may occur), whose effluent is principally a solid that is not itself objectionable, and which can be flushed away with water or wiped up with a cloth, or gathered with a squeegee. For large areas, removal by small volumes of high pressure Jets of water will be preferred. All of these methods leave the surface cleansed of the deposit.

It is another object of this invention to provide a method for removing the subject deposits from surfaces, which method produces an effluent that often is agreeably left where it drains next to the surface which was cleansed. It does not itself become a disposal problem. In fact, often it can be swept up, raked up, or simply covered up with dirt. The composition is biodegradable.

It is still another object of this invention to provide a cleanser and a method in which the principal mechanism for removal of the deposit is interruption of its physical bond with the surface, followed primarily by removal of the material in a solid condition. Often it is particulate, but in other circumstances it may form a soft layer which can be gathered up as stated above.

Yet another object of this invention is to provide a more affordable cleanser, both in its inherent cost and in the elimination of damage to cleansed surfaces. Known stripper type compositions tend to use expensive organic solvents, sometimes for their own action, and sometimes as a carrier for other components. They themselves frequently damage the surface to be cleansed. No other carrier can be less expensive than water, which this cleanser can use. Furthermore this invention enables the use of a group

of components some of which, if used alone, could frustrate the intended action. For reasons which are presently not fully understood, the combination is more benign, resulting in little or no dissolving of the deposits. Used alone, these components vigorously attack and dissolve paints and paint-like deposits. The combination of ingredients provided by this invention attains the intended results with them, but cause no, or at most minimal, damage to the substrate.

The so-called "green"solvents in general do not work as well as the products of this invention, and are considerably more expensive. While using relatively inexpensive components, the formulations of this invention are safe for the user, safe for the environment, safe for the surface, are biodegradable, and when extended by a carrier, can use water and thereby be water-based.

## BRIEF DESCRIPTION OF THE INVENTION

A cleanser according to this invention consists essentially of the following components:

Ethylene glycol n-Butyl Ether (Glycol EB)

Acetone

Dibasic ester (dimethyl adipate, dimethyl glutarate, dimethyl succinate, or a mixture of two or more of them)

Water, if desired.

Glacial acetic acid or phosphoric acid may be substituted for a minor amount of the above formulation for reasons to be disclosed. A thickener may be added to enable the cleanser to reside for a longer time on vertical or steep surfaces, such as street signs and walls. None of these additives when used in minor amounts adversely affects or materially changes the cleansing action of the cleanser as specified.

The invention will be fully understood from the following detailed description.

## DETAILED DESCRIPTION OF THE INVENTION

A cleanser according to this invention consists essentially of the following components in the ranges defined, the percentages being in weight relative to the weight of the total formulation in all of the examples given herein:

Glycol EB (ethylene glycol n-butyl ether), between about 5.0 % to about 40.0%

Acetone, between about 5.0% to about 40.0%

Dibasic ester (dimethyl adipate, dimethyl glutarate, dimethyl succinate, or a mixture of two or more of them) between about 5.0% to about 40.0%

Water, if used, to make 100%

The preferred formulation for General usage, and the presently preferred embodiment, consists essentially of the following components in the percentages defined:

Glycol EB (ethylene Glycol n-butyl ether), about 15.0%

Acetone, about 14.0%

Dibasic ester (dimethyl adipate, dimethyl glutarate, dimethyl succinate, or a mixture of two or more of them), about 16.0%

Water to make 100% (about 55%)

This is a water-based cleanser with applicability to a wide range of applications,

The presently-preferred concentrated formulation, which can be used without dilution by water, and which can later be diluted with water as desired,, is as follows:

Ethylene glycol n-butyl ether (Glycol EB)--about 33.3%.

Acetone--about 31.1%.

Dibasic ester (as defined above) about 35.5%. The ingredients are all commercially available. Certain of these are further identified as follows:

Glycol EB (ethylene glycol n-butyl ether) Case No. 111-76-2

Acetone--Cas No. 67-64-1

Glacial acetic acid--Cas No. 64-19-17

Dibasic ester--a mixture of dimethyl adipate, dimethyl glutarate, and dimethyl succinate, obtainable from Ashland Chemical Inc., of Columbus, Ohio, under its mark DIBASIC ESTER 1. This is a mixture of 66% dimethyl glutarate, (Cas No. 1119-40-0), 17% dimethyl adipate (Cas No. 627-93-0) and 16% dimethyl succinate (Cas No. 106-65-0). The total diester content of this product is 99%.

The water to be used should be de-ionized water, which minimizes cloudiness which might be caused by minerals in untreated water.

Substitution of some of the formulation by glacial acetic acid or phosphoric acid appears to enhance the breakage of the bond between the deposit and the substrate surface, and to decrease any tendency for the deposit to be dissolved. These are optional substitutions.

A suitable thickener if one is to be used, is obtainable from Degusa, under its trademark Aerosil-200, which when used will be added to the above formulation, generally between about 2% and at most 4% of the total formulation weight. A thickener will be added when the formulation is to be used on a surface which is so steep that a less viscous product would flow off of the substrate too quickly, such as from a wall or a vertical sign. However, as a commercial matter, a thickener will actually be added to all formulations to facilitate its use in all applications.

The percentages for the formulation itself are given without any of the above optional additives. When these or any of them are used, they are substituted for an equal amount of the total formulation as defined, and they have no deleterious effect on the action of the formulation for its cleansing function.

This invention is primarily directed toward the removal of adherent layers of certain kinds of adherent deposits from many kinds of substrate surfaces. Among these are the following:

Street signs and freeway signs, such as reflectively silk screened, high intensity surfaces, and surfaces coated with protective materials, concrete, cinderblock, cement, slumpstone, mountain rocks and split rocks, stucco, formica, glass, iron work, steel, stainless steel, aluminum, and other metals and alloys, brick - glazed and unglazed, vinyl, and trees. Plastic, for example, plexiglass and fiberglass. Wood, especially denser woods, tile glazed and unglazed, linoleum, clothing and fabrics generally, carpets, wallpaper removal and blackboards and dry mark boards.

This list is not intended to be exhaustive, but instead to be illustrative of the wide range of utility of this invention.

The following are some examples of what are hereafter referred to as an "adherent deposits": oil lacquers, water-based lacquers, high-gloss acrylics, acrylic enamels, enamel semi-gloss, flat-based paints, water-based enamels, urethane enamels, permanent markers, super enamels, Speed-E-Namels, primers, varnish, wood stains, high-liter inks, correction fluid, all aerosol paints, and wallpaper adhesives.

This list is not intended to be exhaustive, but instead to be illustrative of the wide range of utility of this invention. Adherent deposits are characterized by their formation of an adherent layer which, when dried, cured or hardened, is attached to the substrate by a physical bond which it is the purpose of this cleanser to eliminate, or at least to reduce it to the extent that the layer can physically be removed. The marker and Hi-Liter inks, while they do not form this type of deposit, still appear to be removed by this composition by some mechanism from non-porous substrates, without smearing. For this reason, they are included in the list.

The action of this cleanser is instructive to observe. It is applied to the deposit. Left for only a short time, usually for less than one minute, the cleanser will have penetrated the deposit. Then a perceptible release of the deposit from its substrate surface begins to be observed. Occasionally, the deposit will loosen in platelets. Left to work for a bit longer, the deposit divides itself into very small fragments. About three minutes is about the preferred residence time on porous surfaces. For non-porous, soft and delicate surfaces, a shorter time is required. Interestingly, there appears to be little or no solution of the deposit. Observation of the liquid cleanser after the action has occurred shows little if any evidence of solution, for example by transfer of colored material into solution. If placed in water, the water will remain essentially uncolored. Significantly, an advantage of this invention is its quick action. A thickener, while it usually will be used, will be needed only when the surfaces are so steep that there would be insufficient residence time before it drained away, and also to confine it to the surface intended to be cleansed. Advantage should be taken of the quick action of this invention, which is one of its most desirable features.

The importance of this action, for example along highways, is that the deposits when washed from the surfaces can drain onto the ground as entrained material in a low volume stream of water. This effluent can be allowed to flow away, or can be washed away, or can be left on the ground where the entrained material can be covered, swept up, or raked up. Often this material is so ineffusive that it can simply be ignored, because it is inconsequential in size and bulk. The total volume is only that of the deposit which was removed, and it has not been extended by solution mechanisms. The substrate surface is left clean. When the deposit was removed, it was not removed in a form that penetrated the surface, such as by a solution or an emulsion, but rather as a suspension to be carried away by a stream of water, or even wiped up.

An action of this kind has not previously been observed or known to exist by the inventor herein. It is obtained by the formulation of this cleanser by means of a mechanism not fully understood by him, and its very nature is a matter of some speculation, but whatever the mechanism is, the result is as described.

It appears to be the result of an interruption of the bond which held the deposit to the surface. Frequently, if the deposit is not removed, and the cleanser is allowed to evaporate, the deposit returns nearly to its previously adherent condition.

The components of this formulation have been used in other cleanser formulations, but in them their intended objectives appear to have been as solvents. For example, dibasic esters are notable for their ability to soften and dissolve substances of interest to this invention, and that is the very problem with their use in the applications intended for this cleanser. A review of their utility as evidenced by prior publications attests to the fact that their effect is to substitute one mess for another. However, their resulting mess is one which cannot entirely be removed from porous surfaces, and also which involves the disposal problems discussed above.

Similarly, Glycol EB and acetone are principally found in formulations where a surface coating is to be dissolved.

It is surprising that a combination of components which individually are classically directed to reducing a deposit to a solution or to a sludge, can be combined to form a composition which enables the adherent deposit to be removed freely from its substrate surface.

As illustrative examples, most or all of the adherent deposits of concern herein are quickly dissolved in a suitable aqueous solution of the dibasic esters. The addition of acetone does not appear to repress this action. An aqueous solution of acetone is an efficient solvent. The addition of dibasic esters results in the solvent action described above. Similar comments apply to the Glycol EB.

The preferred formulation is the most effective one which the inventor has been able to devise. Any composition which departs from the preferred formulation but in which the components are still within the defined ranges, generally displays a lesser efficiency, and in some circumstances a tendency to soften the deposits, but still provides the advantages of this invention to an important extent.

The reasons for the synergy of the components are not understood, but their consequence is an effective and environmentally benign cleanser and environmentally benign effluent after application of the cleanser.

After a brief residence on the deposit, the cleanser and the loosened deposit, can be flushed, wiped, or scraped away. A reasonably strong stream of water is effective for this purpose. However, in many situations water will be in short supply, and also it is advantageous to reduce the total amount of effluent, so as to reduce the area over which it might flow.

A high-pressure water jet stream will be more effective in removing the particulate material from non-painted porous substrates such as concrete, stucco, stone, or brick. Such a stream will usually be needed only for such substrates. Only a surprisingly small volume of water is needed, which can be carried in a pressure tank which may be so small as to be carried by the workman. There is a wide range of devices for this purpose sold on the market. However, for producing a low volume, high pressure jet spray, the inventor herein has found the conventional "airless" paint gun sprayer to be superior. Many examples of this type of sprayer are available on the market. It can discharge water in an even fan spray at a high velocity. One suitable gun delivers a 4 inch wide fan-shaped jet spray of water up to 3,000 psi. This is very effective, and is a high velocity, low volume jet of water. It successfully blows off the deposits, and provides enough water for them to be washed away without requiring excessive water for the purpose. Supplementary washing can be provided, but will rarely be needed.

For reasons not understood by the inventor, some stains, markers, and High-Lighters, varnishes,

lacquers, stains such as wood stains, can also be removed but not from porous substrates. These do not appear to come away as solids, but to a reasonable degree they will be removed from surfaces such as plexiglass and vinyl. Water based adhesives used for hanging wallpaper are also released. The wallpaper's condition is unimportant. The importance is its release.

This product will preferably be sold with water in it as specified above, because this is a stable, clear mixture readily useable without further care. There are, however, applications where water would more advantageously be added later. Adding it to a container of water, or adding water to it at or near the point of use or sale may in some instances be more convenient, and more economical to ship than carrying the entire pre-mixed product to the point of use.

Also, although it ordinarily will not be preferred, the concentrated formulation can be used without dilution. However, the action of the concentrate is not as effective as the formulation with water in it. It appears that some of the components may preferentially evaporate, leaving the others in a concentration which may more vigorously attack the deposit, sometimes dissolving it. Still, it can be used directly and is useful if used with more care than need be given to a water containing cleanser. Generally, at least about 20% by weight of the formulation will be water, in order to provide a product with widespread utility.

This invention is not to be limited by the embodiments described in the description, which are given by way of example and not of limitation, but only in accordance with the scope of the appended claims.

* * * * *







( 1 of 1 )

**United States Patent**                    **5,484,487**
**Motsenbocker**                          **January 16, 1996**

Cleanser for releasing adherent deposits from surfaces

### Abstract

A cleanser for releasing adherent deposits from a surface consisting essentially of ethylene glycol n-butyl ether, acetone, dibasic ester, and optionally water in specified proportions. Also disclosed is a method of releasing adherent deposits from a surface by applying the aforementioned composition to the deposits.

Inventors: **Motsenbocker; Gregg** (Lake Arrowhead, CA)
Appl. No.: **414199**
Filed:      **March 31, 1995**

### Related U.S. Patent Documents

| **Application Number** | **Filing Date** | **Patent Number** | **Issue Date** |
|---|---|---|---|
| 74887 | Jun., 1993 | 5415800 | |

**Current U.S. Class:**                        **134/6** ; 134/38, 134/40
**Field of Search:**              252/162,170,171,173,143,174.19,174.21,DIG.8 134/38,40,6

### References Cited [Referenced By]

#### U.S. Patent Documents

| | | |
|---|---|---|
| 3607760 | September 1971 | McIntyre |
| 4309300 | January 1982 | Danforth et al. |
| 4465612 | August 1984 | Altenschopfler |
| 4780235 | October 1988 | Jackson |
| 4792354 | December 1988 | Matsuo et al. |

| 4927556 | May 1990 | Pokorny |
| 4934391 | June 1990 | Futch et al. |
| 5084200 | January 1992 | Dishart et al. |
| 5089164 | February 1992 | Stanley |
| 5124062 | June 1992 | Stevens |
| 5183514 | February 1993 | Marquis |
| 5227085 | July 1993 | Motsenbocker |
| 5250211 | October 1993 | Motsenbocker |

**Foreign Patent Documents**

| 4034765 | May., 1992 | | DE |

*Primary Examiner:* Therkorn; Linda Skaling
*Attorney, Agent or Firm:* Mon; Donald D.

---

**Parent Case Text**

---

CROSS REFERENCE TO OTHER APPLICATION

This is a division of applicant's U.S. patent application Ser. No. 08/074,887, filed Jun. 9, 1993, now U.S. Pat. No. 5,415,800, entitled "Cleanser for Releasing Adherent Deposits from Surfaces".

---

**Claims**

---

I claim:

1. A method of releasing adherent deposits from a surface comprising:

a. applying to an adherent deposit on a surface an environmentally safe cleanser consisting essentially of the following components, whose percentages are expressed relative to the total weight of these components without including other materials that might be included in minor amounts which do not interfere with the intended action of the cleanser:

Ethylene glycol n-Butyl Ether (Glycol EB), between about 5.0% and about 40.0%;

Acetone, between about 5.0% and about 40.0%; and

Dibasic ester selected from the group consisting of dimethyl adipate, dimethyl glutarate and dimethyl succinate, and mixtures of any two or more of them, between about 5.0% and about 40.0%; and optionally water to make 100%; and

b. permitting said cleanser to contact said deposit for a time sufficient to release said deposit from said surface; and

c. removing said released deposit from said surface.

2. A method according to claim 1 in which a stream of water directed against said released deposits to remove them.

3. A method according to claim 2 in which said stream of water is produced by an "airless" paint gun.

4. A method according to claim 1 in which the released deposit is physically removed.

5. A method according claim 4 in which the released deposit is removed by wiping.

## Description

### FIELD OF THE INVENTION

A biodegradable cleanser which can be extended with water for releasing adherent deposits from porous, non-porous, soft, and delicate surfaces.

### BACKGROUND OF THE INVENTION

Removal of paints and paint-like deposits is an old and well-developed art. Generally the objective is to soften the deposit, usually by at least partially dissolving it so that it can be scraped away. The intended effect is usually that of dissolving the material so it becomes fluid. The result is generally a softening of the deposit accompanied by some liquids. The difficulty of pursuing this softened material into cracks and structural intersections is well-known. One response to this problem is to dip the object into a tank of stripper and let it dissolve away.

Not only are these techniques very troublesome, but disposition of the stripper and of its contents is becoming more of an environmental problem. Generally, these strippers use strong organic solvents which, in addition to their disposal problems, constitute a potential health hazard to the user, to the environment, and to the substrate structure.

Despite these inherent problems, because they represent the best materials available, these materials are regularly used on durable, non-porous surfaces that can be regarded as "hard". Examples are the stripping of wood, and the cleansing of metal and enamel surfaces, subject to other problems discussed below.

However, they are not suitable for porous materials such as concrete, concrete block, stucco, cinderblock, rocks and stone, bricks and trees. This is because the dissolved and softened material tends to enter the porous surface, from which it can be removed only partially and then only with great difficulty, and usually with damage to the surface. When the material flows into the pores, later attempts to flush it out can be expected to drive at least some of it deeper. Attempts are sometimes made to overcome this problem by attacking the surface with a strong water jet, often with sandblast grits in it, or by sandblasting. This leaves modified areas which frequently have faint patterns of what was removed.

Soft surfaces, such as vinyls cannot withstand the action of these strippers, or of sandblasts. Neither can many delicate surfaces, for example plexiglass, where the plexiglass will be rendered translucent, rather that transparent.

Further, especially on large exposed areas such as retaining walls and highway signs, if this dissolved material is flushed from the surface, nearby areas will be contaminated by it. As a consequence,

organizations such as the California Department of Transportation and many municipal entities simply cover graffiti with a patch of paint, leaving the deposits in place. A trip along many streets and freeways will disclose those patches, whose only merit is that they are less objectionable than what they cover.

Further, even as to enamelled highway signs, where there is no penetration into the sign itself, the action of strippers is slow. While their action could be accelerated by the use of hot water, hot solvents, steam, and sandblasting, highway crews cannot carry along with them such equipment, which often must reach to very inconvenient places. Again, the run-off is itself objectionable, especially after the solvents evaporate.

In an attempt to frustrate graffiti artists, it has become common practice to place a rather expensive layer of plastic material such as 3M 1150 on enamel signs or to impregnate the signs with laminate at the time of manufacture. Unfortunately these respond poorly to solvents applied hot, such as MEK and Kerosene, and even the new citrus-based solvents. Generally these tend to attack the laminations, often delaminating them, resulting in cracking and migration through the plastic to the sign surface. The inherent problem in solvents such as these is that their primary intended effect is to dissolve the adherent material. When quick dissolving of such deposits is intended, it is not surprising that at least some damage will be done to the substrates because of these "hot" solvents.

What is needed, and what this invention provides, is a biodegradable cleanser, which can be extended with water, which works quickly and well at ambient temperatures, which primarily does not dissolve the substances being removed (although in some circumstances some solution may occur), whose effluent is principally a solid that is not itself objectionable, and which can be flushed away with water or wiped up with a cloth, or gathered with a squeegee. For large areas, removal by small volumes of high pressure jets of water will be preferred. All of these methods leave the surface cleansed of the deposit.

It is another object of this invention to provide a method for removing the subject deposits from surfaces, which method produces an effluent that often is agreeably left where it drains next to the surface which was cleansed. It does not itself become a disposal problem. In fact, often it can be swept up, raked up, or simply covered up with dirt. The composition is biodegradable.

It is still another object of this invention to provide a cleanser and a method in which the principal mechanism for removal of the deposit is interruption of its physical bond with the surface, followed primarily by removal of the material in a solid condition. Often it is particulate, but in other circumstances it may form a soft layer which can be gathered up as stated above.

Yet another object of this invention is to provide a more affordable cleanser, both in its inherent cost and in the elimination of damage to cleansed surfaces. Known stripper type compositions tend to use expensive organic solvents, sometimes for their own action, and sometimes as a carrier for other components. They themselves frequently damage the surface to be cleansed. No other carrier can be less expensive than water, which this cleanser can use. Furthermore this invention enables the use of a group of components some of which, if used alone, could frustrate the intended action. For reasons which are presently not fully understood, the combination is more benign, resulting in little or no dissolving of the deposits. Used alone, these components vigorously attack and dissolve paints and paint-like deposits. The combination of ingredients provided by this invention attains the intended results with them, but cause no, or at most minimal, damage to the substrate.

The so-called "green" solvents in general do not work as well as the products of this invention, and are considerably more expensive. While using relatively inexpensive components, the formulations of this invention are safe for the user, safe for the environment, safe for the surface, are biodegradable, and

when extended by a carrier, can use water and thereby be water-based.

## BRIEF DESCRIPTION OF THE INVENTION

A cleanser according to this invention consists essentially of the following components:

Ethylene glycol n-Butyl Ether (Glycol EB)

Acetone

Dibasic ester (dimethyl adipate, dimethyl glutarate, dimethyl succinate, or a mixture of two or more of them)

Water, if desired.

Glacial acetic acid or phosphoric acid may be substituted for a minor amount of the above formulation for reasons to be disclosed. A thickener may be added to enable the cleanser to reside for a longer time on vertical or steep surfaces, such as street signs and walls. None of these additives when used in minor amounts adversely affects or materially changes the cleansing action of the cleanser as specified.

The invention will be fully understood from the following detailed description.

## DETAILED DESCRIPTION OF THE INVENTION

A cleanser according to this invention consists essentially of the following components in the ranges defined, the percentages being in weight relative to the weight of the total formulation in all of the examples given herein:

Glycol EB (ethylene glycol n-butyl ether), between about 5.0% to about 40.0%

Acetone, between about 5.0% to about 40.0%

Dibasic ester (dimethyl adipate, dimethyl glutarate, dimethyl succinate, or a mixture of two or more of them) between about 5.0% to about 40.0%

Water, if used, to make 100%

The preferred formulation for general usage, and the presently preferred embodiment, consists essentially of the following components in the percentages defined:

Glycol EB (ethylene glycol n-butyl ether), about 15.0%

Acetone, about 14.0%

Dibasic ester (dimethyl adipate, dimethyl glutarate, dimethyl succinate, or a mixture of two or more of them), about 16.0%

Water to make 100% (about 55%)

This is a water-based cleanser with applicability to a wide range of applications.

The presently-preferred concentrated formulation, which can be used without dilution by water, and which can later be diluted with water as desired, is as follows:

Ethylene glycol n-butyl ether (Glycol EB)--about 33.3%

Acetone--about 31.1%.

Dibasic ester (as defined above) about 35.5%.

The ingredients are all commercially available. Certain of these are further identified as follows:

Glycol EB (ethylene glycol n-butyl ether) Cas No. 111-76-2

Acetone--Cas No. 67-64-1

Glacial acetic acid--Cas No. 64-19-17

Dibasic ester--a mixture of dimethyl adipate, dimethyl glutarate, and dimethyl succinate, obtainable from Ashland Chemical Inc., of Columbus, Ohio, under its mark DIBASIC ESTER 1. This is a mixture of 66% dimethyl glutarate, (Cas No. 1119-40-0), 17% dimethyl adipate (Cas No. 627-93-0) and 16% dimethyl succinate (Cas No. 106-65-0). The total diester content of this product is 99%.

The water to be used should be de-ionized water, which minimizes cloudiness which might be caused by minerals in untreated water.

Substitution of some of the formulation by glacial acetic acid or phosphoric acid appears to enhance the breakage of the bond between the deposit and the substrate surface, and to decrease any tendency for the deposit to be dissolved. These are optional substitutions.

A suitable thickener If one is to be used, is obtainable from Degusa, under its trademark Aerosil-200, which when used will be added to the above formulation, generally between about 2% and at most 4% of the total formulation weight. A thickener will be added when the formulation is to be used on a surface which is so steep that a less viscous product would flow off of the substrate too quickly, such as from a wall or a vertical sign. However, as a commercial matter, a thickener will actually be added to all formulations to facilitate its use in all applications.

The percentages for the formulation itself are given without any of the above optional additives. When these or any of them are used, they are substituted for an equal amount of the total formulation as defined, and they have no deleterious effect on the action of the formulation for its cleansing function.

This invention is primarily directed toward the removal of adherent layers of certain kinds of adherent deposits from many kinds of substrate surfaces, Among these are the following:

Street signs and freeway signs, such as reflectively silk screened, high intensity surfaces, and surfaces coated with protective materials, concrete, cinderblock, cement, slumpstone, mountain rocks and split rocks, stucco, formica, glass, iron work, steel, stainless steel, aluminum, and other metals and alloys, brick--glazed and unglazed, vinyl, and trees. Plastic, for example, plexiglass and fiberglass. Wood, especially denser woods, tile glazed and unglazed, linoleum, clothing and fabrics generally, carpets, wallpaper removal and blackboards and dry mark boards.

This list is not intended to be exhaustive, but instead to be illustrative of the wide range of utility of this

invention.

The following are some examples of what are hereafter referred to as an "adherent deposits":

Oil lacquers, water-based lacquers, high-gloss acrylics, acrylic enamels, enamel semi-gloss, flat-based paints, water-based enamels, urethane enamels, permanent markers, super enamels, Speed-E-Namels, primers, varnish, wood stains, high-liter inks, correction fluid, all aerosol paints, and wallpaper adhesives.

This list is not intended to be exhaustive, but instead to be illustrative of the wide range of utility of this invention. Adherent deposits are characterized by their formation of an adherent layer which, when dried, cured or hardened, is attached to the substrate by a physical bond which it is the purpose of this cleanser to eliminate, or at least to reduce it to the extent that the layer can physically be removed. The marker and Hi-Liter inks, while they do not form this type of deposit, still appear to be removed by this composition by some mechanism from non-porous substrates, without smearing. For this reason, they are included in the list.

The action of this cleanser is instructive to observe. It is applied to the deposit. Left for only a short time, usually for less than one minute, the cleanser will have penetrated the deposit. Then a perceptible release of the deposit from its substrate surface begins to be observed. Occasionally, the deposit will loosen in platelets. Left to work for a bit longer, the deposit divides itself into very small fragments. About three minutes is about the preferred residence time on porous surfaces. For non-porous, soft and delicate surfaces, a shorten time is required. Interestingly, there appears to be little or no solution of the deposit. Observation of the liquid cleanser after the action has occurred shows little if any evidence of solution, for example by transfer of colored material into solution. If placed in water, the water will remain essentially uncolored.

Significantly, an advantage of this invention is its quick action. A thickener, while it usually will be used, will be needed only when the surfaces are so steep that there would be insufficient residence time before it drained away, and also to confine it to the surface intended to be cleansed. Advantage should be taken of the quick action of this invention, which is one of its most desirable features.

The importance of this action, for example along highways, is that the deposits when washed from the surfaces can drain onto the ground as entrained material in a low volume stream of water. This effluent can be allowed to flow away, or can be washed away, or can be left on the ground where the entrained material can be covered, swept up, or raked up. Often this material is so ineffusive that it can simply be ignored, because it is inconsequential in size and bulk. The total volume is only that of the deposit which was removed, and it has not been extended by solution mechanisms. The substrate surface is left clean. When the deposit was removed, it was not removed in a form that penetrated the surface, such as by a solution or an emulsion, but rather as a suspension to be carried away by a stream of water, or even wiped up.

An action of this kind has not previously been observed or known to exist by the Inventor herein. It is obtained by the formulation of this cleanser by means of a mechanism not fully understood by him, and its very nature is a matter of some speculation, but whatever the mechanism is, the result is as described. It appears to be the result of an interruption of the bond which held the deposit to the surface. Frequently, if the deposit is not removed, and the cleanser is allowed to evaporate, the deposit returns nearly to its previously adherent condition.

The components of this formulation have been used in other cleanser formulations, but in them their intended objectives appear to have been as solvents. For example, dibasic esters are notable for their

ability to soften and dissolve substances of interest to this invention, and that is the very problem with their use in the applications intended for this cleanser. A review of their utility as evidenced by prior publications attests to the fact that their effect is to substitute one mess for another. However, their resulting mess is one which cannot entirely be removed from porous surfaces, and also which involves the disposal problems discussed above.

Similarly, Glycol EB and acetone are principally found in formulations where a surface coating is to be dissolved.

It is surprising that a combination of components which individually are classically directed to reducing a deposit to a solution or to a sludge, can be combined to form a composition which enables the adherent deposit to be removed freely from its substrate surface.

As illustrative examples, most or all of the adherent deposits of concern herein are quickly dissolved in a suitable aqueous solution of the dibasic esters. The addition of acetone does not appear to repress this action. An aqueous solution of acetone is an efficient solvent. The addition of dibasic esters results in the solvent action described above. Similar comments apply to the Glycol EB.

The preferred formulation is the most effective one which the inventor has been able to devise. Any composition which departs from the preferred formulation but in which the components are still within the defined ranges, generally displays a lesser efficiency, and in some circumstances a tendency to soften the deposits, but still provides the advantages of this invention to an important extent.

The reasons for the synergy of the components are not understood, but their consequence is an effective and environmentally benign cleanser and environmentally benign effluent after application of the cleanser.

After a brief residence on the deposit, the cleanser and the loosened deposit, can be flushed, wiped, or scraped away. A reasonably strong stream of water is effective for this purpose. However, in many situations water will be in short supply, and also it is advantageous to reduce the total amount of effluent, so as to reduce the area over which it might flow.

A high-pressure water jet stream will be more effective in removing the particulate material from non-painted porous substrates such as concrete, stucco, stone, or brick. Such a stream will usually be needed only for such substrates. Only a surprisingly small volume of water is needed, which can be carried in a pressure tank which may be so small as to be carried by the workman. There is a wide range of devices for this purpose sold on the market. However, for producing a low volume, high pressure jet spray, the inventor herein has found the conventional "airless" paint gun sprayer to be superior. Many examples of this type of sprayer are available on the market. It can discharge water in an even fan spray at a high velocity. One suitable gun delivers a 4 inch wide fan-shaped jet spray of water up to 3,000 psi. This is very effective, and is a high velocity, low volume jet of water. It successfully blows off the deposits, and provides enough water for them to be washed away without requiring excessive water for the purpose. Supplementary washing can be provided, but will rarely be needed.

For reasons not understood by the inventor, some stains, markers, and High-Lighters, varnishes, lacquers, stains such as wood stains, can also be removed but not from porous substrates. These do not appear to come away as solids, but to a reasonable degree they will be removed from surfaces such as plexiglass and vinyl. Water based adhesives used for hanging wallpaper are also released. The wallpaper's condition is unimportant. The importance is its release.

This product will preferably be sold with water in it as specified above, because this is a stable, clear

mixture readily useable without further care. There are, however, applications where water would more advantageously be added later. Adding it to a container of water, or adding water to it at or near the point of use or sale may in some instances be more convenient, and more economical to ship than carrying the entire pre-mixed product to the point of use.

Also, although it ordinarily will not be preferred, the concentrated formulation can be used without dilution. However, the action of the concentrate is not as effective as the formulation with water in it. It appears that some of the components may preferentially evaporate, leaving the others in a concentration which may more vigorously attack the deposit, sometimes dissolving it. Still, it can be used directly and is useful if used with more care than need be given to a water containing cleanser. Generally, at least about 20% by weight of the formulation will be water, in order to provide a product with widespread utility.

This invention is not to be limited by the embodiments described in the description, which are given by way of example and not of limitation, but only in accordance with the scope of the appended claims.

\* \* \* \* \*



EXHIBIT B

## DISTRIBUTORSHIP/LICENSE AGREEMENT

This agreement ("Agreement") is made and entered into by and between Motsenbocker's Advanced Development, Inc., a California corporation having a mailing address of P.O. Box 90947, San Diego, California, 92169, (hereinafter, "MAD") and Ecolab Inc., a Delaware corporation having a principal place of business at Ecolab Center, 370 N. Wabasha Street, St. Paul, Minnesota 55102 (hereinafter, "ECOLAB"), effective as of September 1, 1996.

WHEREAS, MAD is engaged in the manufacture, distribution and sale of proprietary chemical agents for the removal and/or cleaning of stains, grease, adhesives, ink and paints, collectively identified as "Cleaning Agents", which are identified in Exhibit A hereto;

WHEREAS, MAD is the exclusive licensee of all patents, pending patents, trade secrets, service marks, trademarks, and any other intellectual property covering or related to the "Cleaning Agents", hereinafter, collectively, the "Intellectual Property";

WHEREAS, ECOLAB, including but not limited to its Janisource division, is a supplier of cleaning products for institutional, industrial and janitorial use;

WHEREAS, ECOLAB wishes to obtain, and MAD wishes to grant an exclusive license for marketing and distribution rights in the United States, Canada and Mexico of the Cleaning Agents for institutional, industrial and janitorial use; and

WHEREAS, MAD is willing to grant licenses to use certain of the Intellectual Property in conjunction with ECOLAB's marketing and distribution of the Cleaning Agents and Related Products on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual obligations and benefits set forth herein, the parties agree to the following terms and conditions:

1. Definitions

   1.1 "Club Stores" shall mean membership clubs, such as, but not limited to Sam's and Price/Costco.

   1.2 "Consumer Retail Sales" shall mean sales of the Cleaning Agents directly to or for distribution for retail sale to end consumers, including, but not limited to, sales to club and discount stores, hardware, paint, sundry, automotive, pet, office supply, stationery, grocery, and drug stores, and consumer catalogs.

   1.3 "Institutional, Industrial and Janitorial Sales" shall mean sales of the Cleaning Agents to commercial service providers, including, but not limited to, governmental agencies, hotels and motels, restaurants, and other hospitality service providers, hospitals, schools, and janitorial services, and to janitorial supply services.

   1.4 "Licensed Patents" shall mean the issued and pending U.S. Patents identified in Exhibit A hereto, as well as any pending applications for U.S. Patent, unless such pending application is abandoned with no intention to revive.

1.5     "Licensed Products" shall mean the Cleaning Agents listed in Exhibit A hereto
        and any related cleaning agents or products developed by MAD, regardless of
        whether or not the cleaning agent or product is patented.

1.6     "Licensed Territory" shall mean the United States of America, including its
        territories and possessions, Mexico and Canada.

1.7     "Licensed Trademarks" shall mean any of the trademarks, registered or not,
        identified in Exhibit B hereto as well as, to the extent that such are proprietary
        to MAD, styles, color combinations, trade dress, designs, symbols, logos and
        slogans used or developed by MAD for the Cleaning Agents.

1.8     "Net Sales" shall mean the total sales income of ECOLAB based on the actual
        sales price of the Licensed Products less any refunds, discounts or allowances.

1.9     "New Products" shall mean any cleaning agents of the type identified on Exhibit
        A or Related Products developed by MAD or licensed to MAD subsequent to the
        effective date and during the term of this Agreement.

1.10    "Related Products" shall mean any composition of matter or product useful for
        cleaning and/or removal of stains, grease, adhesives, ink, or paint, which may
        be used in conjunction with any of the Cleaning Agents, and which does not
        comprise or contain any of the Cleaning Agents or which is not developed by
        MAD.

1.11    "Unrelated Product" shall mean any product that not a Cleaning Agent, a related
        cleaning agent, a New Product, or a Related Product, which is developed by
        Gregg A. Motsenbocker and/or licensed to MAD during the term of this
        Agreement, but which, nonetheless, is of interest to ECOLAB for marketing and
        sale as part of a product line which would not generally be sold under the
        Licensed Trademarks.

2.    License of Rights
      2.1    Distributorship.        MAD hereby grants to ECOLAB the exclusive right to
             market and distribute Licensed Products in the Licensed Territory for
             Institutional, Industrial and Janitorial Sales.  MAD reserves the right to market
             and distribute, and to license for marketing and distribution, Licensed Products
             for Consumer Retail Sales.  All Licensed Products shall be marketed and sold
             under the Licensed Trademarks unless otherwise agreed in writing by the
             parties. Neither party shall solicit sales or accept orders for Licensed Products
             for distribution to and/or sale in Club Stores unless otherwise agreed to in a
             writing signed by both parties, which writing, if any, will become an
             amendment to this Agreement.

      2.2    Market Channels.     ECOLAB shall buy and sell Licensed Products for its own
             account and responsibility and shall be permitted to solicit sales from and
             accept orders for Licensed Products only for Institutional, Industrial and
             Janitorial Sales unless otherwise agreed in writing.

2.3    Trademark License.

> 2.3.1  MAD hereby grants to ECOLAB an exclusive license to use the Licensed Trademarks in the Licensed Territory for the marketing and promotion of Licensed Products and Related Products for Institutional, Industrial and Janitorial Sales, provided that any use of the Licensed Trademarks in conjunction with the marketing and promotion of a Related Product shall only be with the prior written consent of MAD and in accordance with the provisions set forth in Subparagraph 2.3.3.1.

> 2.3.2  MAD covenants not to use, nor to license or allow others to use, the Licensed Trademarks in the Licensed Territory for Institutional, Industrial and Janitorial Sales of any or all of the Cleaning Agents or any Related Products.

> 2.3.3  ECOLAB shall use and display the Licensed Trademarks properly and shall take no actions jeopardizing the existence or enforceability thereof. This shall include, but is not limited to, providing any trademark notices required or permitted by law.

> > 2.3.3.1  Approval by MAD for ECOLAB to use the Licensed Trademarks on Related Products is conditioned upon the Related Products having a quality consistent with the level of quality employed in the Licensed Products, as determined by an inspection of the Related Products by MAD. MAD shall have the right to periodically inspect such Related Products to determine whether the level of quality is being maintained. If, in the future, in MAD's judgment, the level of quality for Related Products sold under the Licensed Trademarks should fall below the approved standard, MAD shall have the right, upon written notice, to terminate license to use the Licensed Trademarks on such Related Products.

> 2.3.4  ECOLAB shall not attempt to register, or aid any third party in attempting to register or to use, any marks or names which may be confusingly similar to any Licensed Trademarks, for any products similar to the Licensed Products or related products

2.4    Patent License.        MAD hereby grants to ECOLAB an exclusive license under the Licensed Patents to market the Licensed Products for Institutional, Industrial and Janitorial Sales. No license to manufacture is granted or implied, except as provided in Section 3.

2.5    New Products.        MAD hereby grants to ECOLAB the option to acquire an exclusive license to market and sell New Products developed by MAD during the term of this agreement for Institutional, Industrial and Janitorial Sales, subject to the royalty provisions of Section 4 and confidentiality provisions set forth in Section 9.

---

3.   Products, Supply and Pricing

3.1   MAD agrees to designate a third party manufacturer with whom ECOLAB will contract directly for its requirements of Licensed Products, and ECOLAB agrees to purchase all of its requirements for Licensed Products from the designated third party manufacturer during the term of this Agreement, except as provided in paragraph 3.1.1.

3.1.1   In the event that ECOLAB identifies an alternate manufacturer which it believes would enhance its ability to perform its obligations under this Agreement, e.g., a manufacturer that is located in close geographical proximity to ECOLAB, or ECOLAB itself, MAD will evaluate the suitability of the alternate manufacturer and, if deemed suitable by MAD, MAD will consent to such alternative manufacturer supplying ECOLAB with the Licensed Products. Such consent shall not be unreasonably withheld or delayed by MAD.

3.1.2   In the event that ECOLAB acquires the right to have Licensed Products manufactured by it or an alternate third party manufacturer, MAD may independently contract with ECOLAB or such alternate third party manufacturer to manufacture Licensed Products for MAD's marketing and sale.

3.1.3   ECOLAB shall provide to MAD copies of each purchase order to and/or invoice from any third party manufacturer, for all Licensed Products manufactured and/or shipped, indicating the quantity and cost of each Licensed Product. For any Licensed Products manufactured by ECOLAB itself, ECOLAB shall provide to MAD copies of all production reports or other similar documents indicating the quantity of each Licensed Product manufactured and shipped by ECOLAB.

4.   Payments and Royalties

4.1   ECOLAB shall pay to MAD a one-time, non-refundable, non-creditable lump sum license fee of two hundred fifty thousand dollars ($250,000), payable in two equal installments of one hundred twenty five thousand dollars ($125,000). The first installment shall be paid on September 1, 1996, or within two (2) weeks of the execution of this Agreement, whichever is later. The second installment shall be paid on March 1, 1997.

4.1.1   MAD will deliver or cause to be delivered to ECOLAB existing marketing materials developed exclusively for the Licensed Products (i.e., the institutional size package) and marketing materials developed exclusively for the Licensed Products which are in production at the time of execution of this Agreement when such materials are completed. An itemization of such marketing materials and the costs incurred by MAD for their preparation as attached hereto as Exhibit C. ECOLAB shall reimburse MAD for the full cost of the marketing materials listed in Exhibit C within thirty (30) days of the date of execution of this Agreement. Itemized statements reflecting future costs incurred by MAD for preparation of marketing materials which have been requested and authorized by ECOLAB will be submitted to ECOLAB upon

completion of the requested marketing materials, and ECOLAB shall reimburse MAD for such costs within thirty (30) days of the receipt of the itemized statement.

4.2 During the term of this Agreement and any extension thereof, ECOLAB shall pay to MAD a royalty in the amount of fifteen percent (15%) of the Net Sales of Licensed Products sold under the Licensed Patents, including any New Product for which an application for U.S. Patent has been filed.

   4.2.1 In the event that a final determination is made by the United States Patent Office or a court of competent jurisdiction, from which no appeal can be, or is, taken, that any of the Licensed Patents is deemed invalid or otherwise lost, or said patent is narrowed in scope as a result of re-examination, or said patent is lapsed as a result of non-payment of any maintenance fee, or a pending patent application is abandoned, royalties due for any Licensed Products covered by said patent or pending patent will adjusted according to Paragraph 4.3 below.

4.3 During the term of this Agreement and any extension thereof, ECOLAB shall pay to MAD a royalty in the amount of twelve percent (12%) of the Net Sales of Licensed Products sold which are not covered by one or more of the Licensed Patents.

4.4 During the term of this Agreement and any extension thereof, ECOLAB shall pay to MAD a royalty in the amount of ten percent (10%) of the Net Sales of Related Products sold under any of the Licensed Trademarks.

4.5 Royalty payments shall be made on a monthly basis, commencing October 1, 1996, and shall be payable no later than the sixteenth (16th) day of the month following the month for which royalties are due.

4.6 MAD shall have the right to request an audit of ECOLAB's Net Sales of Licensed Products and Related Products sold under the Licensed Trademarks no more than twice every calendar year at MAD's expense. Such audit will be by an independent third party which is mutually agreeable and has signed an appropriate confidentiality agreement with ECOLAB. ECOLAB shall make prompt payment to MAD to adjust for any underpayments determined by such audit.

4.7 Beginning in September, 1996, ECOLAB shall make minimum annual royalty payments to MAD based upon minimum sales volume, which will be initially established for the first contract year (September 1 - August 31) as the net sales of MAD for the period September 1, 1995 - August 31, 1996 ("Benchmark Year"), increased by fifteen percent (15%). Thereafter, the minimum sales volume shall increase over the previous contract year as follows:

| Year | Increase Over Previous Contract Year |
|------|--------------------------------------|
| 9/97 - 8/98 | 15% |
| 9/98 - 8/99 | 15% |
| 9/99 - 8/00 | 12% |
| 9/00 - 8/01 | 12%. |

MAD represents that it is transferring customers for the Licensed Products in the Licensed Territory having estimated annualized purchases during the Benchmark year of $800,000 ("Transferred Customers").

4.7.1 In the event that the royalty payments in accordance with Paragraphs 4.2 - 4.4 for a given year do not cumulatively equal or exceed the minimum annual royalty for that year, ECOLAB shall include in the December payment a lump sum payment of the difference between the actual royalty payments and the minimum annual royalty for that year.

4.7.2 Within the time period for monthly royalty payments set forth in Paragraph 4.5 above, ECOLAB shall provide to MAD a written summary report setting forth the Net Sales of all Licensed Products and all Related Products sold under the Licensed Trademarks for the previous month and the sales royalty due thereon. The report for December shall include annual summaries of all sales and royalties paid or to be paid for the preceding year, and an accounting of the same with respect to the minimum annual royalty due, if any.

4.7.2.1 Each summary report shall include a separate breakdown of sales for each of the Licensed Products and Related Products, including quantity and dollar amount.

4.8 In the event that MAD develops any New Products during the term of this Agreement, ECOLAB shall have the opportunity to determine whether to adopt such New Product as one of the Licensed Products. In the event that ECOLAB elects to adopt such New Product, royalties shall be determined as agreed between the parties at the time the New Products are added. Identification of and any information pertaining to any such New Product shall be provided in an amendment to Exhibit A hereto.

4.9 In addition to any payments provided for in the preceding paragraphs of this Section 4, ECOLAB agrees to reimburse MAD for all legal fees and costs incurred in the preparation of this Agreement and the accompanying Consulting Agreement, including any modifications, amendments, or other changes made to any draft agreements as a result of negotiations between the parties, which legal fees shall not exceed five thousand dollars ($5,000).

5. Warranties and Infringement

5.1 Product Warranty.   MAD warrants that its products will be merchantable and free from defects in materials and workmanship under normal use, service and conditions.

5.2 Patent and Trademark Warranties. MAD warrants that it has full right, title and interest in and to the Licensed Patents and Licensed Trademarks, or sufficient rights hereunder to enable it to provide to ECOLAB the licenses and rights granted herein. MAD further warrants that as of the date of its execution of this Agreement it had no knowledge of any patent which would be infringed by the manufacture, use or sale of the Licensed Products, or of any trademark

which would be infringed by the marketing and sale of the Licensed Products and Related Products under the Licensed Trademarks.

5.3   Patent Infringement. In the event that ECOLAB or its customers receive notice, or any suit is brought against ECOLAB or its customers alleging infringement of a U.S. Patent due to the manufacture, use or sale of the Licensed Products, ECOLAB shall give MAD prompt notice thereof. Similarly, MAD shall notify ECOLAB of any notice of infringement received by or suit alleging infringement brought against MAD. The parties shall promptly thereafter decide a course of action to be followed, which decision shall be the subject of written agreement, to either:

> i) make modifications which avoid infringement without significantly effecting the economics of ECOLAB's operations under this Agreement;
> ii) accept a license for ECOLAB and its customers; or
> iii) contest the alleged infringement.

5.3.1   MAD shall pay all costs related to such claim or suit, including the cost of modifications, litigation expenses including reasonable attorneys' fees, court awarded damages, amounts paid in settlement or compromise of the litigation, provided MAD has the opportunity to participate in any settlement or compromise, and past and future royalties paid or payable to the owner of such patent.

5.3.2   If it is decided to contest the alleged infringement, MAD shall have control of any such litigation and shall indemnify, defend and hold ECOLAB harmless.

5.4   Trademark Infringement.   In the event that ECOLAB or its customers receive notice, or any suit is brought against ECOLAB or its customers alleging infringement of a trademark due to the marketing and sale of the Licensed Products or Related Products, ECOLAB shall give MAD prompt notice thereof. Similarly, MAD shall notify ECOLAB of any notice of infringement received by or suit alleging infringement brought against MAD. The parties shall promptly thereafter decide a course of action to be followed, which decision shall be the subject of written agreement, to either:

> i) make modifications which avoid infringement without significantly effecting the economics of ECOLAB's operations under this Agreement;
> ii) accept a license for ECOLAB and its customers; or
> iii) contest the alleged infringement.

5.4.1   MAD shall pay all costs related to such claim or suit, including the cost of modifications, litigation expenses including reasonable attorneys' fees, court awarded damages, amounts paid in settlement or compromise of the litigation, provided MAD has the opportunity to participate in any settlement or compromise, and past and future royalties paid or payable to the owner of such trademark.

5.4.2   If it is decided to contest the alleged infringement, MAD shall have control of any such litigation and shall indemnify, defend and hold ECOLAB harmless.

6.    Enforcement of Intellectual Property Rights

   6.1    MAD agrees not to enforce any of the Licensed Patents or Licensed Trademarks against ECOLAB or its direct or indirect customers for their use or sale of Licensed Products, and Related Products under the Licensed Trademarks, purchased directly or indirectly from ECOLAB. Rather, the sale of Licensed Products, and Related Products under the Licensed Trademarks, by ECOLAB shall carry with it a fully paid up license to use and sell the same.

   6.2    So long as ECOLAB's rights under this Agreement are exclusive, if ECOLAB becomes aware of any infringement of a patent of the Licensed Patents or a trademark of the Licensed Trademark, ECOLAB shall provide MAD with written notice of such infringement with sufficient detail to allow MAD to investigate further. Within three (3) months after such notice, MAD may, at its election, either:

      i)  abate such infringement or institute suit against the infringer;

      ii) give ECOLAB the right to abate such infringement or institute suit against the infringer; or

      iii) agree with ECOLAB on an alternate approach.

   6.2.1  In the event that MAD elects option i), ECOLAB may participate in any action by engaging counsel of its choice at its own expense, but any damages recovered shall belong exclusively to MAD.

   6.2.2  In the event that MAD elects option ii), ECOLAB may take action, at its expense, and retain 100% of any recovery.

   6.2.3  In the event that no action is taken against the infringer, the parties will renegotiate the minimum annual royalties in good faith if the infringement adversely effects the economics of ECOLAB's business.

7.    Term and Renewal

   7.1    This Agreement shall become effective as of September 1, 1996 and shall remain in full force and effect until August 31, 2001 (the "Initial Term"), unless sooner terminated pursuant to Article 8 below.

   7.2    Expiration of this Agreement shall not relieve either party of any obligation incurred prior to such termination.

   7.3    In the event that MAD elects to sell all or any part of its business relating to the Licensed Products, MAD will grant to ECOLAB the option to acquire such business or part thereof. Such option shall remain open for a period of forty-five (45) days after MAD gives ECOLAB written notice of its intent to sell and the terms on which such sale is to be made. If ECOLAB fails to exercise its option within the allotted period, MAD shall have no further obligations to ECOLAB with regard to the sale of MAD's business and shall be free to sell to a third party, provided that negotiations for a third party sale are commenced within the six (6) months immediately following expiration of the forty-five (45) day period. Otherwise, ECOLAB's option is renewed.

8.    Termination

8.1    If ECOLAB defaults in fulfilling one or more of its obligations under this Agreement, MAD may give written notice specifying the default and indicating its intention to terminate this Agreement if the default is not cured within thirty (30) days after receipt of such notice. If the default is not cured within such thirty day period, MAD may terminate this Agreement by written notice to such effect, except that if the default relates to payment of royalties for which there is a dispute requiring that an audit be performed, the cure period shall be thirty (30) days after completion of the audit.

8.1.1    The Parties agree that the remedy at law for breach of this Agreement may be inadequate and that it may be impracticable and extremely difficult to determine the actual damage resulting to MAD's business reputation, goodwill, patents, and/or trademarks should ECOLAB violate or breach the terms of this Agreement. In the event that ECOLAB violates or breaches any term of this Agreement, should MAD so elect, MAD may pursue injunctive relief against ECOLAB. Both parties reserve all rights to pursue their respective remedies in law and equity upon termination of this Agreement.

8.2    Upon termination or expiration of this Agreement, all rights, options and licenses granted hereunder shall immediately terminate, provided, however, that ECOLAB shall be entitled to continue the use of the Licensed Trademarks to sell the Licensed Products and Related Products solely for the purpose of:

i) selling all of ECOLAB's then-existing inventory of Licensed Products and Related Products already marked with the Licensed Trademarks, or allowing MAD to repurchase such inventory from ECOLAB;

ii) fulfilling any contractual obligations to supply Licensed Products and Related Products under the License Trademarks entered into prior to the effective date of termination, providing that such obligations do not continue beyond ninety (90) days after termination; and

iii)    selling of any amount of Licensed Products which ECOLAB is obligated to purchase from the manufacturer with whom it has contracted, unless such obligation can be canceled without cost to ECOLAB.

8.3    Termination of this Agreement shall not relieve either party of any obligation which may have accrued up to the time of termination, including any sales made pursuant to Paragraph 8.2. Minimum annual royalties will not be due for the year in which termination becomes effective.

8.4    Unless MAD terminates or fails to renew this Agreement without cause, within fifteen (15) days of the expiration or termination of this Agreement, ECOLAB shall disclose to MAD all customer lists of customers that purchase the Licensed Products and Related Products sold under the Licensed Trademark, with history and terms of prior sales, future customer commitments, and promotional plans which comprise the business conducted by ECOLAB in the sale of the Licensed Products and Related Products sold under the Licensed Trademarks.

8.5 Unless MAD terminates or fails to renew this Agreement without cause, within thirty (30) days of the expiration or termination of this Agreement, ECOLAB shall notify each customer of the Licensed Products and Related Products that its license to distribute and sell the Licensed Products and the Related Products sold under the Licensed Trademarks has terminated and that it will no longer be distributing or selling such products.

8.6 If any proceedings in bankruptcy or in reorganization or for the appointment of a receiver or trustee or any other proceedings under any law for the relief of debtors shall be instituted by or against either party, or if either party shall make an assignment for the benefit of creditors, the other party may at its option terminate this Agreement by written notice.

9. Proprietary Information

9.1 ECOLAB shall treat any and all proprietary information of MAD furnished hereunder with respect to Licensed Products, New Products, Related Products, or Unrelated Products including, without limitation, the formulations of such products, which is disclosed in writing and marked "Confidential and Proprietary", or is disclosed orally and subsequently identified in writing as confidential or proprietary within thirty (30) days after the oral disclosure, as confidential and shall take reasonable precautions to prevent disclosure, in whole or in part, of such information to any third party. Further, ECOLAB shall not use any of such information for its own benefit or for the benefit of others, except as permitted hereunder. ECOLAB shall be under no obligation, however, with respect to information which:

i) was known to it at the time of disclosure as evidenced by written documents in its possession;

ii) is or becomes publicly available without breach of this Agreement by ECOLAB; or

iii) is disclosed to ECOLAB without restriction on disclosure by a third party who has the lawful right to disclose such information.

9.2 ECOLAB shall use its best efforts to limit disclosure of MAD's proprietary information to its employees on a need-to-know basis and shall bind its employees to the above requirement of confidentiality and limited use, exercising at least the same standard of care that it uses with regard to its own confidential and proprietary information. Any consultants, suppliers or other contractors of ECOLAB who have a need to know such information in order to allow performance under this Agreement shall also be bound by the confidentiality and limited use provision.

9.3 Any legal action taken for violation of this Section 9 may include requests for injunctive relief and damages.

10. Future Relationship. The parties agree to negotiate in good faith for a possible extension of the terms of this Agreement on mutually agreeable terms and/or a possible sale of MAD's business to ECOLAB. Such negotiations may take place either during or after the initial term of this Agreement.

11. Miscellaneous Provisions

    11.1 Relationship between the Parties. Nothing in this Agreement shall be deemed to create a joint venture, agency or partnership relationship between the parties, and neither party shall have authority to act on behalf of, or bind the other party, in any way based upon this Agreement alone.

    11.2 Construction.      This Agreement shall be construed in accordance with the laws of the State of California.

    11.3 Severability. If any term, provision, covenant or condition of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions shall remain in full force and effect. In the event that any one or more provisions is determined to be invalid, void or unenforceable, the parties shall immediately negotiate an appropriate provision in replacement thereof.

    11.4 Notices.      All notices required or allowed under this Agreement shall be in writing and shall be hand delivered, sent by Certified, Return Receipt Request mail, or by U.S Postal Service or commercial overnight delivery service, postage/delivery charges prepaid, to the respective parties at the addresses provided below. Either party shall notify the other party of any change of address within thirty (30) days of the change.

**MAD:**
Gregg Motsenbocker
P.O. Box 90947
San Diego, 92169
     or
Lewis Silverberg
11975 El Camino Real
Suite 300
San Diego, CA 92130

**ECOLAB:**
Ronald Fraboni
Director
ECOLAB INC.
ECOLAB CENTER
370 N. Wabasha Street
St. Paul, MN 55102

with a copy to:
ECOLAB INC.
ECOLAB CENTER
370 N. Wabasha Street
St. Paul, MN 55102
Attn: General Counsel

    11.5 Waiver.      Failure by either party to enforce any provision of this Agreement or waiver by either party to the breach of any provisions herein shall not be deemed a waiver for subsequent breaches of the same or any other provisions herein.

    11.6 Disputes.      If, at the time of notification of one party by the other of the existence of a dispute for which action is to be sought, some form of alternative dispute resolution (ADR), including arbitration or mediation, is desired by one party, both parties must agree that the dispute is to be handled by ADR. If one party objects to the use of ADR, that party cannot be compelled to ADR, and

the dispute must be submitted to the court which has subject matter jurisdiction over the matter.

11.7    Attorneys' Fees.        In the event an action is brought by either party to enforce the terms of this Agreement, including, but not limited to, arbitration, the prevailing party shall be entitled to recover costs and reasonable attorneys' fees. "Prevailing party" shall be defined as the party receiving the greatest recovery on the issues (which includes the successful defense of such an action). Costs shall include fees for mediation or arbitration services, if any.

11.8    Interpretation.        This Agreement was prepared with the input of both parties as a result of arm's length negotiations and shall not be strictly construed in favor of or against either party.   Headings and captions in this Agreement are for reference purposes only, and shall have no effect in interpreting this Agreement.

11.9    Entire Agreement.    This Agreement embodies all of the understandings and agreements between the parties, and wholly and completely supersedes in all respects any understanding or negotiation between the parties.

11.10  Related Agreement. Being executed concurrently herewith is a Consulting Agreement between ECOLAB and Gregg A. Motsenbocker, which Consulting Agreement relates to services provided to ECOLAB for the marketing and promotion of the Licensed Products which are licensed under this Agreement. Certain terms of the Consulting Agreement bear upon the performance of the parties' respective obligations under this Agreement and vice versa.  Therefore, the terms of the Consulting Agreement are incorporated herein by reference.

11.11  Modification. This Agreement may be changed or modified only by an Agreement in writing, signed by both parties.

11.12  Incidental Sales.        MAD and ECOLAB acknowledge and agree that the incidental sale of Licensed Products or Related Products under the Licensed Trademarks in violation of Section 2 shall not constitute a breach of this Agreement.   The parties agree to take such actions as may be reasonably necessary, and as is allowed by law, to honor the narrow and exclusive grant set forth herein, and to avoid any such incidental sales.  In the event such prohibited sales total more than $3,000 of end user sales in any quarter, it shall constitute a material breach and the aggrieved party may terminate this Agreement upon thirty (30) days prior written notice.

11.13 Assignment; Binding Effect.        This Agreement may not be assigned by either party without the prior written consent of the other. This Agreement shall be binding and inure to the benefit of each parties' respective successors in interest or assigns, subject to the consent requirements of this paragraph.

**INTENDING TO BE LEGALLY BOUND**, the parties have entered into this Agreement:

**MOTSENBOCKER ADVANCED DEVELOPMENTS, INC.**

Dated: $9-1-96$

Gregg A. Motsenbocker
President

**ECOLAB INC.**

Dated: _____

Dean deBuhr
Vice President/General Manager

## EXHIBIT A

LICENSED PRODUCT                                    U.S. PATENT NO./SERIAL NO.

MOTSENBOCKER'S LIFT OFF 1                           5,250,211
    FOOD, BEVERAGE AND PROTEIN
    STAIN REMOVER

MOTSENBOCKER'S LIFT OFF 2                           4,306,989
    ADHESIVES, GREASE AND OILY
    STAINS TAPE REMOVER

MOTSENBOCKER'S LIFT OFF 3                           5,227,085
    PEN, INK AND MARKER
    STAIN REMOVER

MOTSENBOCKER'S LIFT OFF 4                           5,415,800
    SPRAY PAINT GRAFFITI                            5,484,487
    REMOVER

MOTSENBOCKER'S LIFT OFF 5                           5,227,085
    LATEX BASED PAINT
    REMOVER

*EXHIBIT A*

## *EXHIBIT B*

LICENSED TRADEMARK | REGISTRATION NO./SERIAL NO.
--- | ---
MOTSENBOCKER'S LIFT OFF | 1,497,329
REMOVAL MADE EASY | 74-467,437
MAKING LIFE'S LITTLE PROBLEMS DISAPPEAR | 
ALL STAINS ARE NOT CREATED EQUAL | 
NAME THAT STAIN | 1,935,302
KEEP OFF | 75-052,257

*EXHIBIT B*